## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-19-CR-01019-FM-1** |
| | § | |
| **LESLIE ROBERT BURK,** | § | |
| | § | |
| **Defendant.** | § | |

## ORDER DENYING MOTIONS [ECF NOS. 440, 444–46, 448–50, 456–61, 475–76]

Before the court are fifteen motions (collectively, "Motions") submitted by Leslie Robert Burk ("Defendant" or "Defendant Burk"), including: "Motion to Substantiate Acquittal based on Prosecretorial [sic] Misconduct—And Clear Error" [ECF No. 440], filed September 14, 2022; "Motion for Acquittal based on inneffective [sic] council" [ECF No. 444], filed September 23, 2022; "Motion claiming Obstruction of Justice and Plain Error" [ECF No. 445], filed September 23, 2022; "Motion to show Falsefying [sic] of Evidence and False Testamony [sic] culminating in both purgery [sic] and plain error" [ECF No. 446], filed September 23, 2022; "Motion to show the conspiracy to defraud and defame Atomic Container Home, Inc., BURK, DAY, and others resulting in the illegal and unjust incarseration [sic] of BURK and DAY" [ECF No. 448], filed September 28, 2022; "Motion to verify testimony of Government witness" [ECF No. 449], filed September 28, 2022; "Motion claiming Obstruction of Justice and Plain Error" [ECF No. 450], filed September 28, 2022; "Motion claiming willfull [sic] fabrication of evidence to illegally arrest, detain, incarserate [sic] both Burk and Day culminating in our charge of kidnapping, theft of funds and property, as well as false imprisonment [sic] and hijacking our Corporation" [ECF No. 456], filed November 4, 2022; "Motion to show Prosecution Presented false witnesses during Trial of

1

Burk and Day" [ECF No. 457], filed November 4, 2022; "Stand Alone Motion to Resolve Clarity of the Previous Motions by Simple 'Yes' or 'No' Questions" [ECF No. 458], filed November 4, 2022; "Motion Challenging Jurisdiction of Said Court" [ECF No. 459], filed November 4, 2022; "Motion to prove Prosecution influenced the credibility of witnesses" [ECF No. 460], filed November 4, 2022; "Motion to verify testimony of Government witness" [ECF No. 461], filed November 4, 2022; "Motion to Show Fraud and Deceptive Practices on the Part of Prosecution and co-conspirators – EL Paso FBI (A Rule 33 Motion)" [ECF No. 475], filed December 2, 2022; and "Motion for Acquittal Based on Prosecutions Fabrication of Evidence, Testamony [sic] and Purgery [sic], (A Rule) 33 Motion" [ECF No. 476], filed December 2, 2022. Therein, Defendant seeks acquittal or a new trial based on various grievances.[1]

---

[1] *See* "Motion to Substantiate Acquittal based on Prosecretorial [sic] Misconduct—And Clear Error" ("Mot. 1") [ECF No. 440], filed Sept. 14, 2022; "Motion for Acquittal based on inneffective [sic] council" ("Mot. 2") [ECF No. 444], filed Sept. 23, 2022; "Motion claiming Obstruction of Justice and Plain Error" ("Mot. 3") [ECF No. 445], filed Sept. 23, 2022; "Motion to show Falsefying [sic] of Evidence and False Testamony [sic] culminating in both purgery [sic] and plain error" ("Mot. 4") [ECF No. 446], filed Sept. 23, 2022; "Motion to show the conspiracy to defraud and defame Atomic Container Home, Inc., BURK, DAY, and others resulting in the illegal and unjust incarceration [sic] of BURK and DAY" ("Mot. 5") [ECF No. 448], filed Sept. 28, 2022; "Motion to verify testimony of Government witness" ("Mot. 6") [ECF No. 449], filed Sept. 28, 2022; "Motion claiming Obstruction of Justice and Plain Error" ("Mot. 7") [ECF No. 450], filed Sept. 28, 2022; "Motion claiming willfull [sic] fabrication of evidence to illegally arrest, detain, incarserate [sic] both Burk and Day culminating in our charge of kidnapping, theft of funds and property, as well as false imprisonment [sic] and hijacking our Corporation" ("Mot. 8") [ECF No. 456], filed Nov. 4, 2022; "Motion to show Prosecution Presented false witnesses during Trial of Burk and Day" ("Mot. 9") [ECF No. 457], filed Nov. 4, 2022; "Stand Alone Motion to Resolve Clarity of the Previous Motions by Simple 'Yes' or 'No' Questions" ("Mot. 10") [ECF No. 458], filed Nov. 4, 2022; "Motion Challenging Jurisdiction of Said Court" ("Mot. 11") [ECF No. 459], filed Nov. 4, 2022; "Motion to prove Prosecution influenced the credibility of witnesses" ("Mot. 12") [ECF No. 460], filed Nov. 4, 2022; "Motion to verify testimony of Government witness" ("Mot. 13") [ECF No. 461], filed Nov. 4, 2022; "Motion to Show Fraud and Deceptive Practices on the Part of Prosecution and co-conspirators – EL Paso FBI (A Rule 33 Motion)" ("Mot. 14") [ECF No. 475], filed Dec. 2, 2022; "Motion for Acquittal Based on Prosecutions Fabrication of Evidence, Testamony [sic] and Purgery [sic], (A Rule) 33 Motion" ("Mot. 15") [ECF No. 476], filed Dec. 2, 2022.

Also before the court is "Government's Omnibus Response to Defendant Leslie Robert Burk's *Pro Se* Post Verdict, Pre-Sentence Motions" ("Response") [ECF No. 466], filed November 22, 2022, by the United States of America ("the Government").[2]

After considering the Motions, Response, and applicable law, the Motions are **DENIED**.

## I.   **BACKGROUND**

Defendant was convicted of one count of conspiracy to commit wire fraud, twelve counts of wire fraud, eight counts of money laundering, and two counts of bankruptcy fraud after a three-week trial that took place in June 2022.[3]

Defendant Burk and Ethan Sturgis Day (collectively, "Defendants") ran Atomic Container Homes Inc. ("Atomic") a business that fabricated homes and other buildings from used shipping containers.[4] During Atomic's time in operation, dozens of clients wired money to Defendants or Atomic, but never received a home.[5] Some were enticed by Defendants' false representations that Atomic had earned large, national contracts or built projects for the federal government.[6]

After wiring Defendants money, these would-be clients were given various excuses for why their respective projects were not getting done. Many tried to confront Defendants or demand

---

[2] Although the Government's omnibus response did not address Defendant's last two motions (Mot. 14 and Mot. 15), no response by the Government is required.

[3] *See* "Verdict Form," ECF No. 426, entered June 22, 2022.

[4] *See* "Indictment" 2, ECF No. 5, filed April 3, 2019.

[5] *Id*. at 2–7.

[6] *Id*. at 4–5.

refunds.[7] In response, Defendants threatened their victims with legal action or simply stopped responding to them.[8]

After numerous reports by these victims, the Federal Bureau of Investigation ("FBI") initiated an investigation into Defendants for potential wire fraud, the outcome of which was a thirty-three-count indictment filed on April 3, 2019.[9] In count one, the Government charged Defendants with conspiracy to commit wire fraud under 18 U.S.C. ("Section") §§ 1349 and 1343.[10] Counts two through nineteen charged Defendants with wire fraud under Section 1343.[11] Counts twenty through thirty-one charged Defendants with money laundering and aiding and abetting under Section 1957 and Section 2, respectively.[12] Finally, Counts thirty-two and thirty-three charged Defendant Burk only with bankruptcy fraud under Section 152.[13]

Trial began on June 1, 2022. On June 22, 2022, after a trial in which numerous victims testified, the jury found Defendant Burk guilty on counts one, four through fifteen, twenty-one through twenty-eight, thirty-two, and thirty-three.[14] In September 2022, Defendant began filing his many Motions, moving the court to set aside the jury's guilty verdicts against him and enter an acquittal or order a new trial.

---

[7] *Id.* at 4.

[8] *Id.*

[9] *See id.*

[10] *Id.* at 2–5.

[11] *Id.* at 6–7.

[12] *Id.* at 7–9.

[13] *Id.* at 9.

[14] Verdict Form at 1–7.

## II.   <u>APPLICABLE LAW</u>

A criminal defendant may move for a judgment of acquittal or a new trial under Federal Rules of Criminal Procedure ("Rule") 29 and 33, respectively.[15] However, a defendant may only do so within fourteen days after the jury returns a guilty verdict.[16] The only exception is for a motion for a new trial under Rule 33 when that motion is based on "newly discovered evidence," in which case the deadline is three years.[17] That said, a court may grant a defendant extra time to file a motion under Rule 29 or 33, but only if they failed to timely file "because of excusable neglect."[18]

## III.   <u>DISCUSSION</u>

As a threshold matter, Defendant did not begin filing his Motions until September 14, 2022, eighty-four days after the jury returned guilty verdicts on June 22, 2022.[19] As such, his Motions are untimely. Neither has he offered any "newly discovered evidence" pursuant to Rule 33 or made any showing that his failure to timely file was due to "excusable neglect."[20] Therefore, the court may not grant a new trial or enter an acquittal. This is grounds enough to deny Defendant's Motions. Nevertheless, the court will address the merits of Defendant's assertions in the interests of transparency and justice.

---

[15] FED. R. CRIM. P. 29, 33.

[16] *Id*. at 29(c)(1), 33(b)(2).

[17] *Id*. at 33(b)(1).

[18] *Id*. at 45(b).

[19] *See* Verdict Form.

[20] See FED. R. CRIM. P. 33(b)(1), 45(b).

Defendant moves the court to set aside the jury's guilty verdicts against him and order a new trial or enter an acquittal. Although his Motions are frequently repetitive, his arguments can generally be organized into seven categories. He seeks relief based on allegations pertaining to: 1) government misconduct pre-trial; 2) widespread misconduct during trial; 3) the weight and credibility of evidence at trial; 4) ineffective assistance of counsel; 5) wrongfulness in bringing criminal as opposed to civil charges against Defendant; 6) inappropriate application of contract law; and 7) government malfeasance. Additionally, Defendant submitted numerous filings in questionnaire format in an effort to question *in absentia* Government prosecutors and would-be witnesses.

A.      Pre-Trial Challenges

Defendant challenges pre-trial issues pertaining to the FBI's application for warrants, the Government's allegations in the indictment, Defendant's arrest, and his arraignment.

a.      Warrants

Defendant claims several search warrants in this case were defective.[21] First, Defendant alleges FBI Special Agent ("SA") Mallory Nebrich falsified evidence in an affidavit for a warrant issued on August 3, 2018.[22] SA Nebrich asserted Defendants had blackmailed a client, Marine Fishing International ("MFI"), which purchased bunk houses, by refusing to provide agreed-upon certifications for bunk house occupancy compliance until MFI ordered and paid for more bunk

---

[21] Mot. 4 at 15–16; Mot. 3 at 11; Mot. 14 at 13.

[22] Mot. 4 at 4.

houses.[23] Yet Defendant claims one of MFI's contractors personally "oversaw" the compliance documents.[24] Furthermore, Atomic delivered the bunk houses MFI ordered.[25]

Defendant's unsubstantiated assertions are vague and utterly unresponsive to the affidavit's averments. What does Defendant mean an MFI contractor "oversaw" compliance documents? And what do this oversight and Atomic's antecedent delivery of bunks have to do with whether Defendants fraudulently withheld occupancy compliance certificates from MFI?

Second, Defendant claims the warrant executed on September 18, 2018, at 1575 East San Antonio Avenue in El Paso, Texas ("1575 E. San Antonio"), was "false" since it only gave permission to search Atomic, not American Container Homes,[26] which was Defendant's other business at the same address. Moreover, Defendant asserts, the FBI behaved badly during the search, interrogating his son while pointing a firearm "directly at his head for 45 minutes" and systematically destroying certain installation materials (which security cameras allegedly corroborate).[27]

These claims are unavailing. The court has already explained to Defendant that his belief the warrant only permitted a search of Atomic is incorrect. "The text of the warrant gave explicit authorization for the Government to search the address of American Container Homes, LLC. Moreover, the affidavit in support stated American Container Homes, LLC is also known as

---

[23] "Aug. 3 Warrant to Seize Property Subject to Forfeiture," "Affidavit in Support of Aug. 3 Seizure Warrant" 7–8, 3:18-MJ-05715-MAT, ECF No. 1, filed Aug. 3, 2018.

[24] Mot. 4 at 4.

[25] *Id.*

[26] Mot. 4 at 15–16; *see* "Executed Search and Seizure Warrant of Sept. 4" 1, 3:18-MJ-06531-MAT, ECF No. 4, filed Sept. 14, 2018.

[27] Mot. 4 at 15–16.

'American Container Homes, ACHI Modular, Atomic Container Homes Inc., Atomic Home Designs, Atomic Construction, and Quantum Stealth Technologies.' Regardless of the business entity on the lease agreement, the Government properly sought to search the address of where [Defendant] admits to conducting business."[28] Additionally, Defendant's allegations of FBI misconduct are absurd and—critically—unsubstantiated.

Third, Defendant challenges a search warrant executed on April 8, 2019, at 1575 E. San Antonio, arguing this "false" warrant was for Universal Container Homes, a business owned exclusively by Iliana Velazquez and registered to an address over twelve miles away.[29] Therefore, the warrant did not give the FBI the right to search 1575 E. San Antonio.[30] During the search, furthermore, Ms. Velazquez was threatened by the FBI and gave them evidence under duress.[31]

However, the search warrant executed on April 8, 2019, lists the address to be searched as 1575 E. San Antonio,[32] which the supporting affidavit asserts contains specific items subject to forfeiture.[33] Although the warrant names the entity to be searched as Universal Container Homes, that business was exclusively the marketing and business development arm of Atomic.[34] Further,

---

[28] "Order on *Pro Se* Motions 2" 10–11, ECF No. 282, entered Dec. 20, 2021; *see also* Executed Search and Seizure Warrant of Sept. 4 at 1.

[29] Mot. 3 at 11; *see* "Executed Search and Seizure Warrant of Apr. 5" 1, 3:19-MJ-04051-ATB, ECF No. 4, filed Apr. 17, 2019.

[30] Mot. 14 at 13.

[31] Mot. 3 at 12.

[32] Executed Search and Seizure Warrant of Apr. 5 at 1.

[33] "Affidavit in Support of Apr. 5 Search and Seizure Warrant" 2, 3:19-MJ-04051-ATB, ECF No. 3, filed Apr. 5, 2019.

[34] "Trial Transcript Volume 9" ("Tr. 9") 4, ECF No. 505, filed Dec. 20, 2022.

with respect to Ms. Velazquez, she never testified to being threatened.[35] Nor does Defendant, a third party, have standing to challenge FBI treatment of Ms. Velazquez.

Finally, Defendant claims one unidentified warrant was based on allegations that Atomic owed a David Tien $400,000.[36] Yet, he asserts, Mr. Tien ordered and received a $127,000 house while only paying Atomic $79,500.[37] No links to Defendant's allegations can be found in this case: no warrants or supporting affidavits pertain to Mr. Tein nor were any allegations by or concerning Mr. Tien litigated at trial.

        b.     Indictment

Defendant next challenges the indictment. He claims it was founded on lies fabricated by the FBI and the Government.[38] Nor were any relevant contracts mentioned in or attached to the indictment, which he feels is tantamount to suppression of evidence.[39]

Defendant's challenges are untimely. Rule 12 provides that a motion challenging a defect in the indictment must be made before trial.[40] Regardless, Defendant's assertions are without merit: 1) his contention that the indictment was based on fabrications and lies is vague and unconvincing; 2) the indictment *does* mention contracts with victims[41]; 3) the Government was not required to attach copies of those contracts to the indictment; and 4) as the court has already found, "[t]he

---

[35] *Id.* at 12.

[36] Mot. 4 at 7–8.

[37] *Id.*

[38] Mot. 3 at 5.

[39] Mot. 14 at 7.

[40] FED. R. CRIM. P. 12.

[41] Indictment at 4.

indictment is facially sufficient" as it "contains the elements of the offenses charged, fairly informs Defendant of the charges, and enables him to plead."[42]

        c.     Arrest

Next, Defendant takes issue with the FBI's conduct during his arrest. He claims he was not Mirandized.[43] He contends agents searched him without his permission.[44] He asserts they stole roughly $16,000 from his wallet and vehicle—seizures which were never recorded.[45] And he argues he has "never formally been arrested," which "is false imprisonment."[46]

Defendant's contentions are frivolous. As the court found previously, Defendant's *Miranda* rights were not implicated during his arrest since he was not interrogated while in custody.[47] Nor were law enforcement officers required to secure Defendant's permission before searching him incident to a valid arrest.[48] What the FBI seized from Defendant, moreover, has been well-documented and catalogued, including funds located during searches of Defendant and his vehicles.[49] Finally, the court entered an arrest warrant on April 4, 2019, which the FBI executed

---

[42] "Order on *Pro Se* Motions 1" 10, ECF No. 203, entered June 11, 2021.

[43] Mot. 8 at 5.

[44] *Id.*

[45] Mot. 14 at 15.

[46] Mot. 8 at 5.

[47] Order on *Pro Se* Motions 2 at 9.

[48] *See Arizona v. Grant*, 556 U.S. 332 (2009) (a search incident to a lawful arrest may include the arrestee's person); "Arrest Warrant Returned Executed" 1, ECF No. 25, filed April 15, 2019.

[49] "United States of America's Motion for Preliminary Order of Forfeiture," Ex. A, "List of Currency/Funds Seized" 1, ECF No. 428-1, filed June 28, 2022.

four days later.[50] To the extent Defendant believes that some magic words or particular acts must be spoken or undertaken to "formally" arrest someone, he is mistaken.[51]

Defendant also claims the FBI threatened his lawyer after he was arrested, telling her she would lose her license, "her freedom," and any money Defendant's wife paid her if she helped them.[52] This unsubstantiated allegation is implausible on its face and unworthy of meaningful consideration.

        d.      Arraignment

Finally, Defendant asserts that FBI SA Nebrich lied and "spun" evidence at Defendant's arraignment hearing, claiming, for example, that Defendant "received $336,000 and on the very same day sent $50,000 back to the source," which indicated money laundering.[53] But, according to Defendant, it was in fact Ms. Velazquez who had laundered this money.[54]

Again, unsubstantiated allegations are unavailing. Furthermore, neither Ms. Nebrich nor Ms. Velazquez—nor FBI Forensic Accountant ("FA") Nicole Ramm for that matter—testified to such a transaction, which therefore did not become evidence at trial and did not factor into the jury's determination of guilt.

---

[50] Arrest Warrant Returned Executed at 1.

[51] *Florida v. Bostick*, 501 U.S. 429, 436 (1991) (the test is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.").

[52] Mot. 14 at 15.

[53] Mot. 3 at 12; Mot. 14 at 16; Mot. 8 at 4.

[54] Mot. 3 at 13.

B.      Misconduct During Trial

Defendant takes issues with various perceived misconduct at trial, including alleged prosecutorial testifying; witness coaching; suppression of exculpatory evidence; Defendants' prohibition from testifying; the court's control of evidence; and the jury instructions.

a.      Prosecution Testifying

Defendant alleges the prosecution consistently and egregiously testified for witnesses, sometimes contradicting them in the process, which necessitated daily admonishments from the court.[55] Defendant speculates this misconduct was a result of prosecutor Stanley Serwatka's inability to clearly hear witness testimony (Mr. Serwatka uses hearing aids).[56] For example, Defendant alleges Mr. Serwatka, due to his inability to hear well, improperly testified for witnesses Ana Jones and FBI FA Ramm.[57]

Defendant is incorrect. First, witness examination during trial was above board and unremarkable. The court stepped in to remind examining attorneys to avoid testifying for witnesses in a few isolated and borderline instances—this is not uncommon during a three-week trial.[58] Even then, it would be a stretch to characterize these reminders as admonishments as the attorneys' conduct was not egregious. Neither did Mr. Serwartka's alleged difficulties hearing improperly interfere with any witness examination or presentation of evidence. At no point did he testify for Ms. Jones or Ms. Ramm. He did refer to their testimony during closing arguments, but an

---

[55] Mot. 1 at 3.

[56] *Id*. at 2–3.

[57] *Id*. at 4; Mot. 6 at 2–3.

[58] *See* "Trial Transcript Volume 2" ("Tr. 2") 141, ECF No. 498, filed Dec. 20, 2022 (with respect to defense counsel Edgar Holguin); "Trial Transcript Volume 3" ("Tr. 3") 40, 57, ECF No. 499, filed Dec. 20, 2022 (Assistant U.S. Attorney Stanley Serwatka); "Trial Transcript Volume 5" ("Tr. 5") 17, ECF No. 501, filed Dec. 20, 2022 (Assistant U.S. Attorney Spencer Kiggins); Tr. 9 at 180–81 (Assistant U.S. Attorney Spencer Kiggins).

attorney's "closing arguments are not evidence."[59] Moreover, attorneys are permitted during closing arguments to sum up a witness' prior testimony and frame it for the jury in the context of that side's theory of the case.[60]

> b. Witness Coaching

Next, Defendant claims vaguely that the prosecution coached witnesses to provide false testimony, secured through promises of immunity.[61] Even when the prosecution coached witnesses to testify truthfully, he asserts, such coaching was "unethical and grounds in its own merit [sic] to file greviences [sic] for misconduct against the Prosecution."[62]

Defendant's arguments fail: First, he does not explain what specific testimony was false. Second, potential *Giglio* materials were fully disclosed to the jury.[63] Finally, not only is preparing a witness to testify permissible, it is also exceedingly commonplace.[64] After all, witnesses must still tell the truth and they are still subject to cross-examination.

---

[59] *Beathard v. Johnson*, 177 F.3d 340, 348 (5th Cir. 1999).

[60] *See United States v. Lara*, 23 F.4th 459, 481 (5th Cir. 2022) (closing arguments may discuss admitted evidence and reasonable inferences, legal theories, or conclusions based on that evidence).

[61] Mot. 9 at 1.

[62] *Id*. at 1–2.

[63] *See Giglio v. United States*, 405 U.S. 150, 154–55 ("evidence of any understanding or agreement as to a future prosecution [is] relevant to [a witness'] credibility and the jury [is] entitled to know of it."); "Trial Transcript Volume 8" ("Tr. 8") 30–38, ECF No. 504, filed Dec. 20, 2022 (Cody Carbone pranked Defendants using spoofed Craigslist ads and personally investigated and contacted victims of Defendants and Atomic, but he stopped on the FBI's request after agents told him his actions were interfering with their investigations); Tr. 9 at 12 (Iliana Velazquez, a business partner of Defendant, confirmed the Government had made no promises for her testimony).

[64] *Ibarra v. Baker*, 338 Fed. App'x. 457, 465 (5th Cir. 2009) ("An attorney enjoys extensive leeway in preparing a witness to testify truthfully").

c.      Suppression of Exculpatory Evidence

Next, Defendant argues the FBI, prosecution, *and defense counsel* conspired to hide exculpatory evidence and produce false convictions.[65] He claims that, of the roughly 42,000 pieces of available evidence, only 3,000 were admitted, none of which was exculpatory.[66] He gives a few examples of allegedly exculpatory evidence that should have been shown to the jury:

First, he claims a noncancelable contract between Atomic and Grainger Industrial Supply ("Grainger") was suppressed.[67] Defendant is wrong. Existence of that contract, as well as its noncancelable component, was litigated thoroughly through witness testimony, and therefore available for jury consideration.[68]

Second, Defendant claims exculpatory email evidence from the CEO of Checkers Drive-in Restaurants, Inc. ("Checkers") shows Checkers hired Atomic to build container-based restaurants despite witness testimony to the contrary.[69] In support, Defendant attaches purported emails between himself and a Brad Giles (bgiles@fourfoodsgroup.com),[70] alleging Mr. Giles is the CEO of Checkers and that Checkers is owned by "Four Foods Group."[71] Beyond Defendant's unsubstantiated allegations, there is no evidence that Checkers or Four Foods Group are at all connected. Additionally, the purported emails show Mr. Giles asking Defendant to build Swig

---

[65] Mot. 3 at 16.

[66] *Id.* at 4.

[67] Mot. 12 at 6.

[68] "Trial Transcript Volume 6" ("Tr. 6") 27, 47–49, ECF No. 502, filed Dec. 20, 2022.

[69] Mot. 2 at 4–5.

[70] Mot. 4 at 25.

[71] Mot. 2 at 4–5; Mot. 3 at 2.

14

stores, not Checkers restaurants.[72] Checkers factors into the email chain only as Defendant's claim to show Mr. Giles what Atomic allegedly prepared for Checkers.[73] Thus, the unverified emails are not exculpatory.

Third, Defendant argues that evidence of some clients cancelling contracts and of Atomic bringing civil suits against other clients was exculpatory and kept from the jury.[74] For example, he points to an alleged civil lawsuit against an Ashley Kim for failure to fully pay for her Malibu container home.[75] Such evidence, however, is not relevant, let alone exculpatory, because neither a third party's conduct nor Atomic's response are exculpatory of *Defendants'* conspiracy, wire fraud, and money laundering.

In short, nothing suggests exculpatory evidence was withheld from Defendant. Indeed, Defendant has full knowledge of and has identified the purportedly exculpatory evidence.

        **d.**      **Prohibiting Defendants from Testifying**

Defendant claims defense counsel refused to let Defendants testify, threatening in front of a third party to break Defendant Day's arm if he testified.[76] This uncorroborated allegation, like so many others, is absurd on its face and undeserving of serious consideration.

        **e.**      **Court Improperly Controlled Admissibility of Evidence**

Defendant argues the court should not have been allowed to decide what evidence was admitted, claiming "[j]udges do not have the right to pick and choose what evidence the Jurys [sic]

---

[72] Mot. 4 at 25.

[73] *Id.*

[74] *See* Mot. 1 at 6 (Cody Carbone cancelled his contract with Atomic despite allegedly still owing $25,000); Mot. 2 at 8 (describing an alleged civil lawsuit between Ashley Kim and Atomic).

[75] Mot. 2 at 8.

[76] Mot. 4 at 18.

get to see[.]"[77] Defendant is completely wrong. Federal Rules of Evidence make abundantly clear that federal courts are authorized to control the flow of evidence in trial by deciding whether evidence is relevant and admissible.[78] "Irrelevant evidence is not inadmissible."[79] Relevant evidence is presumptively admissible, subject to a balancing test conducted by the court.[80]

This role of the court as gatekeeper is critical to protect both efficiency of trial and the rights of the parties. Otherwise, the jury might consider evidence that is irrelevant, misleading, or prejudicial (i.e., harmful to the opponent beyond its probative value).

f.      Jury Instructions

Finally, Defendant takes issue with the instructions the court gave the jury at the close of trial. Specifically, the instructions listed Ron Tash/Reagent World as the victim connected to counts fourteen (wire fraud), fifteen (wire fraud), and twenty-eight (money laundering).[81] Defendant asserts that Mr. Tash, a sales representative for Reagent World ("RW"), did not testify and "has not gained or lost a single dollar."[82]

Defendant misses the point: the question before the jury on those counts was whether Defendants committed wire fraud and laundered money through their business dealings with RW, not Mr. Tash. Moreover, Lucy Deng, president of RW testified as to Defendant's dealings with

---

[77] *Id*. at 21–22.

[78] FED. R. EVID. 104(a).

[79] *Id.* at 402.

[80] *Id.* at 403. ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

[81] Mot. 12 at 4; *see* "Court's Instructions to the Jury" 31, 39, ECF No. 422, entered June 21, 2022.

[82] Mot. 12 at 4.

her company, thereby providing the jury grounds to render a verdict on counts fourteen, fifteen, and twenty-eight.[83]

C.     Trial Evidence

Defendant next argues the weight and credibility of various evidence and testimony presented at trial, including the following:

a.     Ana Jones

Defendant asserts Ana Jones was a "false" witness.[84] Ms. Jones signed a contract for Atomic to build her a house, which she never received. Yet Defendant claims she perjured herself by first testifying that she did not get a house or a refund, but then later asserted she was not owed a house.[85] She also allegedly admitted the homeowners association ("HOA") in charge of the neighborhood in which she sought to build never signed off on Atomic's design plans.[86] Moreover, she eventually sold her undeveloped parcel for a profit, and therefore got her money back.[87]

Defendant's contentions are either incorrect or irrelevant: Ms. Jones never testified that she was not owed a house.[88] Instead, she explained that she wired Defendant $19,000 in early 2015 for Atomic to design and being building her home.[89] The project was to take twelve weeks.[90] Shortly after wiring the funds, she began to receive excuses from Defendants as to why building

---

[83] Tr. 8 at 79–93.

[84] Mot. 9 at 4.

[85] *Id.*

[86] Mot. 1 at 4–5.

[87] *Id.*

[88] *See* Tr. 2 at 2–127.

[89] *Id.* at 12, 34, 45.

[90] *Id.* at 59.

had not started, which dragged on for roughly two years.[91] Ms. Jones asked for her money back but never got it.[92] Moreover, in early 2016, her HOA *did* approve plans for the house Defendants were to build.[93] Finally, although Ms. Jones was able to sell her undeveloped parcel for a small profit, this fact is entirely irrelevant to the question of whether Defendants defrauded her.[94]

              b.    Tess Passero

Defendant also alleges Tess Passero was a "false" witness.[95] Ms. Passero sought a house from Atomic, which she never received. But Defendant argues she should not have been allowed to testify because 1) she was not named in any of the counts against Defendants; 2) she was not owed a house (she only wired Defendants $21,800, i.e., not the full cost of a home); and 3) the prosecution suppressed evidence of a "false" and improperly conducted civil action Ms. Passero filed against Defendants.[96]

Defendant, yet again, is wrong. First, it is not the case that only victims named in an indictment or jury instruction may testify. Second, the contract between Atomic and Ms. Passero provided that the $21,800 she paid upfront was sufficient to begin construction of her home, which Defendants never did, despite Ms. Passero's efforts and entreaties.[97] Finally, evidence of the subsequent civil judgement Ms. Passero won against Defendants was not relevant to the question

---

[91] *Id.* at 62–63.

[92] *Id.* at 64.

[93] *Id.* at 83, 126.

[94] *See id.* at 89–90.

[95] Mot. 9 at 4.

[96] *Id.* at 4–5.

[97] Tr. 5 at 93–121.

at issue in trial—namely, whether Defendants had defrauded their victims in violation of criminal law.[98] That evidence was therefore inadmissible.

  a. Cody Carbone

  Defendant contends Cody Carbone was the "ultimate false witness."[99] Mr. Carbone signed a contract to have Atomic build him a house, which it never did. Nevertheless, Defendant points out Mr. Carbone cancelled his contract and later entered binding arbitration, the verdict of which allegedly required him to pay Atomic $25,000.[100] Thus, according to Defendant, he was not owed a house or a refund and lied when he said he never got either. Further, he should not have been allowed to testify because he had broken the law by impersonating Defendants in prank Craigslist postings.[101]

  Defendant's contentions are unconvincing. Mr. Carbone testified that he signed a contract with Atomic in September 2015 and wired Defendants over $48,00 to begin building his home.[102] By June 2016, they still had not done so.[103] Nevertheless, Defendant pressured Mr. Carbone to send another $3,000 for a container cleaning fee, which he did, even though he had been told earlier that the fee was included in the initial payment.[104] Mr. Carbone never received his home or any refund of the over $50,000 he had wired.[105] Additionally, with respect to arbitration, any

---

[98] *See id*. at 123–26.

[99] Mot. 9 at 9.

[100] *Id.*

[101] Mot. 12 at 3.

[102] Tr. 8 at 8–9, 13.

[103] *Id*. at 16.

[104] *Id*. at 19–20, 52.

[105] *Id*. at 40.

agreement that occurred after Defendant's fraudulent conduct was irrelevant to the question of whether Defendant had defrauded Mr. Carbone. Finally, Mr. Carbone admitted to wrongdoing with respect to his prank Craigslist posts.[106] The jury was therefore able to consider them in assessing his credibility. *That* he had made those posts did not disqualify him as a competent witness.

      b.  Rachel Kaizoji

Defendant argues Rachel Kaizoji's testimony was also "false."[107] Ms. Kaizoji, a sales representative for Grainger, testified that Grainger agreed to pay Atomic certain restocking fees to put to rest a dispute between Grainger, Orange County Public Works ("OCPW") (Grainger's customer), and Atomic (Grainger's supplier).[108] Atomic had agreed to build container-based facilities for homeless individuals in Orange County but failed to meet numerous deadlines and failed to provide the facilities.[109] After several months of delay, OCPW pulled out of the agreement, and Grainger likewise told Atomic it was canceling the order because of Atomic's failure to meet requirements.[110] Atomic demanded full payment nonetheless, citing the noncancellable nature of its contract with Grainger, and even attempted to bill OCPW for the full cost of the project.[111] Grainger finally agreed to pay Atomic a twenty percent restocking fee.[112]

---

[106] *Id.* at 33–34.

[107] Mot. 9 at 6.

[108] Tr. 6 at 48–52.

[109] *Id.* at 15, 43–45.

[110] *Id.* at 41–46.

[111] *Id.* at 41, 47, 53–54.

[112] *Id.* at 49, 52.

Defendant contends Ms. Kaizoji should not have been allowed to testify, asserting she 1) lacked personal knowledge as to any restocking fees and 2) "falsely eluded [sic] that restocking fees were paid back to Atomic even though [FBI FA Ramm] had zero record of any falsely purported transaction."[113]

Defendant is incorrect. First, email evidence showed Ms. Kaizoji was involved in decisionmaking at Grainger concerning whether to pay Atomic the restocking fees Defendants requested.[114] Second, FBI FA Ramm did not testify that there was no evidence of restocking fees. Nor was she required to corroborate every transaction described by witnesses.

c.   Erik Nelson

Relatedly, Defendant asserts Erik Nelson of OCPW was also a false witness since he and Grainger enticed Atomic to spend $127,000 on building plans for homeless shelter facilities and then stole the designs.[115] But OCPW did not "steal" any plans. Rather, providing certified plans to OCPW was a prerequisite before the facilities could be installed.[116] OCPW's order with Grainger was cancelled, meanwhile, because of *Atomic's* failure to meet deadlines or provide the agreed-upon facilities, not on OCPW's having pilfered some coveted plans.[117]

---

[113] Mot. 9 at 6.

[114] Tr. 6 at 47–48, 50–51.

[115] Mot. 9 at 7.

[116] "Trial Transcript Volume 7" ("Tr. 7") 25, ECF No. 503, filed Dec. 20, 2022.

[117] *Id.* at 48.

### d.    Stephen Messer

Defendant next takes aim at Stephen Messer, an attorney for Checkers. Defendant asserts email evidence shows Atomic and Checkers had a business relationship.[118] Therefore, Mr. Messer was lying when he said Checkers had "never done business with Atomic" and "would never build restaurants from containers."[119] But Mr. Messer never so testified; instead, he said that, after reviewing records and interviewing Checkers corporate employees, he could *find* no business relationship between Atomic and Checkers.[120] He also testified that, after speaking with Checkers' head of construction, it appeared Checkers *had* never used containers in its builds—not that it *would* never do so.[121]

Defendant also argues Mr. Messer was an imposter since he claimed he was an attorney for Checkers even though that company is owned by a parent company.[122] Defendant apparently believes subsidiary companies cannot have their own attorneys. Defendant, once again, is wrong.

### e.    Reagent World

Next on Defendant's hit list is RW, another client who failed to receive the facilities it was promised. Defendant asserts the prosecution willfully suppressed Atomic's contract with RW and claims Atomic told RW it had a limited time to pick up the container-based fire training facility it paid for, which it failed to do.[123]

---

[118] *See, supra,* § II.B.d.

[119] Mot. 2 at 4.

[120] Tr. 7 at 135.

[121] *Id.*

[122] Mot. 12 at 7.

[123] *Id.* at 5.

Defendant's contentions are unavailing. First, the contract between RW and Atomic was described at length by RW's president, Lucy Deng.[124] Second, the evidence does not bear out Defendant's story. Instead, Ms. Deng testified RW entered into a $110,000 agreement with Atomic in November 2017 for the latter to provide a container-based fire training facility for the Army, which was to be picked up in January 2018.[125] RW was to make payments at the completion of six build phases, which were to be verified by photo submission.[126] But Defendant began to delay and the photos RW received did not show proper progression.[127] RW eventually requested to inspect Atomic's facility in El Paso (Atomic had missed its deadline by two months at this point) but Defendant refused.[128] By now, RW had paid Atomic $65,000.[129] RW was never able to get a hold of Defendant again after he rebuffed its request.[130]

### f.   Mischaracterizations of Atomic as a Business

Finally, Defendant argues Atomic was mischaracterized at trial. First, he attempts to bolster its legitimacy. He claims Atomic was not a veneer—contradicting the Government's closing argument—given that Atomic had stockholders.[131] Defendant also points out that Atomic completed hundreds of builds, had over fifty happy customers, and occasionally donated to a

---

[124] Tr. 8 at 81–85.

[125] *Id.* at 81–83.

[126] *Id.* at 83–86.

[127] *Id.* at 84–86.

[128] *Id.* at 86–88.

[129] *Id.* at 91.

[130] *Id.* at 88.

[131] Mot. 3 at 6–7, 3.

neighborhood nonprofit, evidence which the jury never heard, and which could have swayed it.[132]

Additionally, because high-profile contracts, like that with Grainger, were between clients and

Atomic—not clients and Defendants—Defendants could not have used them "to add [] an air of

legitimacy."[133]

Defendant's assertions are unavailing. That Atomic had stockholders does not undermine

the fact Defendants treated the company as their piggy bank (i.e., a veneer). Neither does the fact

that *some* clients received homes and were happy, i.e., not defrauded, negate the jury's finding that

others *were* defrauded. Both conclusions can exist simultaneously. Nor is it improper to find that

Defendants used contracts signed between Atomic and its clients to add legitimacy to their own

dealings, given that both Defendants were leaders of the company.

Second, Defendant claims the prosecution lied about Atomic's building and refunding

record by "testifying" that Atomic 1) had never given out *any* refunds and 2) "never built or

delivered anything of value."[134] Defendant also asserts the prosecution, in preparation for trial,

incorrectly tallied refunds given out by Atomic at $58,000 when it had in fact given out over

$100,000 in refunds "to different clients for a wide range of reasons."[135]

Defendant's contentions are incorrect and misplaced. First, the prosecution never claimed

Atomic failed to build *anything* of value or refund *any* clients.[136] Instead, failure to produce or

refund was relevant only with respect to testifying victims. Nor did the prosecution *testify*

---

[132] Mot. 4 at 19; Mot. 12 at 5.

[133] Mot. 12 at 6.

[134] Mot. 1 at 5; Mot. 2 at 8.

[135] Mot. 1 at 5.

[136] The indictment asserts Defendants "fail[ed] to provide anything of value to the customers." Indictment at 1, 3. But, when read in context, that phrase clearly pertains to the referenced victims who in fact received nothing.

concerning Defendants' failure to produce or refund. Rather, such evidence was elicited from victims themselves.[137] Second, the alleged $58,000 tally, though such a list may have been computed in preparation for litigation, was not entered into evidence. Therefore, no such computation was at issue during trial.

### D.    Ineffective Assistance of Counsel

"The Sixth Amendment accords a right of effective [] assistance of counsel to criminal defendants."[138] "Regardless of whether an ineffective assistance of counsel claim is raised in a motion for a new trial, on collateral review, or on direct appeal, the standard of review is the same."[139] To establish ineffective assistance of counsel, a defendant bears the burden to show "that (1) counsel's performance fell below an objective standard of reasonableness and that (2) but for counsel's deficient performance, the result of the proceeding would have been different."[140] "Judicial scrutiny of counsel's performance must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[141]

Defendant argues he received ineffective assistance of counsel because defense counsel was lazy and did not sufficiently study the evidence or investigate Defendant's background and

---

[137] *See* Tr. 2 at 64 (Ana Jones' testimony concerning lack of a refund); Tr. 3 at 70–71 (Nagarajan Rao's); "Trial Transcript Volume 4" ("Tr. 4") 148, ECF No. 500, filed Dec. 20, 2022 (Gary Crossland's); Tr. 5 at 82 (Cynthia Miller's); Tr. 5 at 139 (Tess Passero's); Tr. 6 at 131 (Christina Wade's); Tr. 6 at 153 (Daniel Trick's); Tr. 7 at 74 (Ruochuan Lu's); Tr. 7 at 122 (Laurie Olson's); Tr. 8 at 38 (Cody Carbone's); Tr. 8 at 101 (Lucy Deng's); Tr. 8 at 119 (Christine Geis').

[138] *United States v. Thomas*, 724 F.3d 623, 646 (5th Cir. 2013).

[139] *United States v. Bishop*, 629 F.3d 462, 469 (5th Cir. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984)).

[140] *Id*. (citing *Strickland*, 466 U.S. at 687–96).

[141] *Strickland*, 466 U.S. at 669, 689.

businesses.[142] Also, defense counsel allegedly had over 42,000 pages of documents but never sought to admit any exculpatory evidence.[143] For example, no warrants were entered into evidence, nor were any contracts with purported victims or other clients.[144]

Defendant's contentions cannot sustain a claim of ineffective assistance of counsel. First, merely stating vaguely that a great deal of evidence was not admitted, and that some of that evidence was exculpatory, is insufficient.[145] Second, criminal defendants do not have an unqualified right to have warrants admitted into evidence. Nor, again, is there any indication that the FBI's execution of warrants here was wrongful. Third, the jury *did* in fact see and consider relevant contracts and agreements between Atomic and Defendants' victims.[146] But contracts between Atomic and clients who were not witnesses or victims of fraud in this case were properly excluded since those documents were not relevant to the question of whether Defendant committed wire fraud or laundered money. Again, irrelevant evidence is inadmissible. In short, Defendant has not carried his burden to show defense counsel's performance was objectively unreasonable or that the result of trial would have been different but for defense counsel's deficient performance.

---

[142] Mot. 2 at 3.

[143] Mot. 3 at 4.

[144] Mot. 1 at 7.

[145] The few specific pieces of allegedly exculpatory evidence are addressed above. *See, supra,* § III.B.c.

[146] Tr. 2 at 10, 16 (contract with Ana Jones); Tr. 3 at 11–14 (with Nagarajan Rao); Tr. 5 at 98 (with Tess Passero); Tr. 6 at 110 (with Christina Elizabeth Wade); Tr. 7 at 57 (with Ruochuan Lu); Tr. 7 at 96 (with Laura Olson); Tr. 8 at 8 (with Carbone).

E.        Wrongfulness In Bringing Criminal Charges

Next, Defendant contends all grievances by purported victims were contractual in nature and, therefore, criminal charges were inappropriate.[147] As a result, Defendant argues this court does not have jurisdiction to sentence Defendants.[148]

Defendant's gripe that this criminal case was nothing more than so many civil contract claims is an oft repeated one. Defendant is sorely mistaken. Criminal charges were properly brought here since the question to be tried was not whether Defendant or any other party had necessarily breached a contract. Rather, the question was whether Defendant conspired to and committed wire fraud, laundered money, and committed bankruptcy fraud. The presence of contracts with victims does not convert the criminal nature of this case into a civil one. To that end, the Government only needed to prove violation of the relevant criminal statutes, which are as follows:

To prove counts two through nineteen, i.e., wire fraud under Section 1343, the Government needed to show that Defendant engaged in interstate communication for the purpose of executing a "scheme or artifice to defraud" or obtain "money or property by means of false or fraudulent pretenses, representations, or promises."[149] Absence of a contract is not necessary as one can execute a scheme to defraud irrespective of a contractual relationship with their victim. Instead, the critical question under Section 1343 is whether one intended to defraud another and used interstate communication to do so. The jury concluded Defendant did just that.[150]

---

[147] Mot. 4 at 11–12.

[148] Mot. 7 at 8.

[149] 18 U.S.C. § 1343.

[150] *See* Verdict Form at 1–4; Indictment at 1 (counts four through fifteen).

To prove count one, i.e., conspiracy to commit wire fraud under Section 1349, the Government only had to show that Defendant attempted or conspired to violate Section 1343.[151] Presence of a contract between a defendant and their victim does not negate applicability of Section 1349. The jury here found the evidence showed beyond a reasonable doubt that Defendant conspired to commit wire fraud.[152]

To prove counts twenty through thirty-one, the Government needed to show Defendant laundered money—a violation of Section 1957—and aided and abetted the laundering of money—a violation of Section 2. Section 1957 makes it a crime to engage or attempt to engage "in a monetary transaction in criminally derived property of a value greater than $10,000."[153] Section 2 makes it a crime to aid and abet the commission of a federal crime.[154] The jury was convinced the Government met its burden of proof on both fronts.[155] That Defendant also had contractual relationships with the victims whose defrauded funds he laundered does not undermine such a finding.

Finally, to prove counts thirty-two and thirty-three, i.e., bankruptcy fraud under Section 152, the Government needed to show that Defendant concealed assets or made a false oath or claim in a bankruptcy proceeding.[156] The jury was convinced Defendant had done exactly that.[157]

---

[151] 18 U.S.C. § 1349.

[152] *See* Verdict Form at 1; Indictment at 1 (count one).

[153] 18 U.S.C. § 1957.

[154] 18 U.S.C. § 2.

[155] *See* Verdict Form at 4–7; Indictment at 1 (counts twenty-one through twenty-eight).

[156] 18 U.S.C. § 152.

[157] *See* Verdict Form at 7; Indictment at 1 (counts thirty-two and thirty-three).

Violation of these statutes are punishable with criminal penalties, fall under the jurisdiction of federal courts, and are properly prosecuted by the United States Government. None are predicated on the absence or presence of a contract.

F.        Application of Civil Contract Law

Defendant also challenges the validity of the indictment, which he reads as bringing a cause of action for unjust enrichment. Such a claim, he believes, is inapplicable where formal contracts are involved. Defendant's contention fails for two reasons.

First, Defendant misinterprets the indictment. It encompasses thirty-three charges covering wire fraud, conspiracy to commit wire fraud, money laundering, and bankruptcy fraud.[158] The indictment does not include a charge for unjust enrichment. Although the indictment charges Defendants with conspiring to "enrich [themselves] unjustly," that language, in this context, does not have the same meaning as "unjust enrichment" in the context of a civil cause of action. The indictment's language uses the plain meaning of the words "enrich" and "unjustly." "Enrich" means to make someone wealthier. "Unjustly" describes an action done against moral rightness or fairness. Meanwhile, "unjust enrichment," as a civil cause of action, is a term of art with specific elements and legal standards, none of which are at issue here.

Second, under Rule 12, a motion challenging a defect in the indictment must be made prior to trial.[159] Therefore, Defendant's arguments regarding the indictment are not timely.

G.        Alleged Government Malfeasance

Defendant makes several far-fetched allegations of governmental fraud and malfeasance, including the following:

---

[158] *See* Indictment at 1.

[159] FED. R. CRIM. P. 12(b)(3)(B).

First, Defendant claims that, during their initial investigation, FBI agents told "all of [Atomic's] clients" that they were victims of fraud, which defamed Defendant and was *purposefully* intended to destroy his business.[160] His allegation, however, is unsubstantiated and implausible.

Second, he asserts that FBI agents and prosecutors falsified warrants and committed perjury in a conspiracy to hijack Defendant's company, illegally seizing over $2.8 million dollars in cash, tools, equipment, materials, and machinery, which the Government failed to report.[161] As a result, Defendant demands "immediate release from custody" and "a $2.8 [million] cashier's check."[162]

Defendant is, once again, incorrect. The Government provided an itemized list of all cash, tools, equipment, materials, and machinery seized from Defendants.[163] Nor were these seizures improper since property which constitutes or was derived from proceeds traceable to wire or bank fraud, or which was involved in or is traceable to money laundering, is subject to forfeiture under Sections 981 and 982, respectively.[164] The property seized here fits that bill. Accordingly, the court declines to release Defendant and order the Government to cut him a $2.8 million check.

---

[160] Mot. 5 at 2.

[161] Mot. 14 at 13; Mot. 5 at 4.

[162] Mot. 14 at 11.

[163] *See* "Amended Bill of Particulars for Forfeiture of Property," ECF No. 310, filed Apr. 6, 2022.

[164] *See* 18 U.S.C. § 981(a) ("The following property is subject to forfeiture to the United States: . . . Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."). Section 1956(c)(7) defines "specified unlawful activity" as "any act or activity constituting an offense listed in section 1961(1) of this title." The list in Section 1961(1) includes wire fraud.

*See* 18 U.S.C. § 982(a)(1) ("The court, in imposing sentence on a person convicted of . . . [money laundering] . . ., shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.").

Third, Defendant believes Judge Torres, who released Defendant on bond in May 2021, did so after concluding the prosecution and FBI agents were conspiring against him.[165] Defendant's wild speculation conflicts with the record. Judge Torres released Defendant on bond because he would have otherwise been in custody for three years before the commencement of trial.[166] Moreover, Judge Torres revoked Defendant's bond only a few months later on the Government's petition, which was based on Defendant's numerous violations of pretrial release conditions.[167]

Fourth, Defendant argues prosecutors here committed fraud by prosecuting him even though many were not licensed to practice law in the state of Texas.[168] "Our outside council [sic]," Defendant asserts, "clearly has stated to us this is very very serious."[169] The court offers Defendant two things. The first is a lesson in federalism: federal practitioners, be they prosecutors or public defenders, are not required to be licensed in any particular state because they do not practice state law in state courts. The second is advice: Defendant is strongly cautioned, in no uncertain terms, against lying to the court.

H.    Questionnaire Filings

Finally, Defendant submitted numerous filings that followed a questionnaire format, the aim of which is to examine witnesses and the lead prosecutor responsible for his trial.[170] This is

---

[165] Mot. 9 at 11.

[166] "Detention Hearing" 1, ECF No. 198, entered May 28, 2021.

[167] "Motion Hearing" 1, ECF No. 228, entered Sept. 2, 2021; "Petition for Action on Conditions of Pretrial Release" 1, ECF No. 214, filed July 23, 2021.

[168] Mot. 14 at 13–14, 19.

[169] Mot. 15 at 7.

[170] *See* Mot. 5 at 7–12; Mot. 10 at 1–13; Mot. 11 at 1–5; "Addendum 1" 2–19, ECF No. 454, filed Oct. 28, 2022; "Addendum 2" 5–19, ECF No. 455, filed Nov. 4, 2022.

not a cognizable or actionable means of communicating with the court or other parties. Defendant is ordered to desist.

## IV.    <u>CONCLUSION</u>

Having found not a shred of merit across the roughly two hundred pages of Defendant's Motions, the court pauses here to admonish Defendant for wasting valuable judicial resources. Defendant spilled a deluge of ink proffering unsubstantiated, frivolous, improbable, and likely dishonest allegations, which the court was obliged to address. This conduct was punctuated by his second blatant attempt at communicating *ex parte* with the undersigned.

For the foregoing reasons, it is **HEREBY ORDERED** that:

1. "Motion to Substantiate Acquittal based on Prosecretorial [sic] Misconduct—And Clear Error" [ECF No. 440] is **DENIED**.

2. "Motion for Acquittal based on inneffective [sic] council" [ECF No. 444] is **DENIED**.

3. "Motion claiming Obstruction of Justice and Plain Error" [ECF No. 445] is **DENIED**.

4. "Motion to show Falsefying [sic] of Evidence and False Testamony [sic] culminating in both purgery [sic] and plain error" [ECF No. 446] is **DENIED**.

5. "Motion to show the conspiracy to defraud and defame Atomic Container Home, Inc., BURK, DAY, and others resulting in the illegal and unjust incarseration [sic] of BURK and DAY" [ECF No. 448] is **DENIED**.

6. "Motion to verify testimony of Government witness" [ECF No. 449] is **DENIED**.

7. "Motion claiming Obstruction of Justice and Plain Error" [ECF No. 450] is **DENIED**.

8. "Motion claiming willfull [sic] fabrication of evidence to illegally arrest, detain, incarserate [sic] both Burk and Day culminating in our charge of kidnapping, theft of funds and property, as well as false imprisonment [sic] and hijacking our Corporation" [ECF No. 456] is **DENIED**.

9. "Motion to show Prosecution Presented false witnesses during Trial of Burk and Day" [ECF No. 457] is **DENIED**.

10. "Stand Alone Motion to Resolve Clarity of the Previous Motions by Simple 'Yes' or 'No' Questions" [ECF No. 458] is **DENIED**.

11. "Motion Challenging Jurisdiction of Said Court" [ECF No. 459] is **DENIED**.

12. "Motion to prove Prosecution influenced the credibility of witnesses" [ECF No. 460] is **DENIED**.

13. "Motion to verify testimony of Government witness" [ECF No. 461] is **DENIED**.

14. "Motion to Show Fraud and Deceptive Practices on the Part of Prosecution and co-conspirators – EL Paso FBI (A Rule 33 Motion)" [ECF No. 475] is **DENIED**.

15. "Motion for Acquittal Based on Prosecutions Fabrication of Evidence, Testamony [sic] and Purgery [sic], (A Rule) 33 Motion" [ECF No. 476] is **DENIED**.

**SIGNED AND ENTERED** this **21**st day of **December 2022.**


_____
**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**