```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF TEXAS

 3                      EL PASO DIVISION

 4   UNITED STATES OF AMERICA           No. EP-19-CR-1019-FM

 5   v.                                 El Paso, Texas

 6   (1) LESLIE ROBERT BURK             August 9, 2023

 7   (2) ETHAN STURGIS DAY

 8                    RESTITUTION HEARING

 9          BEFORE THE HONORABLE FRANK MONTALVO

10            UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:      Stanley M. Serwatka
                              Assistant United States Attorney
13                            700 East San Antonio, Suite 200
                              El Paso, Texas 79901
14                            and
                              Todd R. Keagle
15                            Assistant United States Attorney
                              601 NW Loop 410
16                            San Antonio, Texas 78216

17   Pro Se Defendant:        Leslie Robert Burk
                              32634380
18                            West Texas Detention Facility
                              401 S. Vaquero Avenue
19                            Sierra Blanca, Texas 79851

20   Standby Counsel:         Louis E. Lopez, Jr.
                              Attorney at Law
21                            416 N. Stanton, Fourth Floor
                              El Paso, Texas 79901

22
     For the Defendant Day:   Eduardo Solis
23                            Law Offices of Eduardo Solis
                              901 Wyoming Avenue
24                            El Paso, Texas 79902

25       Proceedings reported by court reporter.  Transcript
     produced via computer-aided transcription.
```

Nalene Benavides, CRR, RMR
525 Magoffin Avenue
El Paso, Texas 79901

09:13 1             COURTROOM DEPUTY:  EP-19-CR-1019, United States versus

2     Leslie Robert Burk and Ethan Sturgis Day.

3             MR. KEAGLE:  Todd Keagle and Stanley Serwatka for the

4     United States, Your Honor.

5             THE COURT:  Good morning.

6             MR. BURK:  Mr. Burk for myself, Your Honor.

7             THE COURT:  Good morning.

8             MR. LOPEZ:  Louis Lopez as standby counsel,

9     Your Honor, for Mr. Burk.

10            THE COURT:  Good morning.

11            MR. SOLIS:  Good morning, Your Honor.  Eduardo Solis

12    for Mr. Day, Your Honor.

13            THE COURT:  Good morning.

14            Let me take care of a couple of housekeeping matters.

15    There were two motions filed by Mr. Burk.  I issued an order on

16    one of his motions yesterday.  And there is a second one, the

17    Motion to Present Government with Testimony, and I this morning

18    finalized and signed and I'm going to turn it over to be filed,

19    the order denying Mr. Burk's Motion to Present the Government

20    with Testimony.  So that's the first housekeeping matter.

21            The second housekeeping matter is that Mr. Day filed a

22    Motion for Reconsideration of his sentence, and I expect the

23    government to file a response to that.

24            MR. KEAGLE:  Okay.  Judge, I can, but I think we can

25    maybe nip it in the bud, if you will.

09:14 1        THE COURT:  Not now, no, no.  I mean, I want a

2   response in writing --

3        MR. KEAGLE:  Okay.

4        THE COURT:  -- to that -- to that motion.

5        MR. KEAGLE:  When do you want that by, Your Honor?

6        THE COURT:  Whatever the timetable is -- what?  11

7   days, Blake, for filing a response?

8        LAW CLERK:  It should be 14 days from the day it was

9   filed.

10        THE COURT:  Very well.  So do that.

11        MR. KEAGLE:  Okay, Judge.

12        MR. SOLIS:  Your Honor, with respect to that motion,

13   Your Honor, I have to apologize.  It was late, and I was in a

14   hurry, and there were some typos that autocorrect had some

15   blame in, but myself, too.  So I apologize for some typos with

16   the initial part of that motion, Your Honor, so -- just so you

17   know.

18        THE COURT:  No problem.

19        MR. KEAGLE:  Judge, if I can be heard just briefly on

20   the motion.

21        THE COURT:  Sure.

22        MR. KEAGLE:  So I will file a response; however,

23   Judge, I believe the motion is not timely right now.  And what

24   I'm worried about is if we finish the restitution hearing today

25   hopefully, you issue a judgment, the judgment is docketed,

09:15 1  that's when the timeline for notice of appeal begins to run.

2  At that time, this motion would be proper.

3          THE COURT:  And, actually, that's -- that's the

4  procedural argument on that, but go into the substance of it.

5          MR. KEAGLE:  Okay.

6          THE COURT:  Because the substance of it is, in

7  essence, a miscalculation -- not a "miscalculation" -- a

8  misapprehension, so to speak, on the calculation of the

9  applicable sentencing guidelines.  And, of course, as you know,

10  the sentencing is a two-step process.  You know, the first step

11  is determining the correct sentencing guidelines that are

12  applicable and then, of course, the evaluation of those

13  guidelines.

14          MR. KEAGLE:  Yes, sir.

15          THE COURT:  You know, pursuant to the 3553(a) factors,

16  which, you know, that brings in allocutions and whatnot.  So I

17  need you to address the substantive part of it.

18          MR. KEAGLE:  Will do, Judge, will do.

19          THE COURT:  Okay.

20          MR. SOLIS:  On a procedural matter, if I may,

21  Your Honor?

22          THE COURT:  Sure.

23          MR. SOLIS:  I think the cases are pretty clear, the

24  cases cite --

25          THE COURT:  Mr. Solis.

09:16 1          MR. SOLIS:  Yes, sir.

2          THE COURT:  Let the government do their job.  Okay?

3          MR. SOLIS:  Yes, sir.

4          THE COURT:  All right.  So, Mr. Lopez, yes, sir.

5          MR. LOPEZ:  May I approach, Your Honor?

6          THE COURT:  Of course.

7          Counsel, yes, sir.

8          (Discussion at the bench on the record)

9          MR. LOPEZ:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. LOPEZ:  As you may be aware, the jury is out

12 across the street.

13          THE COURT:  Yes, sir.

14          MR. LOPEZ:  They are still deliberating.

15          THE COURT:  Yes, sir.

16          MR. LOPEZ:  If I get a message asking me to come back

17 for a verdict, I will raise my hand to let you know.

18          THE COURT:  Yes.

19          MR. LOPEZ:  I have already talked to Mr. Burk.  He has

20 prepared all of his materials.  He has gone over everything,

21 and I asked him:  Would you be able to continue without me next

22 to you, and he says yes.  He would not --

23          THE COURT:  We will cross that bridge when we get to

24 it.  But I will definitely accommodate your situation.  Don't

25 be concerned with that.

09:17 1    MR. LOPEZ:  Thank you, Judge.

2    THE COURT:  Of course.

3   (Open court)

4    THE COURT:  Mr. Keagle, call your first witness.

5    MR. KEAGLE:  Judge, the government calls Nicole Ramm.

6   (Oath administered.)

7    THE WITNESS:  I do.

8    THE COURT:  Thank you, ma'am.  Please have a seat and

9 speak into the microphone at all times.

10    MR. KEAGLE:  Judge, just before we get started, as the

11 Court is aware under 18 USC 3664(d)(4), there are certain

12 rights for victims that the Court, I know, was aware of that

13 includes documents victims provide.  The code actually says the

14 documents can be reviewed in camera.  What I am going to ask,

15 Judge, is that all exhibits used today, when we are done, I

16 will ask them to be admitted, but to be sealed.

17    THE COURT:  Yes, sir.

18    MR. KEAGLE:  I have provided copies to Mr. Solis.  I

19 provided copies to Mr. Lopez, standby counsel.  So I just want

20 to make sure we are clear for that, Judge, because I have a

21 duty to protect the victims' rights.

22    Additionally, Judge, in front of you there is a bench

23 binder with the exhibits.  There is no Exhibit 15.  There is a

24 tab, but it is empty.  And there is also a large spreadsheet.

25 I don't intend to offer that large spreadsheet into evidence.

09:19  1    I simply made that to help the Court and defense counsel along

       2    the way with arguments.

       3            I do have a smaller one, what I labeled as Exhibit 40.

       4    This is a document that you asked me to send to Mr. Burk via

       5    email.  I was able to do that.  And I could only confirm

       6    through the detention facility that they gave it to him.  I was

       7    not able to determine if Mr. Burk actually received it.  But I

       8    wanted you to know I adhered to that court order for that.

       9            THE COURT:  Very well.

      10            MR. KEAGLE:  Lastly, Judge, I believe you have heard

      11    from Ms. Ramm in the trial.  Does the Court wish to go through

      12    her qualifications again?

      13            THE COURT:  It is not necessary.

      14                    NICOLE RAMM, PREVIOUSLY SWORN

      15                        DIRECT EXAMINATION

      16    BY MR. KEAGLE:

      17    Q.  Ms. Ramm, we are here for restitution.  And I know you

      18    testified at trial.  And at some point prior to this hearing,

      19    did you meet with myself; Mr. Serwatka; Mr. Reisinger, who is

      20    now the lead FBI agent in the case; as well as Ms. Morales and

      21    Ms. Jorgina from probation?

      22    A.  Yes, I did.

      23    Q.  And at that point, did we review bank records, FBI 302s,

      24    and victim impact statements that were provided?

      25    A.  Yes.

DIRECT — NICOLE RAMM                                    8

09:20 1    Q.  In front of you is a binder that has Exhibits 1 through 39

2    with the exception of Exhibit 15, which is empty.  Did you

3    review all of those exhibits prior to coming here today?

4    A.  Yes, I did.

5    Q.  And also in front of you is a large spreadsheet, which has

6    notes on it.  If you know, who made those notes?

7    A.  I believe you did, sir.

8    Q.  I did.  And did we go over those notes together?

9    A.  Yes, we did.

10    Q.  So what I'm going to do, for expedient purposes, I am going

11    to go exhibit by exhibit, which is victim by victim, just to

12    talk about what was used to determine the amount of restitution

13    owed.  Is that okay with you?

14    A.  Yes, sir.

15    Q.  So let's start with Exhibit Number 1, which is victim

16    Justin Jones.  What documents are part of victim number 1 for

17    restitution purposes?

18    A.  For Justin Jones, it's his FBI 302 interview and the bank

19    records that I reviewed.

20    Q.  In all the bank records we are going to talk about today,

21    for the most part, are those bank records that were a part of

22    the trial?

23    A.  Yes.

24    Q.  And whose bank records are they?

25    A.  They were belonging to the entity Atomic Container Homes or

09:21 1    American Container Homes and the individual defendants

2    personally.

3    Q.  And who were those defendants?

4    A.  Leslie Burk and Ethan Day.

5    Q.  Okay.  And so with Exhibit 1 we came up with a figure of

6    $43,350 for the amount of restitution to Mr. Justin Jones and

7    his spouse Ana Jones.  Is this -- are you in agreement with

8    this figure?

9    A.  Yes.

10   Q.  Initially, on this one, I believe probation had it at

11   30,000.  Does that sound right to you?

12   A.  I don't recall.  It could be, yes, sir.

13   Q.  And as a general -- when we are going and trying to

14   calculate the correct amount of restitution, did we have to

15   alter those figures a couple of times as we went through them?

16   A.  Yes.

17   Q.  And if you know, why did we have to do that a couple of

18   times?

19   A.  Because there were additional documents that reflected

20   either more money being paid back or less loss the victim was

21   claiming.

22   Q.  Okay.  Ms. Cynthia Miller, which is Exhibit 2, how do we

23   calculate her amount of restitution?

24        THE COURT:  Let me ask a question here.  Ma'am, you

25   showed the amount of loss for Mr. and Mrs. Jones as 42- --

09:22  1  43,350, but what is the amount of restitution they are entitled

       2  to is the question at the hearing.  It's not the amount of

       3  loss.  It's the amount of restitution.

       4          MR. KEAGLE:  And that's what we are discussing, Judge.

       5  I am only going to discuss restitution today.  I'm not talking

       6  about loss.

       7          THE COURT:  Okay.  Because you skipped from Jones to

       8  Miller -- I mean, you went from Jones to Miller already.  And

       9  the amount of loss -- the amount of loss for the Joneses is

      10  43,350, but the amount of restitution is 30,000 --

      11          MR. KEAGLE:  So, Judge --

      12          THE COURT:  -- from my review of the addendum prepared

      13  by probation.

      14          MR. KEAGLE:  And, Judge, I spoke with probation about

      15  that.  And I don't want to necessarily speak for Ms. Morales,

      16  but we did discover a few typos along the way.

      17          THE COURT:  Okay.  Then we need to address that

      18  because I have -- I have gone through every bit of paper that I

      19  have received from probation.  And this is the first I hear on

      20  that one.  So I need to hear the difference.  How did Ms. Ramm,

      21  you know, went from 30- to 43,350?  Okay.

      22          THE WITNESS:  I can clarify that, sir.

      23          THE COURT:  Okay.

      24          THE WITNESS:  So the dollar amount that I found in the

      25  bank records was 43,350.  That's the amount that was paid by

09:24 1    them or on their behalf.  The 30,000 is what's in the 302 that

2    they are claiming as their loss.  And that's also relative to

3    loans being forgiven that were given on their behalf.  That

4    makes the difference between the 43,000 and the 30,000.

5            THE COURT:  What do you mean "loans being forgiven"?

6            THE WITNESS:  Mr. Crossland -- Mr. Crossland was a

7    friend of theirs and had provided some of the funds that I

8    accounted for for them.  And so Mr. Crossland forgave that

9    money and so tech- -- the money was still given to the

10    defendants for the container; however, Mr. Crossland personally

11    forgave those loans to the Joneses.

12            THE COURT:  Okay.  So let me make sure I follow you.

13    So Mr. Crossland gave the Joneses $13,350 worth of loans that

14    the Joneses took together with their 30,000, and then they gave

15    that amount of money to one or more of the corporate entities

16    involved -- corporate or DBA entities involved in this case for

17    a total of 43,350?

18            THE WITNESS:  Yes.

19            THE COURT:  Is that correct?

20            THE WITNESS:  I believe Mr. Crossland gave them more,

21    but he only forgave them the difference of what they were

22    claiming.

23            THE COURT:  Okay.  So my question is:  Was the total

24    amount of money that went from -- I mean, did the total amount

25    of money that went from Mr. Crossland to Mr. and Mrs. Jones,

09:26 1    did that go to defendant and their entities?

2              THE WITNESS:  Mr. Crossland paid Atomic directly.  He

3    did not first give it to the Joneses.

4              THE COURT:  Okay.  So it was -- but it was on behalf

5    of --

6              THE WITNESS:  Yes.

7              THE COURT:  -- Mr. and Mrs. Jones?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Thank you, ma'am.

10             Back to you, Mr. Keagle.

11   BY MR. KEAGLE:

12   Q.  And just so we're clear, that 13,500 that's the difference

13   in the numbers we are talking about, you found that in the bank

14   records?

15   A.  Yes.

16   Q.  Regarding Ms. Miller, what documents did we use to come up

17   with her restitution figure?

18   A.  Her 302 interview, the bank records that I reviewed, and

19   then her victim impact statement.

20   Q.  And I know we have quite a few cases with victim impact

21   statements.  For purposes of the record, did you send those

22   out?

23   A.  No.

24   Q.  Do you know who did?

25   A.  The probation department.

09:27 1    Q.  And did you receive those documents?

2    A.  I did not.

3    Q.  But you did get a chance to review them prior to today?

4    A.  I did look at them, yes.

5    Q.  And if there were discrepancies, did we discuss it?

6    A.  Yes.

7    Q.  For Ms. Miller, the total amount of restitution you found

8    for her was 94,200?

9    A.  Yes, sir.

10   Q.  Going to Cody Carbone, what documents were used in

11   determining his restitution amount?

12   A.  The FBI 302 interview, the records that I reviewed from the

13   banks, and his victim impact statement.

14   Q.  And, again, was there anything unusual when you reviewed

15   these, or do the numbers match up?

16   A.  No.  The numbers matched.

17   Q.  And so, again, for Mr. Carbone the figure was $51,800?

18   A.  Yes.

19   Q.  Exhibit 4, which is Alycia Simpson and Kristal [sic] Wade,

20   the amount of loss -- excuse me -- the amount of restitution we

21   have is 53,800.  What documents did you review in coming up

22   with that figure?

23   A.  The interview 302, the bank records, and the victim impact

24   statement.

25   Q.  Okay.  And when looking at some of the documents they

09:28 1  submitted, especially in this one, did we find a -- did you and

2  I find a typo that we think was on their end in the amount of

3  $520?

4  A.  Is there a particular page of the exhibit that you can

5  point out?

6  Q.  Sure.  So you are going to be -- if you look at page 6,

7  which is the cover page of their victim loss form they sent to

8  probation, they wrote down their total restitution is 54,320.

9  However, when you look at their specific losses and add 47,520

10  to 6800, that actually doesn't equal 54,320, does it?

11  A.  Correct.

12  Q.  And you're -- the bank records you found also correspond to

13  restitution in the amount of 53,800; is that correct?

14  A.  Yes.

15  Q.  So, in fact, we just had a small -- they appeared to have a

16  small typo in their victim impact statement?

17  A.  Yes, sir.

18      MR. BURK:  I object, Your Honor.  We seem to have a

19  problem here.  These victim impact statements, they are not

20  discoverable.  And I would say they are not relevant to this

21  hearing by being not discoverable to the defense.

22      THE COURT:  The testimony -- the testimony of Ms. Ramm

23  is actually based on money traced.  It is not based on what

24  they put on the victim impact statement.  So in a way, she is

25  saying even though they may have asked for X amount on the

09:30 1    victim impact statement, the correct amount, as shown by the

2    money tracing that Ms. Ramm made, is the amount she is showing.

3    So that is the reason why that is relevant.  And whether -- and

4    whether you didn't have the statements or not really doesn't

5    have an impact.  It doesn't negatively impact you, because what

6    she is testifying to that they can claim is actually what is

7    shown by the checks made, you see, or drafts made or electronic

8    wire transfers made.  So your objection is overruled.

9              Back to you, Mr. Keagle.

10             MR. KEAGLE:  Thank you, Judge.  And, Judge, just so we

11   are clear, I provided the victim impact statements heavily

12   redacted to both defense counsels previously so that they would

13   have copies of those.

14             And I will tell you, Judge, it is insanely rare that

15   we ever offer victim impact statements into evidence to the

16   point I don't know that it has ever been done.  But I'm doing

17   it for purposes of this hearing because I think it will help

18   the Court make a determination, as well as the record.

19             MR. BURK:  Does this actually apply to every single

20   one of these victims or just this one particular we are

21   speaking of?

22             THE COURT:  We are going to take this one at a time,

23   Mr. Burk.  You made an objection with respect to Ms. Simpson

24   and Ms. Wade, and I addressed that objection.  And as you heard

25   Mr. Keagle, you know, you received a copy of that statement,

09:31 1    redacted for purposes of confidentiality.

2              But you know what Ms. Simpson claimed, which is

3    incorrect as Ms. Ramm has pointed out.  So if you have an

4    objection to another one, you are going to have to make that

5    objection as we go from person to person.

6              So back to you, Mr. Keagle.

7              MR. KEAGLE:  Thank you, Judge.

8    BY MR. KEAGLE:

9    Q.  Ms. Ramm, looking at victim number 5, Mr. Rao.  What

10   documentation did you use in determining loss for purposes of

11   Mr. Rao?

12   A.  His 302 interview, the bank records, and his victim impact

13   statement.

14   Q.  And, again, if you go to page 5 of this document, which is

15   his victim impact statement, it appears he lists his

16   restitution as 91,400.  What did you find -- and, again, for

17   that, he did not provide any supporting information.  What did

18   you find in the bank records as far as restitution purposes?

19   A.  84,900.

20   Q.  And that's the number you and I agreed would be proper for

21   restitution?

22   A.  Yes.

23   Q.  Going to defendant 6, Mr. Lu, this one is going to be a

24   little bit different.  What documentation did you look at for

25   Mr. Lu in coming up with restitution purposes?

09:33 1    A.   The 302 interview, bank records, and his victim impact

2    statement.

3    Q.   And if you go to the rear of that exhibit -- it will be

4    about ten pages in where his victim impact statement starts --

5    did he actually list some specific transactions that took

6    place, in addition to his container?

7    A.   Yes.

8    Q.   And did he provide -- well, did he provide documentation

9    for the Court to review as part of his victim impact statement,

10   which appears to be five pages long?

11   A.   Yes.

12   Q.   In addition to the restitution amount of -- excuse me --

13   the initial amount of 143,600, what also did he seek

14   restitution for?

15   A.   Rent.

16   Q.   For a rental house?

17   A.   Yes.

18   Q.   And I know you reviewed his very lengthy -- I guess

19   timeline.  Was that also reflected in his timeline?

20   A.   Yes.

21   Q.   And so in this case, for Mr. Lu, it wasn't just his bank

22   records that were used in determining proper restitution?

23   A.   Correct.

24   Q.   And, in fact, that's how we arrived at the $182,000 amount?

25   A.   Yes, sir.

09:34  1          THE COURT:  Mr. Keagle.

       2          MR. KEAGLE:  Yes, sir.

       3          THE COURT:  Wouldn't those additional damages be

       4   consequential damages?

       5          MR. KEAGLE:  No, Judge.  I think under the code, when

       6   you look at restitution, just restitution, any losses that a

       7   victim has because of the crime -- so, for instance, if they

       8   have to seek counseling, that's an allowable expense for

       9   restitution.  And I believe in this case his house was supposed

      10   to be ready on a date -- his container home -- it was not, so

      11   he had to go rent a home, which was a loss he would have not

      12   otherwise had to incur.

      13          THE COURT:  Okay.

      14          MR. BURK:  I object again, Your Honor.  We are stating

      15   here that this -- that he had to go rent a home.  Do we have

      16   any proof for this?

      17          THE COURT:  Okay.  Is that statement -- was that

      18   statement provided to Mr. Burk?

      19          MR. KEAGLE:  Judge, the victim impact statements were

      20   provided to defense counsels.

      21          THE COURT:  Okay.

      22          MR. KEAGLE:  He was not -- I don't know if he was

      23   pro se at the time.

      24          THE COURT:  I'm sorry.  To his -- Mr. Lopez, did you

      25   have time to go over that statement with Mr. Burk?

09:35 1          MR. LOPEZ:  Your Honor, when I received the exhibits,

    2    I forwarded them to legal at the detention facility.  Whether

    3    legal was able to get them to him or not, I was not able to

    4    ascertain.  However, they were very diligent in forwarding

    5    everything that we had sent to them, so I can't -- as well as

    6    the government, so I can't imagine they would not have gotten

    7    to him.

    8          MR. BURK:  Your Honor, all I have are FBI 302s, and

    9    the list that Mr. Keagle provided.  We have zero impact

   10    statements ever provided to us.

   11          THE COURT:  So you are telling me here today that you

   12    do not have Mr. Lu's impact statement that was provided to

   13    Mr. Lopez and then Mr. Lopez forwarded it to you and legal?

   14          MR. BURK:  We do not have that.  The only thing that I

   15    was provided, Your Honor, was every single one of the FBI 302s.

   16    That's all they printed out for us.

   17          THE COURT:  Mr. Lopez, could you go over -- I know you

   18    prepared, you know, because you said so in open court.  You

   19    prepared a spreadsheet of all the documentation you received

   20    and that you spent several hours on two different occasions

   21    with Mr. Burk going over that documentation.

   22          Do you by chance have that with you in your computer

   23    so that you can see if you have that statement from Mr. Lu?

   24          MR. LOPEZ:  I did not.  At the time of the hearing

   25    that we had, these victim impact statements were not part of

09:37 1    what I was provided by that time.

2              THE COURT:  Marshals, I need one of you to reach out

3    to West Texas legal –– I mean, to West Texas and find out about

4    the transmittal of that email that Mr. Lopez said that he

5    forwarded to Mr. Burk, that Mr. Burk now claims he's never

6    seen.

7              THE MARSHAL:  Will do, sir.

8              THE COURT:  I need that immediately.  I need you to

9    call West Texas and get somebody with knowledge of this on the

10   phone.

11             THE MARSHAL:  Yes, Your Honor.

12             MR. KEAGLE:  Judge, if it will help, I have got the

13   direct line for the individual I spoke with.  Do you want me to

14   get that for the marshals?

15             THE COURT:  Yes.  Please do.

16             MR. KEAGLE:  Her name is Clarissa.

17             THE COURT:  Please do.

18             MR. BURK:  Thank you, Your Honor.

19             THE COURT:  Yes, sir.

20             MR. BURK:  While they are doing this, Your Honor, if I

21   may state:  I would like to move to admit what's called "Burk's

22   Exhibits."  I provided one to the Court, one to Mr. Keagle, and

23   also one to Mr. Solis.  If I can go ahead and move to admit

24   those exhibits, please.

25             THE COURT:  You are going to have a chance to do that

09:39 1    when you get a chance to speak.  At this time, it's

2    Mr. Keagle's presentation.

3              MR. BURK:  Thank you, Your Honor.

4              MR. KEAGLE:  Okay, Judge, I believe we were on

5    Exhibit 6, which was --

6              THE COURT:  Mr. Ruouchan Lu, right, exactly.

7              MR. KEAGLE:  -- Mr. Lu.  And I believe Ms. Ramm did

8    say the amount of restitution calculated was 182,000.

9    BY MR. KEAGLE:

10   Q.  I'm going on to Exhibit 7, Ms. Ramm.  This is Laurie Olson.

11   What documents were used in trying to determine this

12   restitution figure?

13   A.  Her interview 302 and the bank records.

14   Q.  Okay.  And what number did you come up with for restitution

15   purposes for Ms. Olson?

16   A.  $59,217.62.

17   Q.  Going to Exhibit 8, which is Reagent World/Ron Tash, what

18   information was used on this one?

19   A.  The interview 302 and bank records.

20   Q.  And, again, what restitution figure did you come up with

21   for Mr. Tash, also known as Reagent World?

22   A.  $65,000.

23   Q.  Okay.  Going to Exhibit 9 --

24             MR. KEAGLE:  And, Judge, this is one I want to speak

25   to that I talked to Mr. Solis about.  I believe he will address

09:40 1    the Court later.  There are seven individuals who did receive a

2    container, and it is going to be up to the Court to decide what

3    is that worth.  And I will let Ms. Ramm testify about how we

4    determined our number, but I just want to -- I'm telling the

5    Court ahead of time:  Mr. Solis and I have differed on what we

6    believe the value is, and I'm sure he will address it later.  I

7    believe Mr. Burk will as well, Your Honor.

8    Q.  So, Ms. Ramm, looking at Exhibit 9, this is Taylor Allen

9    and Christina Geis.  What document was used for this case, this

10   exhibit?

11   A.  Their interview 302, bank records, and their victim impact

12   statement.

13   Q.  And going to page 4, which is the first page of the victim

14   impact statement, what information did they initially put as

15   their restitution amount?

16   A.  130,000.

17   Q.  And if you would, did they provide additional documentation

18   to the Court via the victim impact statement about the costs

19   they had?

20   A.  They did explain them.

21   Q.  And so we are clear for the Court, dealing specifically

22   with Taylor Allen, the $127,100, that number is different than

23   the amount of funds you found in bank transactions; is that

24   right?

25   A.  Yes.

09:42 1    Q.  And so is that where we get the difference in numbers here

2    in this exhibit?  The difference between what they are asking

3    for in additional losses versus what you found as far as bank

4    records?

5    A.  Yes.  So in the bank records, it was 90,990.

6    Q.  And then upon reviewing this victim impact statement, we

7    determined there were additional losses for restitution

8    purposes?

9    A.  Yes, sir.

10   Q.  And when you and I met with who is now the lead agent on

11   the case, what did we determine was the fair market value of a

12   container at that time?  Do you remember?

13   A.  $2,900.

14   Q.  And do you remember what that was based on, where we got

15   that figure?

16   A.  So it was invoices that we obtained from Twin Cities during

17   the time of this case.

18   Q.  And those are invoices that were part of the documents in

19   the criminal trial?

20   A.  Yes.  I don't know if they were admitted as exhibits, but

21   they were provided in discovery.

22          MR. KEAGLE:  Judge, going to Exhibit 10, which is

23   Joseph Stuart.

24   Q.  Ms. Ramm, if you could tell the Court how we came up with

25   that figure.

09:43 1    A.   The 302 interview, the bank records, and his victim impact

2    statement.

3    Q.   And he has a restitution amount listed of $55,820.  Is that

4    what you found in your bank records?

5    A.   Yes, sir.

6    Q.   Going to Exhibit 12, which is Mark Washington -- Morgan

7    Washington, which, I believe, is his spouse -- what information

8    was used regarding these calculations?

9    A.   The interview 302, bank records, and an email involving

10   yourself.

11   Q.   And you say "involving yourself," was that an email that he

12   sent to me?

13   A.   Yes.

14   Q.   And did you review that email?

15   A.   Yes.

16   Q.   And, again, did you find that the numbers in your bank

17   records were different than what he said in the email to me?

18   A.   Yes.

19   Q.   And so would that explain the discrepancy in the numbers?

20   A.   Yes.  So in the bank records, I found $3,000 attributable

21   to Mr. Washington.  And then the number here is $12,000 [sic].

22   Q.   Okay.  And, in fact, is that email -- under Exhibit 12, is

23   that email in there?

24         MR. KEAGLE:  And, Judge, I apologize.  I skipped an

25   exhibit.  I will go back to that in a minute.  We are on

09:44 1    Exhibit 12, Judge, which is Mark Washington.

2              THE COURT:  Yes.  And explain to me again the

3    discrepancy here, Ms. Ramm, with Mr. Washington.  Bank records

4    was $3,000 that he had actually disbursed to defendants and

5    their entities, right?

6              THE WITNESS:  Yes.  So that's what I can directly

7    attribute to Mr. Washington.

8              THE COURT:  Right.

9              THE WITNESS:  But there are other transfers into the

10   account that we didn't obtain every transfer owner's name

11   during the course of the investigation.

12             THE COURT:  Okay.  Where is the documentation of those

13   transfers?

14             THE WITNESS:  Of the --

15             THE COURT:  The transfers.

16             THE WITNESS:  -- the $3,000 or --

17             THE COURT:  No.  The additional -- the additional --

18   you are saying that the amount of restitution owed -- the

19   amount of restitution owed to Mr. Washington is $6,800; is that

20   correct?

21             MR. KEAGLE:  Yes, Judge.

22             THE COURT:  So the difference -- where are the 3800

23   additional dollars coming from?

24             MR. KEAGLE:  Judge, if I can help, if you will go to

25   page 5 of the exhibit, there is an email from Mr. Washington to

09:46  1   myself in which he explains that.

2              THE COURT:  12, okay.

3   BY MR. KEAGLE:

4   Q.  If you would, Ms. Ramm, do you have that email in front of

5   you?

6   A.  I do.

7   Q.  If you -- did you read this prior to coming here today?

8   A.  I did.

9   Q.  And does that explain or -- let me rephrase that.  Does

10  Mr. Washington explain the difference in the numbers?

11  A.  Yes, he does.

12  Q.  And also, a side point here, are there some transactions

13  you located in all of these bank records that you could not

14  specifically attribute to an individual person or entity?

15  A.  Yes.

16  Q.  Give me an example.

17  A.  A cashier's check that has no remitter name on it and is

18  from an institution that isn't for a particular area or

19  something that I can definitively figure out a person for.

20  Q.  So you had transactions, money coming in, you had no idea

21  who it came from?

22  A.  Correct.

23  Q.  Were there cash transactions as well?

24  A.  Like cash deposits?

25  Q.  Yes, ma'am.

09:47 1    A.  Yes.

2    Q.  What -- so we said cashier's checks, cash deposits.  What

3    else?

4    A.  There is other interbank transfers that occur that just

5    have numbers on them.  And without an additional subpoena to

6    determine where those funds came from, I couldn't identify the

7    owner.

8    Q.  So it is possible that there was a transaction; just you

9    didn't have a way of tracing it?

10   A.  Correct.

11            MR. KEAGLE:  And, Judge, just for purposes of the

12   record, I hope your copy has that email in your exhibit.

13            THE COURT:  Yes, I saw that.

14            MR. KEAGLE:  Thank you.

15            THE COURT:  And looking at that, how do I know that

16   that amount of money, that additional -- that additional --

17            MR. KEAGLE:  The 3800?

18            THE COURT:  Exactly.

19            MR. KEAGLE:  Judge, that is going to go to --

20            THE COURT:  How do I know that that went to defendants

21   or one of their entities?

22            THE WITNESS:  So I could give a list, I mean, after

23   this or -- I have provided it to -- or we have provided it to

24   defense, all the bank records.  In my analysis, I could pull

25   out all the transactions that are unidentified for you to

09:48 1    review.  Without Mr. Washington providing me something to match

2    a date or an account number, I couldn't definitively say

3    whether it's his or not.

4            THE COURT:  So let's take a step back.  So we are

5    going from 3,000 to $6,800, right?

6            THE WITNESS:  Yes.

7            THE COURT:  And what I heard you say in response to

8    Mr. Keagle's question was that that $3,800 difference, that

9    additional information is from the email that Mr. Washington

10   sent Mr. Keagle; that there was -- the $3,800 was transferred

11   through a cash transfer directly to defendants and/or their

12   entities.  So how do I know -- I mean, where is the

13   documentation on that?  You know what I'm saying?  Where is

14   that $3,800?

15           THE WITNESS:  This is the documentation that I have,

16   sir.  This is all that I have.

17           THE COURT:  Okay.  Did you see it there?  Did you see

18   that $3,800 in that documentation?

19           THE WITNESS:  Well, there is no particular date.

20   There is more than one transaction like that.  And so to figure

21   out which one may have been his, I don't know.  And so much

22   time has gone by, he doesn't know exactly when he sent the

23   funds.  That's the problem with some of these victim

24   statements.

25           THE COURT:  Okay.  But did Mr. Washington have

09:50 1    anything -- any documentation that he could show you of having

2    sent that money out or having sent that $3,800 out?

3              THE WITNESS:  Besides the attached contract and his

4    statement as such, no, sir.

5              THE COURT:  Okay.

6              MR. KEAGLE:  Judge, I think, you know, going to kind

7    of the heart of a lot of these issues with restitution is we

8    are in a weird conundrum because, under the code, victims

9    cannot be forced to participate in restitution proceedings.  So

10   it's almost -- it's the government, so we are kind of doing it

11   backwards.

12             We want them to participate.  We want them to send in,

13   you know, what were your losses and calculate from there.  But

14   we can't make them.  And even emailing Mr. Washington, I felt

15   like I was kind of skirting the issue on the code because he

16   can't be forced to participate.  And so I think -- and this is

17   going to -- what this boils down to, Judge, is you deciding is

18   this -- based on preponderance of the evidence, is this enough

19   to award the additional 3800 restitution?  And I'm going to let

20   you -- I'm going to leave that to the bench.  That's why you

21   are the judge.

22             MR. SOLIS:  For that process, we would object,

23   Your Honor.  That would invite the Court to speculate that

24   those 3800 came from some account deposited into these

25   accounts, Your Honor.  So if that's the invitation, I would

09:51 1    object to that, Your Honor.  Thank you.

2              MR. BURK:  Your Honor, I am going to join this

3    objection.

4              THE COURT:  Okay, thank you.

5              MR. KEAGLE:  Judge, do you want to hear any more on

6    Exhibit 12?

7              THE COURT:  Let me make -- let me take some notes

8    here.

9              MR. KEAGLE:  Okay.

10             THE COURT:  I have a pretty good memory, but there are

11   a lot of details here.

12             MR. BURK:  Your Honor, I have received the victim

13   statements from the exhibits so far, and I really don't need

14   them to proceed, so I don't want to delay this hearing.

15             THE COURT:  So you are confirming now that you

16   received the statements?

17             MR. BURK:  Well, the statements I'm seeing are here.

18   I'm able to work off of what's here and what is being said here

19   in court.  But I did not receive them at the West Texas

20   facility.  So what I'm stating is, instead of trying to create

21   a delay, I would just want to let you know that I would like to

22   go ahead and proceed.  But I still don't believe that they are

23   relevant to this hearing.

24             THE COURT:  Okay.  Let me make sure I understand what

25   you are saying.  You started by telling me that those were

09:52 1    relevant.  And I explained to you that they were not, unless

2    they add something to the computation of the restitution

3    amount, at which time Mr. Keagle inquired of Mr. Lopez, and

4    Mr. Lopez said:  Judge, I sent everything, all the statements.

5    You said you never received them.

6          I see you now looking at Mr. Lopez' laptop.  And are

7    you acknowledging now that you did receive the restitution

8    statements?

9          MR. BURK:  I did not receive them at the West Texas

10   facility, Your Honor.  What I'm saying is that here today with

11   what we have and the exhibits that are here in front of me, I

12   can work with what we have here.

13         THE COURT:  Okay.

14         MR. BURK:  So I want to say that.  But I'm also

15   stating for the record that they are not -- that I believe they

16   are not relevant to the hearing.

17         THE COURT:  Okay.  So you are withdrawing your

18   objection about not having the restitution statements?  Am I

19   understanding that correct, Mr. Lopez?

20         MR. LOPEZ:  That is correct, Your Honor.  What

21   Mr. Burk -- I have shown -- we have gone over the victim impact

22   statements that have been provided -- apologies -- that have

23   been provided by the government.  And based on those

24   statements, Mr. Burk has told me that:  I don't really -- I

25   don't need those to proceed.  So what he would like to do is

09:54 1    waive or withdraw the objection to being discoverable.

2    However, he would still like to preserve his objection to

3    relevance.

4        THE COURT:  Okay.  Yes, and that's fair.  I just

5    wanted to address the first -- the first step.  So did you

6    agree with what Mr. Lopez says, that you are withdrawing the

7    objection to not having the victim impact statements?  Is that

8    correct?

9        MR. BURK:  That is correct, Your Honor.  What I'm

10   stating, though -- and I think Mr. Lopez said it very

11   clearly -- is what we are looking at here in the exhibits, they

12   are here, but they were not given to me.

13       THE COURT:  I --

14       MR. BURK:  Okay.

15       THE COURT:  I understand what you are saying.  The

16   critical question for me to understand from you and answer --

17   all I need is an answer from you.  Are you withdrawing the

18   objection you had earlier?  That's all I need to know.

19       MR. BURK:  One moment, please, Your Honor.

20       With regards to discoverable, yes; to the relevance,

21   no, Your Honor.

22       THE COURT:  That's fine.

23       MR. BURK:  Thank you.

24       THE COURT:  Back to you, Mr. Keagle.

25       MR. KEAGLE:  Thank you, Judge.

09:55  1            THE COURT:  So to recap the issue with Mr. Washington,

       2  in essence, he says in that email that he paid the $6,800 that

       3  the contract called for?

       4            THE WITNESS:  Yes.  So the email specifies two $1,500

       5  payments and a $3,800 payment.  I had already located the two

       6  1500.  The 3800 could be a number of different transactions.

       7            THE COURT:  Okay.  And fair enough, okay.

       8  BY MR. KEAGLE:

       9  Q.  And, Ms. Ramm, looking at that exhibit, near the back,

      10  there is a document titled, "Agreement and Conditions for Home

      11  Design."  It is after the email that he sent me.  If you will

      12  look -- are you there on that document?

      13  A.  Yes.

      14  Q.  If you'll look in the middle of that page, does it say what

      15  the total amount was supposed to be for this project?

      16  A.  $6,800.

      17  Q.  I got to back up because I got ahead of myself.  If we can

      18  go back to Exhibit 11, which is Cindy Richter.  If you could,

      19  what documents were used for Ms. Richter?

      20  A.  So Ms. Richter -- the 302 is the documentation of the

      21  Better Business Bureau complaint and the bank records.

      22  Q.  And your bank records show -- do you show a credit to her

      23  at some point?

      24  A.  Yes.  So she initially paid $15,000, and she was refunded

      25  $3,000.

DIRECT - NICOLE RAMM                                              34

09:57  1    Q.  And so the amount of restitution for Ms. Richter, you have

       2    at $12,000?

       3    A.  Yes.

       4    Q.  Going to Exhibit 13, which is Steve Leach, what

       5    documentation was used for Mr. Leach?

       6    A.  The 302 interview and bank records.

       7    Q.  And what was the amount of restitution that you came up

       8    with for Mr. Leach?

       9    A.  $26,800.

      10    Q.  And that was verified through the bank records?

      11    A.  Yes, that's the same.

      12    Q.  Going to Exhibit 14, which is Matthew DePofi -- and that's

      13    D-E-P-O-F-I -- what documentation did you use for him?

      14    A.  The interview 302 and bank records.

      15    Q.  And what was the amount that you came up with for

      16    Mr. DePofi?

      17    A.  $32,250 [sic].

      18    Q.  32,000?

      19    A.  I'm sorry.  That's my mistake.  $35,250.

      20    Q.  Now, there's no Exhibit 15.  Going to Exhibit 16, which is

      21    Jeff Guillot.  Again, I think, initially, he asked for

      22    $102,350.  But you and I reviewed that.  And, also, what

      23    documentation did you look at for Mr. Guillot?

      24    A.  His interview 302, bank records, and then an email sent to

      25    the prosecutor.

09:58   1    Q.   And, in fact, for this case, the original -- and the PSR

        2    lists 102,350.  But you and I changed the restitution amount

        3    based on the email; is that correct?

        4    A.   Yes.

        5    Q.   And that's how we get to the $2,000?

        6    A.   Yes.  The initial amount that I found was $102,350.

        7    Q.   So you found that in the bank records, but upon getting

        8    that email from him, which I think it speaks for itself, he is

        9    only seeking $2,000 in restitution?

       10    A.   Yes.

       11    Q.   Going to Exhibit 17, which is Steven Forti, F-O-R-T-I?

       12              THE COURT:  Ms. Ramm.

       13              THE WITNESS:  Yes, sir.

       14              THE COURT:  The exhibit for Mr. Guillot is Exhibit 16.

       15    And is the email there?

       16              THE WITNESS:  Yes, sir, it is.  It's the last two

       17    pages of the exhibit.

       18              THE COURT:  So with respect to Mr. Guillot, the Wells

       19    Fargo records that are part of the exhibits -- Exhibit 16 --

       20    excuse me -- show money transfers, so to speak, from him -- his

       21    entity -- to defendants and their entities of $102,000 --

       22              THE WITNESS:  Yes.

       23              THE COURT:  -- or thereabouts, right?

       24              THE WITNESS:  Yes.

       25              THE COURT:  However, he is not asking for that amount

10:01 1    in restitution anymore?

2                THE WITNESS:  Correct.

3                THE COURT:  Okay.  And what was the reason why he gave

4    for that?

5                THE WITNESS:  He said that he received containers and

6    then listed the issues that they had with them and was only

7    seeking restitution for what they needed to pay to get them to

8    what they should have been, is his explanation in the email.

9                THE COURT:  I see.  Fair enough.  Okay.

10    BY MR. KEAGLE:

11    Q.  Going to Exhibit 17, which is Mr. Forti.  What

12    documentation was used to calculate his restitution?

13    A.  The interview 302 and the bank records.

14    Q.  And what was that amount?

15    A.  $10,750.

16    Q.  Going to Exhibit 18, which is Mr. Sanjay -- and the last

17    name for the court reporter is P-A-R-I-K-H -- what

18    documentation did you have for him?

19    A.  He just -- he gave an interview.

20    Q.  And, again, you weren't able to find bank records for this

21    specific transaction for this victim?

22    A.  Correct, not directly attributable.

23    Q.  Doesn't mean it wasn't in there; you just could not tie a

24    deposit specifically to him?

25    A.  Yes.

10:03 1    Q.  Going to Exhibit 19, Elliot Perrigo, what information was

2    used for this victim -- this figure?

3    A.  The interview 302 and the bank records.

4    Q.  And what was the amount you came up with?

5    A.  $45,200.

6    Q.  Going to Exhibit 20, which is Tess Passero and Christian

7    Ottobre, and this is one we will have to talk a little bit

8    about.  What did you find in the bank records?

9    A.  The dollar amount that I found in the bank records,

10    $21,800.

11         MR. KEAGLE:  And, Judge, if the Court will look --

12    it's going to be page 7, which is their victim impact

13    statement.  Let me know when you are there, Judge.

14         THE COURT:  Okay, yes, sir.

15         MR. KEAGLE:  I believe Mr. Solis previously objected,

16    and I agreed with him.  They are not entitled under the law, as

17    it stands from the Supreme Court, to escrow money or interest

18    or legal fees or pain and suffering.

19         THE COURT:  Right.

20         MR. KEAGLE:  So I just -- for purposes of the record,

21    I agree with Mr. Solis.  The *Lagos* case from the Supreme Court

22    is instructive on this.

23         THE COURT:  They are not entitled to that for

24    restitution, but that doesn't impact the loss, though.

25         MR. KEAGLE:  That's correct, Judge.

10:04 1          THE COURT:  The loss remains as it was in the PSR for

2    Mr. Passero -- for Ms. Passero and Mr. Ottobre.

3          MR. KEAGLE:  Correct, Judge.  This is just only

4    talking about the MVRA and restitution.

5          THE COURT:  Exactly.

6          MR. KEAGLE:  And just so I can be very clear, there

7    are times, Judge, when a victim could seek restitution for

8    attorney's fees depending on what the attorney fees are related

9    to; for instance, if they were helping the government in the

10   investigation, then those attorney fees.  This case, it does

11   not.  Mr. Solis was correct in his objection.  And I did not

12   figure those numbers into restitution purposes.  So that's why

13   we have a difference between loss and restitution in this case,

14   Judge.

15         THE COURT:  Fair enough.

16   BY MR. KEAGLE:

17   Q.  And just so we are clear -- I'm sorry, Ms. Ramm -- what was

18   the total amount you found, 21,800?

19   A.  Yes.

20   Q.  Going to Exhibit 21, which is Teresa Taricco.

21   A.  For her, there's an interview 302 and bank records.

22   Q.  And just so we are clear, Ms. Taricco did receive a

23   container?

24   A.  Yes.

25   Q.  And how much credit was she given for the container?

10:06 1    A.  $2,900.

2    Q.  So that would explain the discrepancy between the PSR

3    figure and the figure we are talking about today?

4    A.  Yes.

5    Q.  Going to Exhibit 22, which is Marcia Dean, what was used

6    for that exhibit?

7    A.  The interview 302 and bank records.

8    Q.  I'm sorry.  For Marcia Dean?

9    A.  Yes.

10   Q.  302, okay.  And what was the total amount you came up with

11   for restitution purposes?

12   A.  $2,500.

13   Q.  Going to Exhibit 23, which is Marcee Lundeen, could you

14   tell me what was used to come up with that restitution amount?

15   A.  An interview 302 and bank records.

16   Q.  And what was the amount that you came up with?

17   A.  $10,900.

18   Q.  Okay.  Now, we are going to go to Exhibit 24, which is

19   David Tein.  And what did you review for Mr. Tein?

20   A.  His interview 302, the bank records, and his victim impact

21   statement.

22   Q.  Okay.  Judge, his victim impact statement is on page 4.

23   Ms. Ramm, the PSR has his loss amount at 54,950.  But for

24   restitution purposes, we have an amount of 148,000.  What was

25   that 148,000 preliminary -- primarily based on?

10:07 1    A.   His victim impact statement.

  2    Q.   And did he also provide supporting documentation in the

  3    form of a statement?

  4    A.   Yes, he did explain in the statement.

  5    Q.   And, in fact, in the last page of his statement, doesn't he

  6    state that he ended up spending almost $300,000 to redo and

  7    complete the build?  And that's the third-from-last paragraph

  8    on the last page of his statement.

  9    A.   Yes.

 10    Q.   And, again, the 148,000, that's not what you found in bank

 11    records; that's what he listed in his victim impact statement?

 12    A.   Correct.

 13    Q.   And the documentation he provided for justification for

 14    that was his additional statement attached; is that correct?

 15    A.   Yes.

 16    Q.   Just so I'm clear for the Judge, what you found as far as

 17    monies in the bank accounts was 54,950?

 18    A.   Yes.

 19         MR. KEAGLE:  Judge, do you have any questions with

 20    respect to Exhibit 24?

 21         THE COURT:  Yes.

 22         MR. KEAGLE:  Okay.

 23         THE COURT:  Ms. Ramm, I'm looking at the documentation

 24    provided --

 25         THE WITNESS:  Yes.

10:09 1          THE COURT:  -- by Mr. Tein here.  Where is the

2    additional amount -- I mean, not Mr. Tein -- I'm sorry -- yes,

3    Mr. Tein.  What are the additional funds reflected that make up

4    the difference between the 50-some-odd-thousand to the 148?

5    Where are they?

6          THE WITNESS:  On the last page, there is a portion

7    that says money paid directly to the defendants and their

8    suppliers was almost $190,000.

9          THE COURT:  On the last page, let me see.

10          MR. KEAGLE:  It is going to be page 8, Judge.  I

11    apologize for not having page numbers.

12          THE WITNESS:  See where he puts at the top of the page

13    an additional $60,000 to have everything redone.

14          THE COURT:  Let me find that.

15          Can you show me where the page is?

16          THE WITNESS:  The additional 60,000 and then --

17          THE COURT:  So the record reflects what I'm -- what

18    was pointed out to me by the witness, there is a victim impact

19    request -- "Victim Impact Statement and Request for

20    Restitution."  The second page, it starts with:  For example,

21    the stairwell that Les spent three emails boasting about and

22    charged extra for not only had to be ripped out, as it was not

23    to code, but the inner layout had to be totally reconfigured.

24    So where he added 12,500 for the extra work, it ended up

25    costing me an additional 60,000 to have it done properly.

10:13  1         The second paragraph:  The units didn't line up.  New

       2  doorways and placement had to be redone.  Plumbing didn't line

       3  up, and in some cases was just a pipe photographed coming out

       4  of a wall, but didn't go anywhere and had to be cut out and

       5  started from scratch.  The electrical was just wires taken to

       6  beams that didn't actually go anywhere.  Welding was spot

       7  welding, instead of seam welded, so all had to be redone.

       8         The dreams and hopes were shattered after our units

       9  were finally released, only to find out that the things that

      10  were paid for and promised were only about 20 percent reality.

      11  That we got our most of the containers we bought, but all of

      12  the work had to be totally undone and started from scratch.

      13  And we still had to replace missing containing [sic] that were

      14  bought and paid for and replaced smashed windows that were

      15  damaged in transport.  That the plumbing, electrical, welding,

      16  framing, material work all had to be from scratch.  The money

      17  paid to them directly was gone, and I ended up paying almost

      18  triple what was originally budgeted.  Money paid directly to

      19  Ethan and Les and their suppliers was almost 190,000.  It ended

      20  up costing me almost another 300,000 to redo and complete the

      21  build.  Besides the money this project has costed me, it cost

      22  me personally as well.  It left me and my wife on the verge of

      23  bankruptcy.  It cost me my health, as well as ultimately

      24  costing me [sic] marriage because of the stress, depression,

      25  and drama it brought into our lives.  I am only 98 percent

10:15 1    done, totally out of money, and finishing the remaining things

2    as I can one at a time.

3              The record will reflect that I have read this

4    verbatim.

5              Back to you, Mr. Keagle.

6              MR. KEAGLE:  Thank you, Judge.

7    BY MR. KEAGLE:

8    Q.  Looking at Exhibit 25, which is Nancy Bush.  Ms. Ramm, what

9    did you review on Ms. Bush?

10   A.  The interview 302, the bank records, and the victim impact

11   statement.

12   Q.  What was the amount of restitution you came up with for

13   Ms. Bush?

14   A.  $3,800.

15   Q.  Going to Exhibit 26, which is Robert Abasolo, what was

16   reviewed for purposes of restitution?

17   A.  This is just an interview 302.

18   Q.  And so there -- you did not find any bank records

19   corresponding to Mr. Abasolo?

20   A.  Nothing directly attributable, yes, sir.

21   Q.  And what was the amount in the FBI 302 that he listed as

22   his restitution?

23   A.  $5,800.

24   Q.  Looking at Exhibit 26 --

25              THE COURT:  And what is that -- what statement of fact

10:17 1    did he make in the 302 that ties into that $5,800?  In other

2    words, did he say:  I paid $5,800 for X, Y, and Z?  Or what did

3    he say he paid that money for?

4         THE WITNESS:  He paid $5,800 to Atomic Container Homes

5    to begin the work on a shipping container home.  It was to

6    cover the architectural design and engineering design for the

7    shipping container.

8         THE COURT:  Okay, thank you, ma'am.

9    BY MR. KEAGLE:

10   Q.  Looking at Exhibit 27, which is Richard Ladendorf.  Again,

11   is this someone who did receive a container?

12   A.  Yes.

13   Q.  And so would that account for the discrepancy between

14   what's listed in the PSR at $40,370 with the restitution figure

15   that you and I came up with of 37,470?

16   A.  Yes.  In the bank records, I found $40,370.

17   Q.  But, again, he got a container and based on our

18   calculations, there should be a $2,900 credit back to the

19   defendants for that for restitution purposes?

20   A.  Yes, it's what we discussed.

21   Q.  Exhibit 28, which is Camilo Gomez, what was used for

22   purposes of his restitution?

23   A.  That was an interview 302, bank records, and a victim

24   impact statement.

25   Q.  And what was the amount of restitution that you came up

10:18  1    with?

2    A.   $50,205.

3              MR. KEAGLE:  And, again, Judge, directing your

4    attention to page 3, which is his victim impact statement --

5    and we are on Exhibit 28, Your Honor.

6              Again, Mr. Solis objected to his legal fees, and I

7    want the Court to be aware those are not included in the

8    restitution figure.  Those were legal fees not at the direction

9    of the government.  And, again, under *Lagos*, he is not entitled

10   to the $7,500.  So I agree with Mr. Solis in his objection.

11             THE COURT:  So the amount showed for Mr. Gomez is the

12   50,205, which is the sum of the $7,600 he paid for design and

13   engineering fees and the 42,605?  Those two is the amount in

14   the restitution?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Fair enough.  Thank you.

17             MR. KEAGLE:  Judge, going to Exhibit 29, which is

18   Ashley Kim.

19   BY MR. KEAGLE:

20   Q.   Now, Ms. Kim, is her scenario a little different than, I

21   think, everybody else that's listed as a victim in this case?

22   A.   Yes.

23   Q.   And we are just sticking to restitution.  What did you find

24   as far as deposits from Ms. Kim, or what did you find in

25   looking at Ms. Kim's case?

10:20 1    A.  So directly attributable to Ms. Kim, like a cashier's check

2    with a remitter's name, a personal check, a wire transfer, I

3    did not find anything of her sending funds to these accounts.

4    Q.  And what was Ms. Kim in her 302 -- how was she stating what

5    was her dealings with Mr. Burk and Mr. Day?

6    A.  Her interview states that her credit card was used by the

7    defendants.

8    Q.  Was that fraudulently?

9    A.  As payment, she said so, yes.

10    Q.  But for purposes of the Court here, you couldn't find any

11    bank records dealing with Ms. Kim?

12    A.  No, not directly attributable.

13          THE COURT:  But did she produce any of her own

14    records?  I mean, for example, did she show the agent when she

15    gave the interview, Let me show you my card record that show

16    here, Look, all this money that was withdrawn.

17          THE WITNESS:  We asked.  She did not.  I think she

18    gives an explanation of why the card wasn't available for her

19    to do that.  But into Mr. Day's account, there was over $25,000

20    in merchant services deposits.

21    BY MR. KEAGLE:

22    Q.  And what is "a merchant service deposit"?  Why is that

23    interesting?

24    A.  It is a credit card processor.

25    Q.  And will that necessarily tell you who it is from?

10:21 1  A.  No.  It tells me the processor.  I would have to -- we

2  would have to subpoena the processor to determine the cards

3  that were actually processed.

4        MR. KEAGLE:  And, Judge, just so you are aware, I

5  expect you will hear more about Ms. Kim from defense counsel,

6  Mr. Burk, at a later point, just so the Court is aware.

7        Going to Exhibit 30, which is Rex Cheng --

8        THE COURT:  Hold it.

9        MR. KEAGLE:  Yes, sir.

10        THE COURT:  Let me situate myself here with Ms. Kim.

11        Okay, very well, go ahead.

12  BY MR. KEAGLE:

13  Q.  Ms. Ramm, going to Exhibit 30, which is Rex Cheng, what

14  information was used to come up with this restitution amount?

15  A.  An interview 302, bank records, and a victim impact

16  statement.

17  Q.  And the amount of money you found in the bank records was

18  how much?

19  A.  $6,800.

20  Q.  Going to Exhibit 30 -- and just so we are clear, is that

21  the same amount he asked for in his victim impact statement?

22  A.  Yes.

23  Q.  Going to Exhibit 31, which is J.E. and Paul Carlson, again,

24  in the PSR, it's listed as 35,500.  What did you come up with

25  as far as a restitution amount?

10:24 1    A.   32,600.

2    Q.   And just so we are clear, they did receive a container?

3    A.   Yes.

4    Q.   So that would account for the $2,900 difference?

5    A.   Yes.

6    Q.   And what information did you use in determining that

7    restitution figure?

8    A.   The interview 302, bank records, and the victim impact

9    statement.

10   Q.   Going to Exhibit 32, which is Marine Fishing International,

11   what did you use in determining this restitution figure?

12         Let me clarify:  What did we use in determining this

13   restitution figure?

14   A.   The interview 302.

15         MR. SOLIS:  I'm sorry.  What number are we on?

16         MR. KEAGLE:  I'm sorry.  We are on 32, Marine Fishing

17   International.

18         MR. SOLIS:  That's TMI, isn't it, Tyson Mining

19   International?

20         MR. KEAGLE:  So I have Exhibit 32.  I have the 302

21   from Marine Fishing International.

22         MR. SOLIS:  Okay.  Thank you.

23   BY MR. KEAGLE:

24   Q.   So, Ms. Ramm, looking at what we are going to call MFI,

25   what did you find in bank records as far as total transactions?

DIRECT – NICOLE RAMM                                    49

10:25 1    A.  $829,968.55.

2    Q.  Now, reviewing the 302 and other documents that we have

3    looked at in this case, some provided by the defense, did they

4    receive some of their containers?

5    A.  Yes, they did.  They received most of them.

6    Q.  And, in fact, based on the documentation you had, did it

7    appear they did not receive six containers?

8    A.  Yes.

9    Q.  So arriving at this figure of $155,619.10 for restitution

10   purposes, how did we get to that figure?

11   A.  It's the $829,000 and change divided by 32 to give you the

12   per unit cost and then times six for the six that were lacking.

13   Q.  And, again, this is for restitution purposes?

14   A.  Yes.

15   Q.  The number we came up with?

16   A.  Yes.

17   Q.  And, again, Judge, I think this is another one you will

18   hear more about when defense counsel is up here.  Going to

19   Exhibit 33, which is Mr. Slade, what did you find for

20   Mr. Slade?

21   A.  The interview 302 and the bank records is what I used.

22   Q.  And for Mr. Slade, what was the amount of restitution you

23   came up with?

24   A.  $12,000.  He actually made $12,500 in deposits, and he was

25   returned back $500.

10:26 1    Q.  Going to Exhibit 34, which is Matthew Cooper, what

2    documentation did you use for this restitution figure?

3    A.  The interview 302, the bank records, and the victim impact

4    statement.

5    Q.  And what was the amount of restitution that you came up

6    with for him?

7    A.  15,600, which is what he deposited to the account.

8    Q.  And is that also what he listed in his victim impact

9    statement?

10    A.  Yes.

11    Q.  Going to Exhibit 35, which is Jonathan Colwell, spend a

12    little bit of time on this one, what information did you have

13    for Mr. Colwell?

14    A.  The interview 302, bank statements, and the victim impact

15    statement.

16    Q.  Now, for him, what did he list as what he was seeking for

17    restitution?  And that's going to be on page 4.

18    A.  He is asking for $20,000.

19    Q.  And what did you find in the bank records?

20    A.  $10,002.

21    Q.  And did he provide any other documentation for that 20,000?

22    A.  No.

23    Q.  Okay.  And so is -- just so we are clear, for purposes of

24    this restitution hearing, the amount of money we are seeking is

25    what?

10:28 1    A.   $10,002.

2    Q.   Going to Exhibit 36, which is Private Properties LLC, I

3    believe Eric Wilson is their representative.   What information

4    was used for purposes of restitution?

5    A.   The interview 302 and bank records.

6    Q.   And was this a case in which they did receive a container?

7    A.   Yes, they did.

8    Q.   And would that be the reason the amount listed in the PSR

9    is different than the amount sought for restitution?

10   A.   Yes.   So they made $19,500 in deposits to the account.   And

11   the restitution is reflecting $16,600.

12   Q.   Going to Exhibit 37, which is Chickchickporkpork.   What

13   information did you have for them?

14   A.   Bank records.

15   Q.   And what was the amount that you saw for

16   Chickchickporkpork?

17   A.   $24,169.

18   Q.   And that's where you ascertained that restitution amount?

19   A.   Yes.

20   Q.   Looking at Exhibit 38, which is Karsten Vansander --

21        THE COURT:   Ma'am -- stop for a second -- let's go

22   back to Chickchickporkpork.   Tell me how you went from the --

23   you reduced the 57,705 to the 24,169.   Tell me again, please.

24        THE WITNESS:   So for Chickchickporkpork, they made

25   deposits of $24,169 into the account.

10:30 1              THE COURT:  I see.  So you went strictly by what

2       the --

3              THE WITNESS:  The deposits.

4              THE COURT:  -- the deposits were.  Fair enough, thank

5       you.

6              MR. KEAGLE:  May I proceed, Judge?

7              THE COURT:  Yes, sir.

8       BY MR. KEAGLE:

9       Q.  Okay.  Exhibit 38, which is Karsten Vansander, what

10      information do you have for Karsten?

11      A.  The interview 302 and bank records.

12      Q.  And what did you find for amount of restitution based on

13      that information?

14      A.  $16,500, which is what was deposited to the account.

15      Q.  And last is Exhibit 39.  That is Todd Young.  What did you

16      have for Mr. Young?

17      A.  An interview 302 and bank records.

18      Q.  And what did you find for the total amount of restitution

19      for Mr. Young?

20      A.  $5,300, which is what was deposited to the account.

21              MR. KEAGLE:  Judge, I believe I have discussed

22      Exhibits 1 through 39, with the exception of 15.  Judge, I

23      would move to admit them at this time.  Assuming they are

24      admitted, Judge, I would ask they be placed under seal in

25      accordance with 3663.

10:31 1        Additionally, Judge, I do have an exhibit list that I

2    tendered to the Court.  I did not file in ECF.  If the Court

3    wishes to file that, I would ask that be under seal.

4        And lastly, Judge, I have Exhibit 40, which I believe

5    the Court has a copy of.  I gave counsels a copy of it marked

6    this morning.  They do have copies of this list before.  It is

7    what I'm going to call a summary of the large table you have.

8    I would ask that be admitted as Exhibit 40, also, Your Honor,

9    under seal, in accordance with 3663.

10        THE COURT:  Very well.  Any objection to what

11    Mr. Keagle is moving into evidence?  Mr. Burk?  Mr. Lopez?

12        MR. BURK:  Only subject to our previous objections,

13    Your Honor.

14        MR. SOLIS:  Your Honor, our objection is only that --

15    we have no objection with regard -- for that to be admitted for

16    demonstrative purposes, if the Court can -- because I have too

17    many exhibits to compare our charts.

18        THE COURT:  The objections are overruled.

19        MR. SOLIS:  Yes, sir.

20        THE COURT:  The objections are overruled.  I mean,

21    this is -- this is the totality of the evidence.

22        MR. SOLIS:  Yes, sir.

23        THE COURT:  You know, both of you are making -- are

24    suggesting that I should give this or that weight.

25        MR. SOLIS:  Right.

10:32  1            THE COURT:  And, also, actually by saying "only

       2    admitted as demonstrative," you are saying give it no weight,

       3    which, no, absolutely not.  So that's overruled.

       4            And your previous objection, Mr. Burk, stands on the

       5    ruling that I already made.  So government's exhibits are

       6    admitted.  And they will be under seal.  Okay?

       7            MR. SOLIS:  Just to be clear, Your Honor, Mr. Day does

       8    not admit that the figures are correct.  But we have no

       9    objection to the admission for the purposes I mentioned,

      10    Your Honor.

      11            THE COURT:  Right.  And the business of inaccuracy

      12    goes to the weight of it, and that's what cross-examination is

      13    for.

      14            MR. SOLIS:  Correct.

      15            THE COURT:  It doesn't go to the admissibility.

      16            MR. SOLIS:  Thank you.

      17            THE COURT:  Okay.  And, Mr. Burk, do you have any

      18    questions of Ms. Ramm?

      19            MR. BURK:  Actually, yes, Your Honor.  But I was

      20    unaware that this was going to be the format of how the day was

      21    going to run today.  I -- of course, as you are well aware, I'm

      22    not used to this type of stuff.

      23            THE COURT:  Let me interrupt you for a second to make

      24    sure that I -- that I address the first statement you made:  I

      25    wasn't aware that this was going to be the format.  Actually,

10:34 1    for over a month now, there was a government's witness list

2    consisting of one witness.  So I do not agree that you didn't

3    have notice that this was going to be the format.

4            On to your next point, please.

5            MR. BURK:  Let me clarify, Your Honor.  What I'm

6    saying by "the format" is I was under the understanding there

7    might be an opportunity to do one of these at a time, not to go

8    through the entire list where it was slammed through quickly,

9    and we have missed a lot of people on the list.  There is so

10   much information on each and every individual.  They are not

11   one-size-fits-all.

12           Every single one of these people deserved, in my

13   opinion, to be looked at separately.  I was hoping that we

14   would do one at a time and have the opportunity to

15   cross-examine, so that they were very well taken care of on

16   each one of the issues.  I didn't know we were going to go

17   through the whole list.  That's what I mean by "the format."

18           THE COURT:  And I entertained the objections you made,

19   and I certainly didn't stop you or suggest to you that you

20   couldn't make objections as the witness was testifying.  So

21   this is your turn now.

22           MR. BURK:  So what I'm going to attempt to do,

23   Your Honor, as I speak with Ms. Ramm, is I have made a list

24   based on each one of these people starting at the top all the

25   way to the bottom.

CROSS - NICOLE RAMM                                    56

10:36 1          THE COURT:  Start wherever you want to start and go

2     from -- you know, go over the persons that you feel you want to

3     go over, whether it's one of them or all 38 of them.  That's

4     your call.

5          MR. BURK:  Thank you, Your Honor.

6          THE COURT:  So proceed as you see fit.

7                         CROSS-EXAMINATION

8     BY MR. BURK:

9     Q.  Ms. Ramm, I realize that you are working off of different

10    bank statements.  I had made a request of the Court for the

11    U.S. Bank statement that belonged to Atomic, which I never

12    received, so I'm going to have some difficulties here with some

13    of this.  But, number one, with Justin and Ana Jones, we

14    believe that only $15,000 was paid to Atomic by Justin and Ana

15    Jones.  Now, Atomic did two designs, including 3D renderings

16    that were crafted by Texas Tech intern --

17         THE COURT:  Mr. Burk, this is about asking questions.

18         MR. BURK:  Got it.  I understand, Your Honor.

19    BY MR. BURK:

20    Q.  So I guess my question, looking at my material, for you

21    would be:  Did you break apart the monies that were paid to us

22    and the work that we did versus the money that was paid to

23    Mr. Crossland and then the actual sale of the property where

24    Justin and Ana Jones profited over $7,000?

25         MR. KEAGLE:  Judge, I am going to object at this point

10:37 1    to relevance.

2              THE COURT:  Okay.

3              MR. KEAGLE:  He is testifying.  He is not asking

4    questions.

5              THE COURT:  What is the question?

6    BY MR. BURK:

7    Q.  My question is:  Did you break apart the differences

8    between what we spent versus what Mr. Crossland spent and then

9    what Justin and Ana Jones received as a return?  I don't

10   believe there is any restitution here.

11             THE COURT:  Okay, stop.  Okay.  The "I don't believe"

12   is not a question.  The "Did you break it down?" that's a

13   question.

14             Ma'am, you can answer:  What breakdown did you do?

15   A.  As far as the amounts spent on them, that was not something

16   I could determine without bank records from the corporation,

17   which we were unable to locate on two search warrants.

18   Q.  Okay.  Did you interview Mr. Crossland personally to find

19   out what the results were?

20   A.  No.

21   Q.  Are you aware that Justin and Ana Jones sold the property?

22   A.  No.

23   Q.  Are you aware that they profited from this property?

24   A.  I don't know if that's the case, sir.

25             MR. BURK:  Okay.  That is where my discrepancy is with

10:38 1    the Court on this particular issue with regards to Justin and

2    Ana Jones, Your Honor.

3                Thank you for your help on that one.  I will move to

4    the next one.

5                THE COURT:  Okay.  So let me hear -- let me hear you,

6    Mr. Burk.  What is your objection to the amount of loss claimed

7    by Mr. and Mrs. Jones?

8                MR. BURK:  My objection is that we are being charged

9    for a loss, when, in fact, they were unable to complete their

10   contract and they decided to basically sell the property and

11   walk away, which they did.

12               THE COURT:  Excuse me.  Was that their property that

13   they sold?

14               MR. BURK:  No.  The property -- the property,

15   Your Honor, was a piece of property that they found, that they

16   didn't have the money to be able to purchase.  And when they

17   came to us, we had a suggestion of somebody that might be able

18   to help them.  We sat them down.  It was not our property,

19   Your Honor.

20               THE COURT:  Okay, so your objection is overruled.

21               Mr. Solis, do you have any questions of Mr. and

22   Mrs. Jones to --

23               MR. SOLIS:  Are we going to do it this way?

24               THE COURT:  -- on the amount -- on the amount of --

25   excuse me -- on the amount of loss -- on the amount of

10:40 1    restitution?  Excuse me.

2              MR. SOLIS:  Yes, Your Honor.  Do you want me to

3    proceed through the entire --

4              THE COURT:  Yes.  I am going to do them one at a time

5    now.  So, you know, if you maybe -- you can come to the podium,

6    and then stay there, and then we will go from, you know,

7    claimant to claimant.  Or if you are more comfortable sitting,

8    you know, whatever will be, you know --

9              MR. SOLIS:  Yes, sir.

10             THE COURT:  -- easier for you.

11             MR. SOLIS:  Yes, sir, thank you.

12             MR. BURK:  Thank you, Your Honor.

13                        CROSS-EXAMINATION

14   BY MR. SOLIS:

15   Q.  Just preliminarily, ma'am, how do you pronounce your name?

16   A.  Nicole Ramm.

17   Q.  Ramm.  And I wasn't here -- I didn't participate in the

18   trial.  But your background is in accounting?

19   A.  Yes.

20   Q.  Your education is in accounting?

21   A.  Yes, I have a bachelor's degree from UTEP.

22   Q.  Thank you, ma'am.  Ma'am, when you -- did you become

23   involved in the case or as a case agent following the exit of

24   Ms. Nebrich, I think her name was?

25   A.  I am not a case agent, sir.

10:41 1    Q.  Okay.  A forensic accountant?

2          A.  Yes.

3          Q.  After Ms. Nebrich left?

4          A.  No.  I -- the case agent holds the case for the entire

5          period and so does the forensic account.

6          Q.  Okay.  Were you present when the FBI, for lack of a better

7          phrase or term, raided or came upon the ACH lot warehouse yard

8          on San Antonio Avenue here in El Paso?

9          A.  On -- yes.

10         Q.  Was that right about summer of July, August of 2018?

11         A.  Yes.

12         Q.  Okay.  With regard to Ms. Ana and Justin Jones, I was doing

13         the math on the exhibits provided.  And it did -- it seems --

14         do you have that exhibit in front of you, ma'am?

15         A.  Yes.

16         Q.  Okay.  My figures come to -- as far as deposits confirmed,

17         $39,350.  And one that I think is -- for me anyway -- suspect

18         is one where it's termed a "wire reversal," if you will look at

19         the Chase deposit on July 2.  And most of these deposits are

20         supported by the accompanying cashier's check.  In that

21         particular case, there is a cashier's check where there is a

22         deposit for $2,000.  But the same cashier's check is listed

23         again, same numbers, same date, same figures.  And, now, it's

24         $4,000.  And I'm wondering how that --

25         A.  It is -- that's an error, sir.  The deposit is $4,000, but

10:43 1   the first check was -- it was copied twice.  It's -- there

2   should have been a secondary one.

3   Q.  So then if you do the sum, if you sum it up, then, the

4   restitution amount that's claimed is less, isn't it?

5   A.  Well, no.  My calculation is correct.  The document that's

6   in here is incorrect.

7   Q.  Right, because it was highlighted as if to illustrate that

8   this is a deposit -- highlighted by the government the way I

9   received the documents -- and attached to it was the same check

10  twice?

11  A.  That's -- that's an error.  There should have been two

12  checks there.

13  Q.  So if we do the math and remove the $4,000, that would come

14  off the restitution amount, whatever it is, correct?

15  A.  I'm sorry.  Why are we deducting $4,000?

16  Q.  That's a wire reversal.  It's not a deposit, again, is it,

17  ma'am?

18  A.  Can you -- maybe you can tell me a specific page.  I'm not

19  really following you.

20  Q.  Sure, sure, and so they are not numbered, so it is hard

21  to --

22  A.  Yeah.

23  Q.  I'm looking at September -- at the top left,

24  September 17 -- rather September 27 of 2017.  And the highlight

25  by the government is a deposit, in addition, July 2nd, and it

10:44 1    notes a wire reversal.  A few lines below it, July 10, is a

2    deposit for $2,000.  And the supporting documentation is that

3    $2,000 cashier's check, but it is listed twice, but it is the

4    same check.  And so my concern was they listed it twice,

5    $4,000, as a wire reversal, and that was included in the sum

6    owed.

7    A.  The wire reversal, it's not included because it's not the

8    same transaction.

9    Q.  It should not be included in the restitution; is that

10   correct?

11   A.  Correct.

12   Q.  Okay.  So if we do the math, we are not going to include

13   the $4,000; is that right?

14   A.  No.  The $2,960, that's what you are speaking to about the

15   wire reversal?

16   Q.  The wire reversal shows to be $4,000?

17   A.  No.

18   Q.  I beg your pardon.  $2,060 -- $2,960?

19   A.  Correct.

20   Q.  Okay.  So the deposit right above it for $4,000 --

21   A.  Yes.

22   Q.  -- I don't see it supported by any cashier's check or

23   anything of the sort.

24   A.  $2,000 of it is, but it was duplicated.  There should have

25   been two $2,000 deposits.  Do you see what I'm saying?  It was

10:45 1    produced twice.  There should be two separate ones with it.

2    Q.  Except it should only be one because the supporting

3    documentation -- am I correct, ma'am -- is July 10 a $2,000

4    check listed twice, in the supporting documentation to what you

5    are looking at now?

6    A.  Yes.  What I'm saying is in this the production of this

7    exhibit --

8    Q.  Yes.

9    A.  -- one item was duplicated.  But there should have been two

10   separate items.  The $4,000 is correct.  The duplication of one

11   $2,000 item is the incorrect thing.

12   Q.  Okay.  So the $4,000 deposit is correct?

13   A.  Yes.

14   Q.  And what supporting documentation do you have to support

15   that deposit?

16   A.  One $2,000.

17   Q.  One $2,000?

18   A.  That was duplicated, so there is another $2,000.  That was

19   just -- it was not properly included in the binder.

20   Q.  In the binder --

21   A.  It's in the bank records.  It is in the bank records.  You

22   can find it in the bank records that were given for discovery.

23   Q.  In the bank records you provided, there's a check twice,

24   the cashier's check, same numbers up top, same date, provided

25   twice, I would suspect to support the $4,000 deposit, but it's

10:46 1    the same check?

2    A.   Right.  So in my spreadsheet, there's two separate -- which

3    was provided -- it's two separate items.  But in this binder,

4    it is not.

5    Q.   So you can't deposit the same check twice, right?

6    A.   Correct.

7    Q.   It appears that's what's happened?

8    A.   No.  That's how it's reflected here, but that's incorrect.

9    Q.   Okay.  But you have no supporting documentation to show the

10   $4,000?

11   A.   Electronically, yes.  In this paper document right now, no,

12   I do not.

13   Q.   Okay.  So the $2,000 deposit depicted here on July 10 is

14   depicted, right?  It supports -- the July 10 deposit is

15   supported by the cashier's check, correct?  Do you see that?

16   A.   Yes.

17   Q.   Okay.  The July 2 deposit --

18   A.   Yes.

19   Q.   -- it doesn't illustrate it's a wire deposit or a wire

20   transfer like it normally does, does it?  And you will see

21   others -- other deposits there that are wire transfers.  This

22   one does not indicate a wire transfer, does it, on July 2?

23   A.   No.

24   Q.   So where is the supporting documentation, cashier's check

25   or otherwise, to support that $4,000 deposit?

10:47 1    A.  I don't know.  It's not here.

2    Q.  The other question I have, ma'am, is Mr. Crossland with Ana

3    and Justin Jones --

4         THE COURT:  You are talking Mr. Crossland with respect

5    to -- okay, go ahead.

6         MR. SOLIS:  Your Honor -- oh, I see.

7         THE COURT:  Yes, I just want to make sure we are still

8    with Justin and Ana Jones.

9         MR. SOLIS:  We are, Your Honor.  We are.

10   BY MR. SOLIS:

11   Q.  Mr. Crossland was partners with Mr. Burk?

12   A.  I don't know exactly their relationship.

13   Q.  He was a landlord there at the yard on San Antonio street

14   where ACH was constructing and building containers?

15   A.  That's my understanding.

16   Q.  And so they were partners?

17   A.  I don't know their actual business relationship.

18   Q.  And you explained in your direct testimony that he, for all

19   intents and purposes, forgave a loan.  Is that what you said?

20   A.  Yes.

21   Q.  Do you have any supporting documentation about the loan or

22   about the forgiveness of the loan, anything of the sort?

23   A.  There is a 302.

24   Q.  I know that.  But something between the parties?

25   A.  Oh, between Mr. Crossland and the Joneses?

10:48 1    Q.  Yes.

2    A.  Nothing that was provided for me to review.

3              MR. SOLIS:  Okay.  Thank you, Your Honor.

4              THE COURT:  So the amount of restitution established

5    by the government with respect to Justin and Ana Jones totals

6    $30,000; is that correct, Mr. Keagle?

7              MR. KEAGLE:  Judge, in the government's view, it's

8    43,350.  We will leave it to the discretion of the Court on

9    what the Court believes is proper.

10             THE COURT:  So, Ms. Ramm, you reduced it to $30,000

11   because of the loan forgiveness; is that correct?

12             THE WITNESS:  The $30,000 was from the victim impact

13   statement or the -- I'm sorry -- the interview, what they

14   stated.

15             THE COURT:  Right.  The 43,000 included the loan --

16             THE WITNESS:  Yes.

17             THE COURT:  -- from Mr. Crossland --

18             THE WITNESS:  Yes.

19             THE COURT:  -- that was forgiven.

20             THE WITNESS:  Yes, based on their statement, yes.

21             MR. SOLIS:  Your Honor, I do have one other question.

22             THE COURT:  Yes, sir.

23             MR. SOLIS:  Thank you.

24   BY MR. SOLIS:

25   Q.  Ms. Ramm, the probation department or the probation officer

10:50 1  consults with the government to determine loss, restitution,

2  things of that sort; is that right?

3  A.  You are asking me "did they"?

4  Q.  That's what normally happens, right?

5  A.  In this particular case, what was requested of me -- I'm

6  not quite sure.  I can't speak to any other -- I'm speaking

7  specifically for this case.

8  Q.  Okay.  For this case, did that happen?

9  A.  I did provide something to probation, yes.

10  Q.  Okay.  And so you are aware of what the figures were in the

11  PSR, what we call the PSR, the presentence investigation

12  report?

13  A.  Yes.

14         MR. SOLIS:  May I approach the witness, Your Honor?

15         THE COURT:  Sure.

16         MR. SOLIS:  And I provided this to the government and

17  one copy for the Court, Your Honor.  I'm showing you what is

18  Exhibit 1 -- Defendant's Exhibit 1.  This is just general, and

19  I will leave it here at the moment, Your Honor.

20  BY MR. SOLIS:

21  Q.  Do you see at the very left end of what I have just handed

22  you, ma'am, Defense Exhibit 1, what is termed PSR 11/18/2022,

23  with a number 1; a restitution spreadsheet provided July 31,

24  number 2; and then a restitution spreadsheet, number 3.  Do you

25  see those?

10:51 1    A.  Yes.

2    Q.  So the figures on the left-hand side of that spreadsheet,

3    those are the amounts in the PSR.  And I know you would have to

4    confirm it.  But you are familiar with those figures, correct?

5    A.  Yes.

6    Q.  Okay.  And so you are saying the amount of loss here is

7    43,000 for Ana -- and 43,350 for Ana and Justin Jones with

8    regard to restitution, whereas it's 30,000 with regard to loss

9    on the PSR; is that right?

10             THE COURT:  Actually, backwards.

11   Q.  Loss on -- with regard -- as it informs the PSR is 30,000,

12   and as far as restitution is concerned, it is 43,350.  Do you

13   see that?

14   A.  Yes.

15   Q.  Did that take into account any sort of properties that were

16   exchanged or loans that were forgiven, anything of the sort?

17   A.  I'm sorry.  Did what take that into account?

18   Q.  That loss amount in the 43,350?

19   A.  It's strictly the amount of funds that went to the

20   accounts.

21   Q.  And the figure of 30,000 on the PSR with regard to transfer

22   of property, forgiveness of loans, did that reflect that

23   figure?  Is that reflected in that figure at all, as far as you

24   know?

25   A.  I don't know how those numbers were calculated.

10:52 1    Q.  But they were consulting with you in this particular case,

2    the probation department?

3    A.  I provided them my spreadsheet, yes.

4            MR. SOLIS:  Okay, thank you.

5            THE COURT:  So, Mr. -- let me make sure I follow you

6    here, Mr. Solis.

7            MR. SOLIS:  Yes, sir.

8            THE COURT:  Her testimony was that, on behalf of

9    Mr. and Mrs. Jones, Mr. Crossland made

10   13,000-and-some-odd-dollars payment.  But that the actual

11   out-of-pocket for Mr. and Mrs. Jones was 30,000.  Probation

12   documented that because it was part of their project, and in

13   return of which they got nothing, other than some emails

14   containing some floor plans and 3D renderings.  The total

15   amount of loss with respect to Mr. and Mrs. Jones was the

16   43,350.  But the amount they were actually out of their funds

17   was the $30,000.

18           So I'm dealing with the amount of money that was out

19   of their pocket.  So I'm finding by a preponderance of the

20   evidence that the restitution for Mr. and Mrs. Jones is

21   $30,000.

22           So we are going to -- this is good point for a break.

23   We will be back in 10 minutes, okay?

24           (Recess)

25           MR. SOLIS:  Your Honor, may I follow up on one

11:08 1    question?

2                    THE COURT:  Yes.

3                    MR. SOLIS:  Thank you.

4    BY MR. SOLIS:

5    Q.  Ms. Ramm or Ramm?  Ramm?

6    A.  "Ramm" like the truck.

7    Q.  Ramm.  Still on the subject of Ana and Justin Jones and

8    looking at the government's exhibit, if you have it there:

9    There is two cashier's check where the remitter is Gary

10    Crossland and the other is Gold Cross Properties.  The first

11    check is for 15,000 with remitter as Gary Crossland and the

12    next is Gold Cross Properties for 20,000.  That's in the

13    exhibits provided by the government.

14                    And so the obvious question is:  What is the

15    connection?  How does that connect the Joneses, if you will,

16    with the container home, ACH, when the remitter is

17    Mr. Crossland?

18    A.  It was Mr. Crossland's statement.  So Special Agent Nebrich

19    spoke to both the Joneses and Mr. Crossland.

20    Q.  So Mr. Crossland is purchasing property with this amount of

21    money through the Joneses?

22    A.  I don't know -- he's -- it's being remitted to Atomic

23    Container Homes or Quantum Stealth Technologies.

24    Q.  Not Mr. and Mrs. Ana Jones or Justin and Ana Jones; it is

25    Mr. Crossland and his -- I guess his company because he is the

11:09 1    landlord there, right?  Mr. Crossland is the remitter --

2    A.  Yes.

3    Q.  -- in both cases?

4    A.  Yes.

5    Q.  For 15,000 and 20,000?

6    A.  Yes.

7    Q.  Okay.  Do you know the connection, what the link is?

8    A.  What the link is as far as what, sir?

9    Q.  How is that monies that are owed the Joneses?

10    A.  Mr. Crossland stated that he gave the monies to Quantum

11    Stealth Technologies or Atomic Container Homes on behalf of the

12    Joneses.

13    Q.  And that was to purchase their property?

14    A.  I don't know what the purchase of it was for, sir.

15    Q.  Did you not testify earlier it was for the purchase of real

16    property, that is, land, a lot?

17    A.  No.

18    Q.  No?  Okay.  Thank you.

19          THE COURT:  So to recap, I'm finding by a

20    preponderance of the evidence that the restitution amount for

21    Mr. and Mrs. Jones is $30,000.

22          MR. SOLIS:  Thank you, Your Honor.

23          THE COURT:  Mr. Solis, are you moving into evidence

24    Defendant Day Exhibit 1?

25          MR. SOLIS:  I am, Your Honor.

11:10 1          THE COURT:  Okay.  Admitted.

2          Mr. Burk, do you have any questions with respect to

3     the amount of restitution claimed by Ms. Cynthia Miller?

4          MR. BURK:  Yes, Your Honor, thank you.

5                         CROSS-EXAMINATION

6     BY MR. BURK:

7     Q.  Ms. Ramm, are you familiar with the amounts of money that

8     were spent by Cynthia Miller on work that had been done on her

9     property?

10    A.  No.

11    Q.  Do you have access to any of -- excuse me -- did you have

12    access to any of the material that would show what those

13    amounts were?

14    A.  I have no knowledge of what you are asking me, sir.

15    Q.  Okay.  Let me try to clarify just a little bit.  When we

16    sign a contract with somebody, there's responsibilities --

17          MR. KEAGLE:  Judge, I'm going to object, relevance.

18          MR. BURK:  I'm trying to explain to her what was

19    the --

20          THE COURT:  Excuse me.  Excuse me.  Excuse me.

21    Overruled.

22          Okay.  Back to you, Mr. Burk.  Mr. Burk, this is about

23    questions.  Okay?  So you don't get to testify.

24          MR. BURK:  Yes, Your Honor.  I will try to do better.

25

11:11 1  BY MR. BURK:

2   Q.  So, Ms. Ramm, are you familiar with any of the

3   responsibilities on the contract between Atomic and Cynthia

4   Miller?

5   A.  No.

6   Q.  Are you aware of any amounts of money that were spent by

7   Atomic for Cynthia Miller?

8   A.  No.

9   Q.  So with that said, you would be unable, except to use the

10  material that you have, to come up with what the restitution

11  amount is, correct?

12  A.  Correct.

13  Q.  Okay.  Why did the FBI not have that information?

14          MR. KEAGLE:  Judge, objection, speculation.

15          THE COURT:  It's actually argumentative.  You need to

16  rephrase that question.

17  BY MR. BURK:

18  Q.  Do you know why the FBI did not have the information of

19  what was spent?

20  A.  That's not part of my job description, sir.  I account for

21  things.  Those records weren't there.  I don't know why they

22  weren't provided those records.

23  Q.  Are you aware that the FBI never asked us for any of this

24  material?

25  A.  I'm not -- no, except by search warrant.

11:13 1          MR. BURK:  Okay.  I pass the witness, Your Honor.

2          THE COURT:  Mr. Solis.

3          MR. SOLIS:  Thank you, sir.

4                    CROSS-EXAMINATION

5    BY MR. SOLIS:

6    Q.  Ms. Ramm, a little while ago, you testified that you were

7    present when the -- again, for lack of a better phrase or

8    term -- the raid occurred at the San Antonio lot or yard for

9    ACH, Atomic Container Home company, in the late summer of 2018.

10   And you were present is what you said, right?

11   A.  So there were two different search warrants on the

12   property.  And I believe I was just present for the one in --

13   was it April?

14   Q.  April.

15   A.  April, yes.

16   Q.  But you are aware there was a subsequent one that

17   essentially shut it down in August or July of 2018.  You are

18   aware of that?

19   A.  Shut it down?

20   Q.  Shut the container -- ACH, Atomic Container Homes, American

21   Container Homes, shut down the business?

22   A.  I am aware of the search warrants.

23   Q.  In the summer that I'm talking about?

24   A.  Yes.

25   Q.  Okay.  And there were containers there at the yard, at the

CROSS - NICOLE RAMM                                              75

11:14  1    lot, at the warehouse.  There were several -- numerous
       2    containers; is that right?
       3    A.  I recall there being containers on the property.
       4    Q.  Okay.  And so in looking at Ms. Miller's exhibits and then
       5    looking at your 302 or at least the FBI's 302, it appears that
       6    Ms. Miller makes reference to the delivery of, quote, an
       7    additional shipping container.  So it appears that there was a
       8    shipping container actually shipped to her -- in this
       9    particular case, a storage container; isn't that right?
      10    A.  I don't recall what was shipped to Ms. Miller specifically.
      11    Q.  Okay.  And so this additional shipping container
      12    referencing FBI 302, this one doesn't have a serial like the
      13    others I've referenced have.  This one doesn't.  And this is
      14    evidently an interview, if you are looking at the same 302 I
      15    am, November of 2017, when Ms. Miller talks about the delivery
      16    of an additional shipping container on page 2 of that 302.  Did
      17    you confirm that was the storage container?
      18    A.  No, I didn't do this -- I did not conduct this interview.
      19    Q.  I know.  But you are here as a representative of the
      20    government, and so I'm asking if you followed up on this or
      21    confirmed or somehow eliminate whether there was a container or
      22    not delivered, whether she is requesting an additional
      23    container?
      24    A.  No.
      25    Q.  Okay.  With regard to the issue of containers, you talked

11:16  1    about in your testimony a little while ago about how you came

2    to an average of $2,900.  And tell us again how you came to

3    that figure, ma'am.

4    A.  It's not an average.  So Twin Cities provided us their

5    invoices that were paid by Mr. Burk during the time that they

6    did business together.

7    Q.  Yes, ma'am.

8    A.  And so that was the cost of the containers that he had

9    purchased.

10    Q.  Okay.  And so does this account for what they call

11    high-cube containers, 12-foot, 8-inch containers versus

12    standard -- what is it -- 8-foot containers?  Do you know?

13    A.  There are probably like a half dozen invoices, and we went

14    with the highest amount of invoice.

15    Q.  And these high-cube containers are much more expensive than

16    8-foot containers, aren't they?

17    A.  There were several smaller or less expensive ones, yes.

18    Q.  Would you agree that about $5,500 is about an average?

19    A.  I can't say, sir.  The highest on those invoices -- I went

20    based off the invoice -- was $2,900.

21        MR. SOLIS:  Pass the witness.

22        THE COURT:  Mr. Solis, did you have anything that

23    suggests to you that Ms. Miller received the container?

24        MR. SOLIS:  Besides the reference in the 302,

25    Your Honor, just my consultations with my client, Your Honor.

11:17  1          THE COURT:  Because from the PSR and the addendums,

       2   which, of course, I adopted at the sentencing hearing for both

       3   the defendants, there's no indication that she ever received

       4   the container.  From my review -- from my review of everything

       5   here because, of course, I presided over the trial, as best as

       6   I can tell, she received pictures of containers and septic

       7   tanks, septic tank study for her property or something along

       8   those lines.  But what she paid for, she never received

       9   anything.  And she actually -- the deposits show that she

      10   transferred -- correct -- the 94,200 to --

      11          MR. SOLIS:  Yes, Your Honor.  I'm not suggesting

      12   those -- the deposits are confirmed.  I'm not denying that.  I

      13   am only suggesting that, given the consultations I have had and

      14   then the additional shipping container referenced in the 302,

      15   that there exists a possibility that she was shipped what's

      16   called a storage container.

      17          I can't provide the documentation to that, but I will

      18   say this, Your Honor:  Errors do occur.  For the longest time I

      19   was a lone wolf howling in the wind, I suggested time and again

      20   Frank Mancuso was delivered a container.  Until just very

      21   recently, they have acknowledged it, removed it, and eliminated

      22   it from not only loss for guidelines calculations, but also for

      23   restitution.  But that is only very recently, Your Honor.  And

      24   so those are the reasons I bring it up, Your Honor.  I don't

      25   mean to in bad faith ask questions suggesting that.

11:19 1          THE COURT:  Right.  And I'm not getting into that

2      because, you know, it's part of the process.  And it relies --

3      and it relies on everybody being ethical about it.  But from

4      everything I have looked at here, there's nothing that

5      indicates to me that she never received anything of what she

6      paid for in terms of container homes.

7          MR. BURK:  I object, Your Honor.

8          THE COURT:  So having said that, I'm finding by a

9      preponderance of the evidence that the amount owed to

10     Ms. Miller in restitution is $94,200.

11         MR. BURK:  I object, Your Honor.

12         THE COURT:  Yes, sir, your objection is overruled.

13         Mr. Burk, do you have any questions about Mr. Carbone

14     to Ms. Ramm?  About the amount of restitution Ms. Ramm

15     determined was owed to Mr. Carbone?

16         MR. BURK:  Why am I not being allowed to ask the

17     question or tell you why I'm objecting, Your Honor?

18         THE COURT:  You are objecting to my finding.  I have

19     already heard you cross-examining the witness about how she

20     arrived at the figure she testified to under oath about

21     Ms. Miller.  You passed the witness.  So I already know what

22     you are addressing with her.

23         Mr. Solis got his chance to cross-examine.  I am not

24     giving the -- I'm not giving the government an opportunity to

25     redirect, although the government actually would have the right

11:21 1    to redirect if he insisted on it.  But I already have what I

2    need to have.

3            Now, you are objecting to my finding, and my finding

4    is based on what she has testified to.  So do you follow what

5    the procedure is?

6            MR. BURK:  I'm learning, Your Honor.  But when

7    Mr. Solis brought up the part of the container that she had

8    received, I would only expect that you would remember that when

9    she was on the witness stand, people were asking her what she

10   was doing living in that container.  I mean, it's in the trial

11   testimony.

12           THE COURT:  Then that's for you to ask me the

13   opportunity to ask her a question.

14           MR. BURK:  But you had moved to the next person

15   already, Your Honor.

16           THE COURT:  Then all you have to do is ask me:  Can I

17   ask her a question?

18           MR. BURK:  I'm learning.  Thank you, Your Honor.

19           THE COURT:  Okay.

20           MR. BURK:  May I ask her a question?

21           THE COURT:  Of course.  Go ahead, sir.

22           MR. BURK:  Thank you, Your Honor.

23                       CROSS-EXAMINATION

24   BY MR. BURK:

25   Q.  Ms. Ramm, back to Cynthia Miller for one moment.  Were you

11:22 1   here in the courtroom when she was on the witness stand?

2   A.  No.

3   Q.  Have you talked to anybody about her testimony when she was

4   here?

5   A.  No.

6          MR. BURK:  Then I'm probably going to have a really

7   hard time doing this.  Thank you very much.  No further

8   questions.

9          THE COURT:  Thank you.

10          (Discussion at the bench on the record)

11          MR. KEAGLE:  I am going to get out of the way.  You

12   talk.

13          MR. SERWATKA:  If my record -- my recollection serves

14   me correctly, Cynthia Miller testified --

15          THE COURT:  Wait, wait a second.

16          I recall the testimony of Cynthia Miller -- I recall

17   the testimony of Cynthia Miller, and I recall that -- I asked

18   Nalene about that.  And, you know, I can check it out.  But

19   here, what my recollection was that after she paid the $94,000,

20   she paid extra money to have a -- just a shell, in other words,

21   without -- without plumbing, without electricity, without

22   anything.  In other words, she paid whatever amount of money

23   she paid, and then she paid extra --

24          MR. SERWATKA:  I believe an extra $5,000 for that.

25          THE COURT:  -- for a container to be delivered to her.

11:25  1    But it wasn't the house that she contracted for.

2              MR. SERWATKA:  No toilet facility.

3              THE COURT:  No toilet, no plumbing, no electricity, no

4    nothing.

5              MR. SERWATKA:  Yes.

6              THE COURT:  So that's my recollection.  But it was not

7    a function of the $94,000 or so that she paid as part of the

8    contractual dealings.

9              MR. SERWATKA:  Right.  She paid that additional amount

10   for --

11             THE COURT:  Exactly.

12             MR. SERWATKA:  Yes.

13             THE COURT:  So --

14             MR. LOPEZ:  Judge, I got a message that they have a

15   verdict.

16             THE COURT:  I'm sorry?

17             MR. LOPEZ:  Lenny sent me a message that they have a

18   verdict.

19             THE COURT:  Are they going to take it now?

20             MR. LOPEZ:  That's what I understand.  Yes, sir, I

21   asked Mr. Burk if he would want to continue without me.  He

22   said that he's fine with that.

23             THE COURT:  I'm happy to take -- I'm happy to recess

24   if you need a couple of hours because, frankly, I don't want to

25   create -- I'm not interested in creating error in this process

11:26 1    because the reality of it is if you are entitled to have -- I

2    mean, if you are entitled to have standby counsel under *Faretta*

3    to say that your counsel can leave makes --

4         MR. LOPEZ:  Negates the whole purpose.

5         THE COURT:  -- makes the standby counsel, you know,

6    meaningless.  So we will go back on the open record.  You are

7    going to stand up and you are going to say:  Judge, I have been

8    notified of this, and I'm going to recess until 1:30, okay?

9         MR. LOPEZ:  Is that --

10         THE COURT:  No, that's my call to make.

11         MR. LOPEZ:  No, I understand.

12         THE COURT:  I need to accommodate the equities here.

13    Okay.  He doesn't have a right to object.  He doesn't have a

14    right to object.  No one has a right to object to that because

15    it's -- I mean, I have to deal with the equities here.  Am I

16    missing something here?

17         MR. LOPEZ:  No, not at all.

18         MR. SERWATKA:  I believe we all would say that he

19    needs to be present as standby counsel.

20         MR. LOPEZ:  May I have -- can you recess for a minute,

21    two minutes?  Let me send my message to Lenny to make sure that

22    the Court is taking it.

23         THE COURT:  Fair enough.

24         MR. LOPEZ:  Thank you.

25         THE COURT:  Perfect.  Perfect.  Thank you.

11:27 1          (Open court)

2          THE COURT:  Back on the record, Nalene.

3          We are going to recess for 10 minutes.  As is known to

4     the Court, Mr. Lopez is trial counsel in a capital murder case

5     pending in state court.  He has received a notification of the

6     Court that he needs to look into.  So to accommodate that, we

7     are going to recess for 10 minutes, so we will be back.  Okay?

8     Thank you, folks.

9          (Recess)

10          MR. LOPEZ:  There was confusion with the --

11          (Court reporter interrupted.)

12          MR. LOPEZ:  My apologies, Your Honor.

13          THE COURT:  Go ahead and state it again, please.

14          MR. LOPEZ:  There was confusion with the jury on how

15     to answer the special issues, and so they answered them

16     incorrectly, so they have been instructed and sent back to

17     deliberate.  So we are still good to go.

18          MR. KEAGLE:  And I'm sorry, Judge, just for purposes

19     of the record, because I know appeals is going to read this at

20     some point:  Mr. Lopez was just speaking about his state case,

21     the jury in the state case that has no relation to this

22     proceeding.

23          THE COURT:  Of course not.

24          MR. LOPEZ:  Yes, that is correct, Your Honor.

25          THE COURT:  Thank you.

11:36 1          And going back to Ms. Miller, I verified my

2    understanding that, in terms of what she paid for the container

3    home, she did not get what she paid for.  She afterwards

4    received one container with no plumbing, no heating, no

5    ventilation, no electricity, only a door and a window.  That's

6    what she received.

7          So my question to you, Ms. -- going back to your

8    testimony, Ms. Ramm, the $94,200 --

9          THE WITNESS:  Yes.

10          THE COURT:  -- that shows that she disbursed to the

11    defendants and their entities and their related entities, can

12    you tell the precise timing?  When was the last payment made on

13    that sequence of events?

14          THE WITNESS:  The last payment was made October 13,

15    2017, in the amount of $4,700.

16          THE COURT:  When was the first payment that she made?

17          THE WITNESS:  September 3, 2015.

18          THE COURT:  Very well.  I'm giving a credit of $2,900

19    for that -- for that container.  Just strictly on the average

20    value, I find the amount determined by the government of $2,900

21    toward container average cost comports with the evidence in the

22    case.

23          The next person -- Mr. Burk, do you have any questions

24    of Ms. Ramm with respect to Mr. Carbone?

25          MR. BURK:  On which one, Your Honor?

11:39 1          THE COURT:  Mr. Carbone, victim number 3.

2          MR. BURK:  Yes, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. BURK:

5    Q.  Ms. Ramm, are you aware that Atomic only received 44,300

6    from Cody?

7    A.  No.  That's not my understanding.

8    Q.  Okay.  Are you aware that he, in turn, received nine

9    containers that were placed on the property that he came and

10   saw?

11   A.  I don't know if that's true.

12   Q.  Are you aware that initially only seven containers were

13   there and we had to bring the other two in?  You are not aware

14   of any of this; is that correct?

15   A.  I don't know of anything in regards to the containers you

16   are talking about.

17   Q.  Okay.  Are you aware of the dispute resolution that Cody

18   participated in with myself and also our architect, Sam Barela,

19   downtown here in El Paso?

20   A.  No.

21   Q.  Does the government not have the records of that dispute

22   resolution?

23   A.  They may.  I don't know every instance the government is

24   aware of.

25   Q.  Okay.  So when you are doing your paperwork and figuring

11:41  1    these things out for restitution or for financial amounts, you

2    are not asking the FBI that you work for if they have any

3    additional material for you that would relate to this

4    particular case when it comes to the dollar amounts?

5    A.  It doesn't pertain to dollar amounts.  It pertains to a

6    person.  And so these are the records that I have pertaining to

7    this person --

8    Q.  To the person --

9    A.  -- for this hearing, yes.

10   Q.  Okay.  Are you aware, then, that at dispute resolution,

11   Cody owed us $25,000?

12        MR. KEAGLE:  Judge, I am going to object.  She already

13   answered she doesn't know anything about it, so --

14        THE COURT:  He can ask.  Are you aware of that, ma'am?

15        THE WITNESS:  I'm unaware if that's actually the case.

16   BY MR. BURK:

17   Q.  Okay.  Are you aware of the fact that Cody failed to pay

18   $5,500 to Atomic for engineering?

19        MR. KEAGLE:  Judge, I am going to object again to

20   relevance.

21        THE COURT:  Well, it is actually argumentative.  You

22   know, it assumes the answer.  It assumes that the person did

23   some -- it assumes that the person did what the person asking

24   the question is saying.  So the objection is sustained.

25

11:42 1    BY MR. BURK:

2    Q.  Are you aware of any of the things that Cody received for

3    the money that he spent?

4    A.  I'm only aware of what's in the 302, sir.

5    Q.  So the material that you have, then, does not take into

6    account anything that we did for Cody Carbone?

7             MR. KEAGLE:  Objection, argumentative.

8             THE COURT:  Sustained.

9    BY MR. BURK:

10   Q.  Let me try to rephrase that then.  Based on your records, I

11   believe you know that Cody spent money with Atomic; is that

12   correct?

13   A.  Mr. Carbone gave money to Atomic, yes.

14   Q.  Are you aware of him coming to Atomic for two visits?

15   A.  No.

16   Q.  Did you credit Atomic for any of the work or the materials

17   that we provided to Cody?

18   A.  So the amount that I located was 51,8- -- no -- I'm

19   sorry -- hold on.  Yeah, $51,800, so that includes no credits.

20   Q.  I'm sorry.  Could you repeat that?

21   A.  $51,800 is what I found he paid to Atomic and there were no

22   credits given.  There was no refunds that I located or any

23   business records that I found that were spent on behalf of

24   Mr. Carbone to give credit for.

25   Q.  Okay.  Are you aware that he had the opportunity to come

11:44 1    and pick up materials from us at any time, but he refused to do

2    so?

3              MR. KEAGLE:  Objection, argumentative.

4              THE COURT:  Sustained.

5              MR. BURK:  I pass the witness, Your Honor.

6              MR. SOLIS:  No questions of this witness, Your Honor.

7              MR. KEAGLE:  Judge, could I do a brief redirect?

8              THE COURT:  Yes, sir.

9              MR. KEAGLE:  I think it may help us along the way.

10                        REDIRECT EXAMINATION

11    BY MR. KEAGLE:

12    Q.  Ms. Ramm, in all the documents that were retrieved via the

13    search warrants, did you ever find any business plans of the

14    companies Mr. Burk and Mr. Day ran?

15    A.  Business plans?

16    Q.  Like a business plan, a general business plan?

17    A.  Oh, no.

18    Q.  Did you find any documents detailing what work had been

19    done on any containers?

20    A.  There were some blueprints that we found.  But I believe

21    that those were the original, like the designs that were

22    provided to the victims in this case already.

23    Q.  Did you find any files that said:  For this container for

24    this customer, we have done this work?  Did you find any of

25    that?

REDIRECT - NICOLE RAMM                                    89

11:45 1    A.  No.

2    Q.  Not on a single case?

3    A.  No.

4    Q.  Did you find any whiteboards in the shops that showed the

5    progress on a container and what had been done?

6    A.  So at that point, it was Universal Container Homes, and so

7    it was a different set of individuals.  It wasn't really -- the

8    victims in that -- well, the individuals paying in that case

9    were not used in this case.

10    Q.  So even if there had been work done on containers, you were

11    not able to find any documentation showing what was done?

12    A.  No.

13    Q.  Regarding the bank records that the government has in its

14    exhibits, the highlighting, who highlighted the portions?

15    A.  I did.

16    Q.  You did.  Those bank records, had those been previously

17    provided to the defense counsels -- and I'm going to go back to

18    trial counsels, which are not the gentlemen here -- were those

19    bank records provided way back when to trial counsel as part of

20    discovery?

21    A.  Yes.

22    Q.  So just so I'm clear for Judge Montalvo, the bank records

23    in these exhibits are nothing new?

24    A.  No.

25              MR. KEAGLE:  Judge, I have nothing further.

11:46  1          THE COURT:  Ms. Ramm, so that this is clear to me, are

2      you saying that -- I mean, are you testifying that of all the

3      records that you reviewed for the different victims here, you

4      couldn't find any records that told you that, for example, say

5      Ms. Miller, she remitted a total of $94,200 to defendants and

6      their entities?  You couldn't find any documentation that said,

7      of these $94,200, X amount of dollars are going to be used for

8      buying the containers, X amount of dollars was going to be

9      assigned to the laborers spent?  Did you find anything like

10     that?

11         THE WITNESS:  No, I expected to find escrow files or

12     something that would detail how much money was given, what the

13     contract was for, how much was already spent on it, what was

14     due to be finished, and we found none of that during their

15     searches.

16         THE COURT:  Okay.  And the amount -- to recap, the

17     amount that was determined was owed to Mr. Carbone in

18     restitution was $44,300?

19         THE WITNESS:  51,800 is what I have on here.

20         THE COURT:  And tell me again how you go -- how you

21     arrived at that 51,800.

22         THE WITNESS:  Those were all the deposits he and his

23     business made to the account.

24         THE COURT:  Okay.  I'm finding by a preponderance of

25     the evidence that the amount owed to Mr. Carbone of restitution

CROSS - NICOLE RAMM                                    91

11:48 1    is $51,800.

2                    Mr. Burk, do you have any questions with respect to

3    the restitution to Ms. Simpson and Ms. Wade?

4                    MR. BURK:  Yes, yes, Your Honor.

5                    THE COURT:  You may proceed.

6                                CROSS-EXAMINATION

7    BY MR. BURK:

8    Q.  Ms. Ramm, my first question for you:  Are you aware of a

9    program called Smartsheets?

10   A.  No.

11   Q.  So you would not be aware that that's where we kept all of

12   our records for our clients; is that correct?

13   A.  I don't know if that's the case, sir.

14   Q.  Okay.  Are you aware of any of the materials or work that

15   we did that would offset any of the restitution for Simpson and

16   Wade?

17   A.  No.

18   Q.  Are you aware of any of the different individuals that had

19   showed up at her property that were charging her for different

20   types of work?

21   A.  I don't know if that's the case, sir.

22                    MR. BURK:  I pass the witness, Your Honor.

23                    THE COURT:  Mr. Solis.

24                    MR. SOLIS:  Thank you, sir.

25

CROSS - NICOLE RAMM                    92

11:50  1                          CROSS-EXAMINATION

2    BY MR. SOLIS:

3    Q.  With regard to offsetting loss for Ms. Simpson and Wade, I

4    think it's a typical -- you correct me if I am wrong, ma'am:

5    The typical design fee was, like, $6,800.  Is that what you

6    found in reviewing these documents?

7    A.  Some of the transfers were 3800.

8    Q.  Right.

9    A.  Or 6800.

10   Q.  6800?

11   A.  Yes, the initials.

12   Q.  Right.  And then there was what they call a perc test?

13   A.  I'm sorry?

14   Q.  A perc test and then a study in and around where they

15   wanted to set the containers, do you remember those?

16   A.  I am unaware of what that is or how that --

17   Q.  Do you know -- well, you are not aware, okay, all right,

18   thank you.

19            MR. SOLIS:  Pass the witness.

20            THE COURT:  Of the documents that were provided to you

21   to review, Ms. Ramm, following the two -- the execution of the

22   two warrants --

23            THE WITNESS:  Yes.

24            THE COURT:  -- were you given access to any computer

25   files, any financial documentation in their computers?

11:52   1         THE WITNESS:  There was a computer.

2         THE COURT:  Oh, just one computer, okay.

3         THE WITNESS:  Yes.

4         THE COURT:  And, you know, were you able to review

5 whatever financial records were in that computer?

6         THE WITNESS:  The agent did.  I did not.

7         THE COURT:  Okay.  Do you have that information -- I

8 mean, did you have access in terms of what kind of

9 documentation -- what kind of financial documentation was

10 contained there?

11         THE WITNESS:  I asked her for that, and she said that

12 it was not present.  There was nothing to provide to me.

13         THE COURT:  Okay.

14         MR. KEAGLE:  Nothing further, Judge.

15         THE COURT:  Okay.  So Ms. Simpson and Ms. Wade,

16 typical of many of the victims here, received design plans, no

17 containers.  And they -- the two ladies paid a total of

18 $53,800; is that correct?

19         THE WITNESS:  Yes.

20         THE COURT:  And I'm finding by a preponderance of the

21 evidence that the amount owed to them in restitution is

22 $53,800.

23         The next person is Mr. Rao.  Do you have any questions

24 with respect to Mr. Rao, Mr. Burk?

25         MR. BURK:  Yes, Your Honor, thank you.

11:53 1                          CROSS-EXAMINATION

2      BY MR. BURK:

3      Q.  Do you have any records of any expenditures that Mr. Rao

4      spent with Atomic, Ms. Wade -- excuse me -- Ms. Ramm?

5      A.  From Mr. Rao?

6      Q.  Yes.

7      A.  I'm sorry, the question is kind of confusing.

8      Q.  Okay.  Then I will rephrase.  In your records with whatever

9      you're working with, are you aware of any of the expenditures

10     that were spent on his behalf by Atomic?

11     A.  No.

12     Q.  You are not.  Okay.  Do you have any credits for any

13     materials or work that Atomic did on Rao's property?

14     A.  No.

15     Q.  Are you aware that Rao was not our client?

16     A.  I don't know if that's the case, sir.  He stated he was a

17     client and then provided money.  That's what I'm aware of.

18     Q.  In this particular case, I would like to ask you if you are

19     aware that Laura Martin was our client, but you are already

20     telling me that you are not aware.  So I will withdraw that.

21          Are you aware of any of the expenditures from the bank

22     accounts that you have access to, of materials and people,

23     projects, leases, rentals, any of those types of things that we

24     spent on Rao's project from our bank account?

25     A.  Not directly attributable that I can determine was just for

11:55  1   him.

2   Q.   Okay.   What about equipment rentals?

3   A.   I don't know if it was just for him.   It would have had to

4   have been noted as such, which I found no record of that.

5            MR. BURK:   Pass the witness, Your Honor.

6            THE COURT:   Mr. Solis.

7            MR. SOLIS:   No questions, Your Honor.

8            THE COURT:   The trial testimony will reflect that --

9   reflects that he received home plans that were rejected by the

10   permit office because it not being up to code.   And the amount

11   of restitution owed him is $84,900, and I'm finding that by a

12   preponderance of the evidence.

13            That's the same amount you determined, Ms. Ramm,

14   84,900?

15            THE WITNESS:   Yes, sir.

16            THE COURT:   Okay, very well.

17            And to be clear, the remitter on the transfers of

18   money that you saw in the bank records was Mr. Rao?

19            THE WITNESS:   Yes.

20            THE COURT:   Right.   And he wasn't shown as being the

21   spouse of Ms. Martin or anything like that?

22            THE WITNESS:   The 302 reflects that they are spouses.

23            THE COURT:   Right.

24            THE WITNESS:   But the funds all came from Mr. Rao.   I

25   don't know who Ms. Martin is.

11:57 1        THE COURT:  Very well.  Mr. Burk, do you have any

2    questions about the restitution amount claimed by Mr. Ruouchan

3    Lu?

4        MR. BURK:  I do, Your Honor, but I don't believe this

5    particular witness can answer them.  So I rest on this one.

6        THE COURT:  Okay.  Mr. Solis?

7               CROSS-EXAMINATION

8    BY MR. SOLIS:

9    Q.  Ms. Ramm, you do have a Defense Exhibit 1 that I delivered

10    to you a little while ago?

11    A.  Yes.

12    Q.  All right.  So it appears that the total loss, according to

13    the government's spreadsheet of August 1, for Mr. Lu is

14    182,000.  Is that what your figures show?

15    A.  Yes.

16    Q.  Consistent with my exhibit, right?

17    A.  Yes.

18    Q.  And the PSR, the presentence report there on the very left

19    of that ledger I delivered as Exhibit 1, is 143,600; is that

20    right?

21    A.  Yes.

22    Q.  And the deposits total into the accounts, the bank

23    accounts, and supported by the Government's Exhibit is 143,600,

24    correct?

25    A.  Yes.

11:59 1    Q.  Which is consistent with what the PSR says is the loss for

2    guidelines purposes, right?

3    A.  Yes.

4    Q.  So the difference -- in this case, it's about $38,000, it

5    looks like -- is attributable to the victim impact statement;

6    is that right?

7    A.  Yes.

8    Q.  And there he notes rent and rental agreements that --

9    expenses that he incurred because the container wasn't

10   delivered.  Is that right?

11   A.  Yes.

12   Q.  Do you have any knowledge as to when he had planned to sell

13   the home or property he was already in prior to purchasing or

14   contracting for a container home?

15   A.  No.

16   Q.  Do you know if his plan was to move regardless of whether

17   he had a container home or not?

18   A.  No.

19   Q.  Do you know if his plan absolutely rested on the idea that

20   he would have a container home before he sold his property to

21   move?

22   A.  Well, I could review the 302 to help my memory.

23   Q.  Sure, sure.

24   A.  There are a lot of victims in this case and cases in there.

25   Q.  Sure, that's fine.

12:01 1    A.  No, I don't see it.

2    Q.  All he says is he wanted a container home built in Houston

3    is all he says, right?

4    A.  Yes.

5    Q.  All right, ma'am.  So the difference in the -- in those

6    amounts is strictly attributed to the victim impact statement

7    and the rental expenses, correct?

8    A.  Yes.

9              MR. SOLIS:  Thank you.  Pass the witness, Your Honor.

10             MR. KEAGLE:  Nothing, Judge.

11             MR. BURK:  Your Honor, may I ask her one more

12   question?

13             THE COURT:  Of course, yes, sir.

14                        RECROSS-EXAMINATION

15   BY MR. BURK:

16   Q.  I have actually looked at the 302 on this particular

17   client.  And I'm curious, Ms. Ramm.  I see in the 302 quite few

18   things that are mentioned about the property and expenditures

19   that were done.  Have you taken into account with Rohan [sic]

20   Lu any of the work or costs associated that would be credited

21   to Atomic?

22   A.  No.

23   Q.  And why wouldn't you do that if you see that in the 302?

24   A.  There's no dollar amounts there that I can attribute, no

25   receipts, nothing specific for me to actually use to attest to.

12:02 1    Q.   Okay.  But you do see that there has been work done,

2    correct, by the 302?

3    A.   I do see that he traveled and said that there was equipment

4    working --

5    Q.   Okay.

6    A.   -- on the property.

7    Q.   Okay.  Knowing that, instead of charging us for the full

8    amount that's here, wouldn't you go to the banking records and

9    see what our expenditures are for that particular time frame?

10   A.   I expected to go to Atomic and obtain the escrow file to

11   determine how much that should be credited for, but I didn't

12   find that.  And I can't parse it out per victim.  I don't know

13   whose property was being worked on when and for how much.  And

14   so that would be too subjective for me to attest to.

15   Q.   Why didn't you ask me for the Smartsheets then?

16   A.   I have never spoken to you, sir.  It's not part of my job

17   to talk to you.  That would be the agent's job.

18   Q.   Thank you.

19        MR. BURK:  I'm finished with this particular person,

20   Your Honor.  I will pass the witness to Mr. Solis.

21        MR. SOLIS:  No questions, Your Honor.

22        MR. KEAGLE:  Nothing, Judge.

23        THE COURT:  Looking at the sequence of events, the

24   chronological list presented by Mr. Lu in his statement, and my

25   recollection of the testimony at trial and all the information

12:06    1    adduced in the presentence report, I find by a preponderance of

2    the evidence that the amount owed to Mr. Ruouchan Lu in

3    restitution is $182,000.  As with many of these victims, he

4    received worthless engineering plans and, of course, no

5    container.  And it's interesting to note that he found himself

6    signing the rental agreement as -- after almost three months --

7    two months short of two years of his first contact and had not

8    at that time gotten anything.  So that's my finding by a

9    preponderance of the evidence on Mr. Lu.

10            We will recess until 1:45, at which time we will begin

11    with Ms. Laurie Olson.

12            (Recess)

13            THE COURT:  Mr. Burk, did you have any questions of

14    Ms. Ramm with respect to victim number 7, Ms. Laurie Olson?

15            MR. BURK:  And yes, Your Honor, I do.  Before I ask

16    that question of Ms. Ramm, one of the things that came up just

17    before you came back into the room, Your Honor, was about the

18    victim impact statements.  And my question to the prosecution

19    was:  Would I be able to get that if things were not finished

20    today since it was not printed out at West Texas Detention

21    Facility?

22            Mr. Keagle brought up the idea that because they are

23    not members of the Court there, he's highly concerned about

24    what they would do with them.  And my suggestion to him was, in

25    advance, perhaps they could be printed out here, and I could

14:23 1   hand carry them so that I kept them in my possession.  But I

2   just wanted to pose that to you before I started.

3          MR. KEAGLE:  Judge, my problem with the victim impact

4   statements under 3664(d)(4) is the Court is supposed to guard

5   those with the utmost security.  And I'm going to defer to the

6   Court.  If you order me to, I will have someone print them out

7   and give it to him.  They are redacted, but I'm just -- you

8   know, this is one of those tough situations.  I don't know what

9   the right answer is, but I know he has got a right to look at

10  the documents.  I got to balance that with the victims' rights.

11  So I will defer to the Court.  Whatever you want me to do,

12  Judge, we will follow your order.

13         THE COURT:  Mr. Lopez, you do have those in your

14  laptop, correct?

15         MR. LOPEZ:  I do, as well as printed physically right

16  here.  So it's just a matter of -- I apologize, Your Honor.  If

17  the Court were to allow Mr. Burk to take these in his person,

18  then he could take them on the bus, if the marshals would be so

19  kind.  If not, then I will print them up, and I will take them

20  to him as early as tomorrow morning or even this evening if

21  need be.  My only concern is if I send them electronically,

22  then we defeat the whole purpose of privacy because then they

23  have to go through the facility.

24         THE COURT:  Right.  And they arrive, like, at 7:00 in

25  the morning, right?

14:25 1                THE MARSHAL:  Yes, Judge.

2                THE COURT:  Okay.  So you have time to meet with him

3    before we start -- we reconvene the hearing tomorrow morning?

4                MR. LOPEZ:  Tomorrow morning?

5                THE COURT:  Yes, because we are not going to finish

6    today.

7                MR. LOPEZ:  Yes, sir.  I will make myself available,

8    and I will be here at 7:00 in the morning to go over everything

9    with him.

10               THE COURT:  Yes, sir.

11               MR. KEAGLE:  It's -- Judge, the other option -- you

12   know, Mr. Lopez, I have given him a copy, digital and hard

13   copies of all the exhibits.  The victim impact statements are

14   in the exhibits --

15               THE COURT:  Right.

16               MR. KEAGLE:  -- as well.  So if the Court decides that

17   he wants him to have a hand [sic] copy, you know, Judge, I will

18   follow that order.  I just want the Court to be aware, for

19   purposes of the record, just the apprehension I have in case my

20   bosses call later.  I wanted someone else to blame it on,

21   Judge.

22               MR. LOPEZ:  They have been very careful in redacting,

23   Your Honor.  If there is any personal information on -- I will

24   go through them all right now.  And if there are any personal

25   information that -- Social Security numbers, addresses,

14:26 1  anything of that nature -- I will let the government know, so

2  they could further redact it.

3          THE COURT:  So they are redacted?

4          MR. KEAGLE:  Yes, sir.

5          THE COURT:  Okay.  So there are no personal

6  identifiers there?

7          MR. KEAGLE:  I hope I got everything.  I will tell the

8  Court I think I redacted all of the PII.  Their names should be

9  about the only things on there.  But if Mr. Lopez wants to do

10  me that favor, that will be great.  I will be glad to further

11  redact anything that's needed.

12          MR. LOPEZ:  That's all I have seen is names and

13  numbers, financial numbers, nothing identifiable, Your Honor.

14  But I will go through each one to make sure that there is

15  nothing else.

16          THE COURT:  Okay.  And, Mr. Burk, you will have to

17  bring them back tomorrow.

18          MR. BURK:  Absolutely, Your Honor.  You have my word,

19  and that will absolutely happen.  I need to use them.  So to

20  have them in my possession at all times is paramount.

21          THE COURT:  You bring them back tomorrow, and then

22  they stay with your lawyer.  You will not be able to keep those

23  hard copies.  Your lawyer will keep them, okay?

24          MR. BURK:  I understand, Your Honor.

25          THE COURT:  So I'm going to allow you to have those --

14:27   1    that set of statements overnight.  You have to bring them back

        2    tomorrow.

        3              MR. BURK:  Thank you.

        4              THE COURT:  And, Marshals, if you would make a note to

        5    West Texas that when he gets on the bus here tomorrow, he has

        6    to have that same set of documents with him.  Okay?

        7              THE MARSHAL:  I will, Judge.

        8              THE COURT:  So having taken care of that, any

        9    questions of Ms. Ramm about Ms. Olson?

       10              MR. BURK:  Yes, Your Honor.  Number 7, Laurie Olson.

       11                          CROSS-EXAMINATION

       12    BY MR. BURK:

       13    Q.  Ms. Ramm, in the material that I put together and the

       14    questions that I had for you, were you aware whether or not

       15    Laurie Olson had come to visit Atomic at our facility?

       16    A.  I am unaware.

       17    Q.  Unaware.  What about are you aware whether or not she hired

       18    a contractor to work with her on her end?

       19    A.  I'm unaware.

       20    Q.  Okay.  Due to the date of her 302 and then also, of course,

       21    she came to the trial, are you aware of what stopped her from

       22    working with us?

       23    A.  I'm unaware, sir, or if that's true.

       24    Q.  Okay.  Are you aware whether or not she filed a civil suit

       25    with us?

14:29 1   A.  I'm unaware.

2   Q.  Okay.  Are you aware whether Laurie Olson had actually

3   spoken with Cody Carbone?

4          MR. KEAGLE:  Objection, Judge, relevance.

5          THE COURT:  Sustained.

6   BY MR. BURK:

7   Q.  Okay.  Are you aware of how much site work that she had

8   done at her property?

9   A.  I'm unaware.

10  Q.  So then I would also take it you are unaware of how much

11  site work we did there as well, correct?

12         MR. KEAGLE:  Objection, argumentative.

13         THE COURT:  Sustained.

14  BY MR. BURK:

15  Q.  Are you aware of how many payments that she made to us?

16  A.  Yes, I can look.

17  Q.  Please.

18  A.  Five.

19  Q.  Okay.  Are you aware that when a client makes typically

20  more than one payment to us, it's because there's good

21  communication?

22         MR. KEAGLE:  Objection, argumentative.

23         MR. BURK:  Find a better way of asking it.

24         THE COURT:  Sustained.

25

14:31 1    BY MR. BURK:

2    Q.  Are you aware that when a client makes multiple payments to

3    us --

4            MR. BURK:  I'm not sure I know how to ask this

5    question, Your Honor.  I know what I want to say, but I don't

6    know exactly how to ask it.  One moment, please.

7            Thank you for your moment.

8    Q.  Do you know why Laurie Olson would continue to make

9    payments to us?

10    A.  My understanding is for a container.

11    Q.  Okay.  Did you ever speak with Laurie Olson directly?

12    A.  No.

13    Q.  Are you aware of the amount of money that Atomic spent on

14    her project?

15    A.  No.

16    Q.  And do you have an exact amount today of what is claimed

17    that we owe Laurie Olson?

18    A.  Ms. Olson paid $59,217.62 into Atomic accounts.

19    Q.  Okay.  Would it make sense to you that we would see

20    differently due to the fact we've been working on projects for

21    her?

22            MR. KEAGLE:  Objection, argumentative.

23            THE COURT:  Sustained.

24            MR. BURK:  I will withdraw that question, and I will

25    pass to Mr. Solis.

14:33 1          MR. SOLIS:  No questions of this witness, Your Honor.

2          THE COURT:  Thank you.

3          I find by a preponderance of the evidence that the

4     restitution amount to Ms. Laurie Olson is 59,217.62.  Mr. Burk,

5     do you have any questions of Ms. Ramm with respect to Reagent

6     World?

7          MR. BURK:  Yes, Your Honor.

8                          CROSS-EXAMINATION

9     BY MR. BURK:

10    Q.  Ms. Ramm, for Regent [sic] World, are you aware of how many

11    payments they made to us and what the size of those payments

12    were?

13    A.  I can look.

14    Q.  Please.

15    A.  They made six payments.

16    Q.  And do you know what the size of those payments were?

17    A.  They are all different:  15,000, 10,000, 10,000, 5,000,

18    10,000, 15,000.

19    Q.  Do you know why those payments are different sizes?

20    A.  I don't, sir.

21    Q.  Okay.  Have you seen the contract between Regent [sic]

22    World and Atomic?

23    A.  I have not.

24    Q.  Do you know what the balance owing with the difference

25    between what was paid and what was to be paid?  Do you know

14:34 1    what the balance is?

2    A.  No.

3    Q.  Okay.  Are you aware that the military in Georgia contacted

4    Atomic directly about this particular project?

5    A.  No.

6    Q.  Okay.  Has anybody that you work with shared any emails

7    with you between Atomic, Regent [sic] and/or Georgia, the

8    military base?

9    A.  No.

10   Q.  So you would really not know what happened with this

11   project or why it stalled?

12   A.  I don't know if it did stall.  I don't know the particulars

13   of the project, just that a container did not arrive.

14   Q.  Were you aware that Atomic works when people pay us, and we

15   stop when they stop paying us?

16        MR. KEAGLE:  Objection, argumentative.

17        THE COURT:  Sustained.

18   BY MR. BURK:

19   Q.  Were you aware that Regent [sic] World stopped paying us in

20   the middle of the project?

21        MR. KEAGLE:  Objection, argumentative, Judge.

22        THE COURT:  Overruled.  You can answer that, ma'am.

23   A.  I don't know if that's true, sir.

24   BY MR. BURK:

25   Q.  Okay.  Were you aware that there was multiple plans that

14:36  1    Atomic was given for this project?

       2    A.  No.  I don't know if that's true.

       3    Q.  Okay.  One moment, please.  Are you aware that we offered

       4    for them to come and pick up their project?

       5    A.  I don't know if that actually occurred, sir.

       6    Q.  Are you aware that we didn't finish their project because

       7    they didn't finish paying for it?

       8            MR. KEAGLE:  Objection, argumentative.

       9            THE COURT:  Overruled.  You can answer that, ma'am.

      10    A.  I don't know why a product wasn't produced, sir, just the

      11    fact that it was not.

      12    BY MR. BURK:

      13    Q.  Thank you.  Do you know what it means to be blackballed

      14    from military contracting?

      15    A.  Blackballed, sir?

      16    Q.  Yes, ma'am.

      17    A.  Like not allowed to, not considered for -- not being given

      18    consideration?  Is that what you are trying to --

      19            MR. KEAGLE:  Judge, for purposes of her answer, I

      20    would like to clarify this is her opinion and not --

      21            THE COURT:  Of course, yes --

      22            MR. KEAGLE:  Thank you, Judge.

      23            THE COURT:  -- I understand that.

      24    A.  Like the consideration, not being given the consideration.

      25            MR. BURK:  Okay.  And that will be all of my questions

14:38 1    on this particular one at this time.  Thank you very much.  I

2    pass.

3                MR. SOLIS:  Just real briefly, Judge, if I may.

4                THE COURT:  Yes, sir.

5                          CROSS-EXAMINATION

6    BY MR. SOLIS:

7    Q.  Hello, Ms. Ramm.  On the issue of contracts that Mr. Burk

8    was asking you about, do you know -- you mentioned there were

9    occasions when there was two search warrants or efforts at the

10   yard for ACH on San Antonio Street.  Do you know if there were

11   any contracts of the sort that Mr. Burk is referencing in his

12   questions to you that were seized or confiscated from the

13   container company?

14   A.  There were none located there, sir.

15   Q.  Okay.  Did you ever have occasion to review or view any of

16   those, if there were any contracts?

17   A.  If the agents spoke with a victim and they provided their

18   contract, it was in the file.  I didn't necessarily review

19   every single one of them.

20   Q.  Do you recall having reviewed several?

21   A.  Perhaps.  It's been a very long time.

22   Q.  Okay.  But you had access to those?

23   A.  I have -- I have seen them before, yes.

24   Q.  Okay, yes.  And in your effort here, as I understand it,

25   was to determine loss for restitution purposes, correct?

14:39 1    A.  To assist in that process, yes.

2    Q.  And then simultaneous to that, determining loss for

3    purposes of a guideline sentence prior to this hearing today,

4    right?

5    A.  No.

6    Q.  No?  You had no effort in that?

7    A.  No.  I participated.  I provided the amount of money that

8    came into these accounts.  But I was not the person in charge

9    of -- neither for this hearing or for the purposes of

10   sentencing, determining that amount.

11   Q.  You simply participated in it?

12   A.  Yes.

13   Q.  So in either effort, for purposes of restitution or

14   determining a guideline sentence, would having the contracts

15   have any bearing in your effort to determine what was

16   appropriate loss?

17   A.  No.  The loss is attributable to the amount of money paid.

18   And then any other credit given, that was not -- that was not a

19   task given to me specifically.

20   Q.  Okay.  So you were looking at essentially what came in?

21   A.  Yes.

22   Q.  And what was received?

23   A.  And what was paid out, if there were any disbursements back

24   out.

25   Q.  Right.  And if it came in, you would need to trace it or

CROSS – NICOLE RAMM                          112

14:40 1    link it to somewhere or someone that is verifiable?

2    A.   Yes.

3            MR. SOLIS:  All right.  Thank you.  Pass the witness.

4            THE COURT:  With Reagent World, as well as with Olson,

5    there was no product received.  Ms. Olson received an

6    incomplete set of drawings that are worthless.  And in the case

7    of Reagent World, they received nothing.  So I'm finding by a

8    preponderance of the evidence that the amount of restitution to

9    Reagent World is $65,000.

10           Any questions, Mr. Burk, on Mr. Allen -- Taylor

11   Allen/Christina Geis?

12           MR. BURK:  Yes, Your Honor.

13                       CROSS-EXAMINATION

14   BY MR. BURK:

15   Q.   I have a question to start out.  And, really, before we go

16   much further on this, Ms. Ramm, are you -- are you considered a

17   third party?

18   A.   No.

19   Q.   Okay.  And I forget because I didn't write it down -- are

20   you a forensic accountant?

21   A.   That is my job title.

22   Q.   Would this court allow you to tell me what that exactly is

23   so that I have a better understanding?

24   A.   What a forensic accountant -- what -- are you asking

25   specifically about, like, for the FBI?

14:42 1    Q.  Yes, ma'am.

2    A.  So the FBI teaches us it is the art and the science of

3    connecting people and money.  So I account for things that

4    could potentially end up in litigation.

5    Q.  Thank you for that explanation.  Over the last week or so,

6    I've actually had the opportunity to look at quite a few

7    different numbers when it comes to Taylor Allen.  I see here

8    that you have a total of 127,100; is that number correct?

9    A.  That's what's on the sheet, yes.

10    Q.  Okay.  Can you tell me why that number is different from

11    the 90,990 from probation?

12    A.  That is based on his victim impact statement minus the

13    container that he received.

14    Q.  Impact statement.  And the container that he received, are

15    you referring to one container?

16    A.  Yes.

17    Q.  Are you aware that Taylor Allen built a house out of two

18    53-foot containers?

19    A.  I don't know that to be true.

20    Q.  Do you have any pictures of his home?

21    A.  No.

22    Q.  Did Taylor Allen or Christine Geis in their impact

23    statement, did they provide any receipts or anything of that

24    nature?

25         MR. KEAGLE:  Judge, I'm going to object.  They are not

14:44  1   required to participate in the restitution process; therefore,

2   they do not have to submit anything.

3            THE COURT:  He is just asking.

4            You may answer that, ma'am.

5   A.  They provided the form and then their explanations.

6   BY MR. BURK:

7   Q.  A form and an explanation, thank you.  The 302 I have, I

8   believe it has a number of 91,300 as an estimate by Taylor

9   Allen.  Are you aware of that number and why we have that

10   number?

11   A.  Do you have the page on the 302 where it states that?

12   Q.  This would be on the 302 that I was given, say, less than a

13   week ago.

14   A.  Yeah, which page, though?  I don't --

15   Q.  Okay.  All I wrote down is:  Taylor Allen estimate, 91,300.

16   A.  Okay.  I see in January 2018, agreed to pay a total price

17   of approximately $90,000.  Okay, yes.

18   Q.  Okay.  Because I do not have that -- oh, I apologize.  I do

19   have it in front of me.  One moment, please.

20            So you are aware that Taylor Allen did come to El Paso

21   and work with the Atomic team to build himself a house?

22   A.  Agent Nebrich relayed to me that he did come to El Paso.  I

23   don't know what activities he conducted here.

24   Q.  Are you aware that he signed a new contract with Atomic

25   when he showed up?

14:46 1    A.  I don't know that to be true.

2    Q.  So you are telling me the FBI does not have a copy of that

3    contract?

4    A.  The FBI may have a copy of that contract, but I am not

5    aware of it.

6    Q.  Without seeming like I'm pushing over the top, why wouldn't

7    they share that with you to be part of this restitution?

8    A.  It's all accessible to me.  I need to know what I'm looking

9    for, though.  And that was not one of the items to be included

10   in our list here.

11   Q.  Okay.  So with that said -- and this kind of opens up a new

12   can of worms in my head -- have you looked at everybody's

13   contract prior to coming and doing this type of work for this

14   project?

15   A.  No.

16   Q.  You haven't.  Okay.  Did you have a chance to read any of

17   the material from the trial transcript from Christine Geis?

18   A.  No.

19   Q.  Do you know which one was our client, Christine Geis or

20   Taylor Allen?

21   A.  I can only tell you who paid the money when.  Each of them

22   paid money at different times.

23   Q.  Pardon me?

24   A.  Each of them paid money at different times.  That was my

25   role.  And this is -- I identified them through the funds.

CROSS - NICOLE RAMM                                116

14:47 1    Q.  Okay, thank you.  One of the things we saw in the 302 was

2    that -- I believe it was sometime in November.  I don't have

3    the date in front of me.  But that Taylor Allen had purchased a

4    piece of property in California.  Are you aware of that?

5    A.  No.

6    Q.  Are you aware of the piece of property that his home is

7    existing on at the moment?

8    A.  No.

9    Q.  Okay.  Are you aware of any of the permits that he did or

10   did not take out to build his home?

11   A.  I'm sorry.  Can you --

12   Q.  Yes.  Are you aware of any of the permits that he did or

13   did not take out to build his home?

14   A.  I am unaware.

15   Q.  Okay.  Is there any known signed and sworn affidavit by

16   Taylor Allen or Christine Geis concerning their restitution

17   amounts wanted?

18   A.  There is a signed statement --

19   Q.  So the victim impact statement.

20   A.  -- victim impact statement.

21   Q.  Is there a signed affidavit?

22   A.  I believe so.  I don't know.  That's not something that I

23   obtain.

24   Q.  Okay.  One moment, please.  What we have here in this

25   document, Exhibit E, paragraph 75, 3 pages, which says, Taylor

14:50  1    Allen, Christine Geis on it.  Is this the cleanest copy that we

       2    have?

       3    A.  This is all I'm aware of.

       4    Q.  Were you aware, according to his new contract, that Atomic

       5    wasn't responsible for his foundation, trucking service, or

       6    crane?

       7    A.  I'm unaware.

       8            MR. BURK:  I pass the witness.

       9            MR. SOLIS:  May I, Your Honor?

      10            THE COURT:  Yes, sir.

      11                        CROSS-EXAMINATION

      12    BY MR. SOLIS:

      13    Q.  Before I forget and I go into the deposits with Taylor

      14    Allen and Ms. Geis, on these restitution or victim impact

      15    statements, did you receive any corroborating photographs; or

      16    like in Mr. Taylor Allen's case, corroborating invoices or

      17    expense receipts for the alleged expenses they had to go

      18    through to make the container home habitable or whatever?  Do

      19    you have any of that accompanying any of these victim impact

      20    statements?

      21    A.  I didn't send out the statements.  I don't know what all

      22    was received with them.  This is what I have been provided.

      23    Q.  Yes, ma'am.  But you are here today.  Do you have any of

      24    those today?

      25    A.  No.

14:51  1    Q.   Have you reviewed --

2    A.   Well, unless they are in here already.

3    Q.   Well, have you reviewed that in preparation for today's

4    testimony?

5    A.   I reviewed the whole binder, yes.

6    Q.   Did you find anything like that?

7    A.   There may be some in here.  I don't recall all 39 of them.

8    Q.   Okay.  At least for Mr. Taylor Allen and Christina Geis,

9    could you check to see?

10   A.   No.  I did check.  It is not there.

11   Q.   It is not there.

12        So, oftentimes, it looks like we are taking the word

13   of whatever the particular individual says they went through as

14   far as --

15        THE COURT:  Let me save you some time.  Ms. Geis

16   testified at trial.

17        MR. SOLIS:  Thank you, Your Honor.

18        THE COURT:  And she was subject to cross-examination.

19        MR. SOLIS:  She testified?

20        THE COURT:  Oh, yes, she sure did.

21        MR. SOLIS:  Thank you, sir.

22   BY MR. SOLIS:

23   Q.   All right.  With regard to the deposits, ma'am, that is

24   something you did, right?

25   A.   Yes.

14:52 1    Q.  The government's exhibit indicates some wire transfers, it

2    appears.  And they very clearly indicated Christine Geis -- for

3    example, the very first one, ma'am, U.S. Bank, December 11,

4    December 22, Christine Geis, Christine Geis.  On the flip page,

5    there's January 24, Christine Geis, in the sum of $10,000.  And

6    then before I go to the one I will ask you about, the very last

7    one is May 23, Taylor Allen, $15,000.  And the sum of those is

8    $75,990.  To make the $90,990 that alleges loss for PSR

9    purposes, not including victim impact alleged loss, is an

10    April 5 wire credit that's highlighted from the government's

11    exhibit, but it's referenced Joanne Duma?

12    A.  Yes.

13    Q.  And so I would like to know what the connection with Joanne

14    Duma to Taylor Allen and Christina Geis is and how we link it

15    to them.

16    A.  Christina Geis is the mother.  Taylor Allen is the son.

17    And Joanne Duma is his wife.

18    Q.  And you know this because?

19    A.  Of Special Agent Nebrich.

20    Q.  And she attributed that to a 302 somewhere?

21    A.  A conversation that she had with him.

22    Q.  Is it memorialized or recorded in any verifiable form that

23    we can look at or review or --

24    A.  I -- I don't know, sir.  I don't know if she documented

25    that.  That is what was told to me.  That is how I made the

14:54 1    correlation; otherwise, I can't make the correlation.

2    Q.  Yes.  But you only know that because it was told you.  It's

3    not memorialized, recorded?

4    A.  And the wire may reflect -- so on a wire -- the details

5    aren't in here.  On a wire, you can put originator to

6    beneficiary information that you would like to convey.  And so

7    there may have been some correlation there as well.  I am

8    unsure specifically for these transactions.  I didn't pull the

9    details for this.

10   Q.  So, today, you can't definitively say that's the case here;

11   that that wire would indicate it's linked to Taylor Allen or

12   Joanne -- or Christina Geis?

13   A.  I don't know that the wire reflects that.

14   Q.  You can't say that today, right now?

15   A.  I know it from my conversation with Special Agent Nebrich

16   that it is the case.

17   Q.  And that apart, that aside, otherwise, you cannot indicate

18   by this wire identification process you described that that

19   wire from Duma belongs or should be credited to Geis and Allen?

20   A.  Based on the statement alone, no, sir.

21          MR. SOLIS:  Thank you, ma'am.

22          MR. BURK:  Your Honor, I would join Mr. Solis' math.

23   We have the same math here.

24          MR. SOLIS:  Your Honor, I know the Court is, as we

25   conclude the cross-examination, making rulings as to the loss.

14:55 1    So sometimes I'm reluctant to make just a very short, brief

2    argument to why I think it should be included.  Unless it is

3    painfully obvious what my argument would be, then I would

4    refrain from doing so.

5                THE COURT:  I'm happy to listen to you.

6                MR. SOLIS:  Yes, sir, it's just that --

7                THE COURT:  I mean, this is -- I have been very

8    flexible here all along.  So if you want to object to my

9    finding, this is the time.

10               MR. SOLIS:  Yes, sir.

11               THE COURT:  You are an experienced appellate lawyer.

12   You know the drill.

13               MR. SOLIS:  Yes, Your Honor.  It's just the way we

14   are -- the procedure is a little odd to me.  But -- well,

15   Your Honor, if we can't link that deposit to Taylor Allen and

16   Christina Geis, I don't think it should be attributed as a

17   loss.  I know that there is some conversation -- and I know we

18   are at the sentencing and the restitution phase, so hearsay is

19   allowed.  But we should have some other indicia of reliability

20   that -- normally, it is a 302 or some memorialized report,

21   document to indicate:  We had these conversations and this

22   depositor is linked to the other individuals.  And without

23   that, I object to that 15,000 amount.

24               THE COURT:  Okay.  The Geis deposits on behalf of

25   Taylor Allen are borne out by the testimony.  In fact, I

14:56  1    distinctively recall Ms. Geis saying that she sold her house

       2    and a good bit of the equity she had from the house she gave to

       3    her son.  And I distinctively recall the testimony that

       4    Mr. Allen's wife was expecting a child at the time and all the

       5    grief that he went through in this process.  I distinctively

       6    recall that.

       7            I do understand, you know, your issue with Ms. Duma.

       8    I do understand that.  So that's why I'm looking at the PSR

       9    because I recall Ms. Duma being the wife of Mr. Allen.  But, of

      10    course, you know, I'm just looking at if I have a reference to

      11    that in the PSR to clear it up.

      12            MR. SOLIS:  Yes, sir.  Thank you.

      13            MR. KEAGLE:  And, Judge -- I'm sorry -- briefly

      14    interject, there is a statement from -- it just says, We,

      15    Taylor Allen and Joanne Duma.  So that's -- if the Court wants

      16    to review that, it's --

      17            THE COURT:  Was that given to defendants in discovery?

      18            MR. KEAGLE:  Yes, Judge, it's the --

      19            THE COURT:  Well, point it out.  Show it to Mr. Solis.

      20            MR. KEAGLE:  It's the page right behind his victim

      21    impact statement.  It says:  August 24, 2022, To Whom It May

      22    Concern, we, Taylor Allen and Joanne Duma, are seeking

      23    restitution.  And it goes on to lay out, I guess, what they

      24    went through, Judge.

      25            MR. SOLIS:  Well, if that is -- I wasn't at the

14:58    1    hearing or at the trial, so I don't know who Joanne Duma was or

         2    is.  So --

         3            THE COURT:  But here is the issue, though:  You know,

         4    you pointed out to me that there should be some kind of more

         5    reliable documentation about who Ms. Duma was.  And, you

         6    know -- and I'm taking your -- you know, your objection at face

         7    value.  So the government is pointing out to you that before

         8    this hearing, there has been a document produced that shows who

         9    Ms. Duma is.  So this is not:  Surprise, surprise, here is a

        10    stranger, you know, sending money on behalf of Mr. Allen to

        11    defendant's entities.  No, it is no surprise here.

        12            MR. SOLIS:  Yes, Your Honor, that's in the victim

        13    impact statement.  And the Court is correct.  It was an

        14    oversight.  I recognize that Joanne Duma is linked to Taylor

        15    Allen.

        16            THE COURT:  Fair enough.

        17            MR. SOLIS:  And those victim impact statements came in

        18    last week, Your Honor.

        19            THE COURT:  Okay, but there is discovery, though.  The

        20    302s were produced in anticipation of trial, though.  All of

        21    the 302s were produced here, all of them.  In fact, we had a

        22    hearing specifically dealing with admissibility of evidence and

        23    specifically to address if there were any discovery issues

        24    pending.  So I can tell you that if there is a 302 with that,

        25    it was produced.  So --

15:00 1          MR. SOLIS:  Yes, sir, the volume of discovery in this

2    particular case was -- and I understand the case had been

3    pending for several years.  I have only been on it since --

4    essentially since December.

5          THE COURT:  And like I said, I'm not criticizing you.

6    I mean, you are doing a very good job for your client.  But I

7    just can't let the record just go along without me making clear

8    that, as the presiding judge in this case, I made sure that

9    there were no discovery issues here.

10         MR. SOLIS:  Yes, sir.

11         THE COURT:  Ms. Ramm, so when you went through the

12   banking records --

13         THE WITNESS:  Yes.

14         THE COURT:  -- so, of course, you already linked

15   Ms. Geis and Ms. Duma to Mr. Allen's transactions.

16         THE WITNESS:  Yes.

17         THE COURT:  So in terms of disbursements, actual

18   dollars, so to speak, going from the three of them to defendant

19   and their entities, what was that amount, ma'am?

20         THE WITNESS:  $990,990 -- I'm sorry -- $90,990.

21         THE COURT:  And then the difference between the 90,990

22   and the 127,100 that is being claimed as restitution, could you

23   again tell us what is that difference -- where the difference

24   comes from?

25         THE WITNESS:  Yes, the victim impact statement lists

15:01 1   out expenses for $130,000, and the 2900 for receiving a

2   container was deducted.

3          THE COURT:  So the 130,000 is the 90,990, plus

4   30-some-odd-thousand dollars that they spent; is that correct?

5          THE WITNESS:  So they don't outline each particular

6   expense.  They just list out some of their additional expenses

7   I don't think that they expected to incur in addition to the

8   funds that were provided.

9          THE COURT:  What were those expenses, if you could

10   spell them out for the record?

11          THE WITNESS:  A trucking service, a roof, a

12   foundation, everything needed to rebuild.

13          THE COURT:  Because he received -- was it one or two

14   containers?

15          THE WITNESS:  He doesn't specify here.

16          THE COURT:  That he had to pick up himself here and

17   had bad wiring, so he had a few things that he had to have

18   done.  So is the victim statement showing that that difference

19   is what that cost him?

20          THE WITNESS:  That's how he -- yes, that's how the

21   statement is written.  He also specifies $60,000 -- okay.  He

22   has additional pages to his victim impact statement where he

23   tries to break out some of the additional expenses that were

24   incurred, Your Honor.

25          MR. BURK:  Your Honor, I'm not sure exactly how to

15:04 1    object to this, but I have to object.  Very, very clearly,

2    Mr. Allen came and built his house with us.  When it finished,

3    it was to be shipped to his residence --

4          THE COURT:  Let me stop you there for a second.

5    That's just not the testimony in the case.  And you sat here as

6    I did, too.  So, no, you are arguing evidence at this time,

7    what the evidence showed or didn't show.  You are arguing that

8    the evidence showed something opposite to what supported the

9    jury verdict.  So, no, I am not allowing that objection.  That

10   objection is overruled.

11         Mr. Keagle, the testimony of Ms. Ramm establishes that

12   between Ms. Geis -- please remind me of the wife's last name.

13         MR. KEAGLE:  Duma.

14         THE WITNESS:  Ms. Duma.

15         THE COURT:  Ms. Duma -- between Ms. Geis, Ms. Duma,

16   and Mr. Allen, cash or funds in the total of $90,990 were

17   transmitted to defendant and their -- and all their entities.

18   That's clearly the subject of restitution with, of course, the

19   credit for the one container they received has been

20   established.  So the difference between the net amount there

21   and the $127,100 that they are seeking in restitution, tell me

22   how that extra amount qualifies for restitution.

23         MR. KEAGLE:  So, Judge, any losses they incurred --

24   for instance, he says he had to put a new roof on that was

25   $10,000.  He had to do additional work.  He talks about the

15:06 1    trucking company swindled him out of $60,000.  He lists that in

2    the second -- in the third page of the victim impact statement.

3    Those are losses attributable to the conduct for restitution

4    purposes.

5              MR. BURK:  I am going to object --

6              THE COURT:  Excuse me.  Excuse me, Mr. Burk.  I am

7    going to give you your chance to speak, but you need to wait

8    for Mr. Keagle to finish.

9              MR. BURK:  Yes, Your Honor.

10             THE COURT:  So back to you, Mr. Keagle.

11             MR. KEAGLE:  And that's the government's position.

12   Those are losses that are foreseeable and attributable for

13   restitution purposes.  And, again, Judge, we have discussed

14   this; Mr. Solis and I have.  We wish they would give us an

15   itemized bill showing everything they had to pay for

16   restitution purposes.

17             But as you can see in his statement -- both of the

18   statements, it appears the traumatic effect this had on them

19   was significant.  And, Judge, I don't know why he chose 130.

20   If you add up his losses, just the 60 and the 10 to the 90,000,

21   we are at 150.  So -- and that's our position, Judge.  I would

22   say they are losses that he should be eligible for restitution

23   for, Judge.

24             THE COURT:  Mr. Burk, you may speak now.

25             MR. BURK:  Thank you, Your Honor.  This situation

15:07 1    where they are asking for restitution for trucking, it's never

2    been proven by any matter of a doubt that Atomic was ever

3    responsible for that trucking, ever, nor were we ever

4    responsible for the site itself, which would have been his

5    foundation.  All we were responsible for, Your Honor, is the

6    home, FOB El Paso.  Thank you for hearing me.

7         MR. KEAGLE:  And, Judge, if I could reply, the Court

8    can see in the statement, he says:  After being swindled by the

9    shipping company the breaks -- the Burks -- the Burks set us up

10   with, they lied about sending the proper equipment and forced

11   us into another loan just to pay for a crane service to get a

12   house to the location, and due to black mold, unsafe

13   electrical, bad plumbing, no insulation, the house will never

14   be habitable.

15        So there is also -- he has to pay for a crane.  So I

16   believe that that would be another expense that he should be

17   entitled to restitution to.  And, of course, Judge, I don't

18   know that amount.  But that's just something for the Court.

19        MR. BURK:  And, Your Honor, again, I state it's FOB

20   El Paso on his contract.  We were never responsible for a

21   crane, his foundation, the trucking company.  We gave him

22   several different places he could call.  That didn't mean we

23   are responsible for the trucking, Your Honor.

24        THE COURT:  Irrespective of that, they got nothing,

25   other than a container that they had to fix after paying you

15:09 1    90,900-plus dollars.  So your objection is overruled.  I'm

2    satisfied with the documentation.  I see that it could be more

3    precise.

4            But anyone looking at the totality of these

5    statements -- with the exception of the corporate individuals,

6    the two, Tyson Mining and Marine Fishing, take those two

7    aside -- but the rest of them, including the corporate Reagent

8    World, there is a common thread to all of them:  Lots of

9    promises, lots of money being disbursed, and useless drawings

10    and renderings given in return.

11            So that may not be the most precise documentation that

12    this individual can provide, but it is consistent with the

13    other statements.  And it's also consistent with the agony the

14    man had to go through when, in the middle of this, he has one

15    toddler and his wife is expecting.  And as his mother

16    testified, she pretty much gave her savings to him.

17            So your objection is overruled.  I'm finding by a

18    preponderance of the evidence that Mr. Taylor Allen, Christina

19    Geis are entitled to $127,100 in restitution.

20            MR. SOLIS:  Your Honor, if I may be heard very

21    briefly, sir.

22            THE COURT:  Yes, sir, of course.

23            MR. SOLIS:  Thank you, Your Honor.  Here's my

24    perspective, very candidly:  So my effort here is focusing on

25    my Defendant's Exhibit 1, the very far left column, PSR, and

15:11 1    that restitution loss as it informs the guideline sentence.  I

2    hear the Court saying that the 90,990 will result in a $2,900

3    credit, so to speak, to where that restitution amount would now

4    be -- rather than for guidelines purposes 90,990, 88,000 and --

5    yeah, $88,090.  I, too, wish the restitution --

6              THE COURT:  I believe the total -- the 127,100,

7    Ms. Ramm, does that reflect the credit for the --

8              THE WITNESS:  Yes, it does, but he is working

9    backwards from the original 90,000 amount.

10             MR. SOLIS:  Yes, sir.  The 90,000 is what informed the

11   guideline sentence, Your Honor.  So what I'm saying is the

12   Court is allowing -- I think I heard the Court saying they were

13   delivered a container.  We are going with what the Court has

14   allowed and taking judicial notice of Ms. Ramm's ascertaining

15   that $2,900 is the fair market value will allow.

16             So that's -- 99- -- $90,990, if you subtract $2,900,

17   is what that restitution amount for PSR purposes would be.  I

18   agree with the Court that I wish, too, that the 127,000 --

19   rather, the 127,000 figure for restitution purposes were better

20   verified.  But I want to be very candid with the Court, given

21   that there is an outstanding motion pending, that my effort

22   would be to inform the other column that I'm addressing,

23   Your Honor, which addresses TMI and MFI.

24             THE COURT:  Right.  And like I said already -- and I

25   realize I'm repeating myself, but I'm repeating myself just

15:13 1   simply to remind you I wasn't engaging in an intellectual

2   exercise when I ordered the government to file a response.

3   Okay?

4            MR. SOLIS:  Yes, sir.

5            THE COURT:  I mean, I've done my homework already.

6            MR. SOLIS:  Yes, sir, thank you.

7            THE COURT:  Mr. Burk, do you have any questions on

8   victim number 10, Joseph Stuart?

9            MR. BURK:  Yes, Your Honor.  One moment, please.

10                          CROSS-EXAMINATION

11   BY MR. BURK:

12   Q.  Ms. Ramm, how familiar are you with the 302 concerning

13   Joseph Stuart?

14   A.  I have read it.

15   Q.  Okay.  And are you aware that he had an outstanding permit

16   for a pool that was hinging on this particular project?

17   A.  I don't know that to be true.

18   Q.  Are you aware that we had worked with Joseph Stuart for

19   quite a long amount of time?  Are you aware of the timeline

20   that we worked with him?

21   A.  I can tell you the timeline for when the payments were made

22   and then when the interview was conducted.  As far as how long

23   you -- the company was involved with Mr. Stuart, no, I'm not

24   aware of that.

25   Q.  Okay.  Are you aware that the FBI contacted Mr. Stuart and

CROSS - NICOLE RAMM                                    132

15:16 1   told him that Atomic built nothing of value?

2                MR. KEAGLE:  Judge, objection, argumentative.

3                THE COURT:  Sustained.

4   BY MR. BURK:

5   Q.  Are you aware that this count was pulled from our

6   indictment prior to the trial?

7   A.  I am aware of that.

8   Q.  Are you aware why it was pulled?

9   A.  Mr. Stuart did not want to participate at the trial.

10  Q.  Are you aware that Mr. Stuart did not own the land that

11  this project was going on?

12  A.  I don't know that to be true.

13  Q.  Are you aware of the permit that was in place for this

14  particular project, ma'am?

15  A.  No.

16  Q.  Have you ever spoken with him directly?

17  A.  No.

18  Q.  One moment, please.  I am looking at a Declaration of

19  Victim Loss here in front of me, ma'am.  And I see a name and a

20  dollar amount.  Can you tell me why there isn't any specifics

21  at all on this sheet except a name and a dollar amount?

22  A.  That was the actual amount paid.  I verified that amount in

23  the bank accounts.

24  Q.  Are you aware of what the contract amount was for this

25  project?

15:18 1    A.  Just what's written in the 302.  Mr. Stuart says it was

2    about $72,000.

3    Q.  So then you are aware that he had not finished paying his

4    project, correct?

5            MR. KEAGLE:  Objection, argumentative, Judge.

6            THE COURT:  Sustained.

7    BY MR. BURK:

8    Q.  Are you aware that Mr. Stuart still owed Atomic for his

9    project?

10    A.  I am unaware.

11            MR. BURK:  Pass the witness.

12            MR. SOLIS:  I have no questions, Your Honor.  Just one

13    brief, if I could note to the bench, Your Honor:  Before we

14    move on from Taylor Allen, there was two containers delivered,

15    and at 2900 apiece, that would be 5880, Your Honor, just so the

16    record reflects that.

17            THE COURT:  Was it two?

18            MR. SOLIS:  Two containers.

19            THE COURT:  Okay.

20            MR. SOLIS:  That's all.  Thank you.

21            THE WITNESS:  That's not something that we verified,

22    sir.

23            THE COURT:  You were not able to verify that?

24            THE WITNESS:  Two, no, sir.

25            MR. SOLIS:  I'm looking at the victim impact

15:19   1    statement.  Mr. Allen himself says:  They eventually shipped us

        2    "containers," plural, that a company did not have the correct

        3    machinery to install the "containers," plural.  And so it seems

        4    to me that in several instances he references in the victim

        5    impact statement "containers."  That's on the second and third

        6    pages of the statement.

        7            THE COURT:  Mr. Keagle.

        8            MR. KEAGLE:  Judge, I don't know the answer to that.

        9    I agree it does say "containers."  I almost want to look at the

       10    transcripts of the trial because I also did not participate in

       11    the trial.  And I checked with Mr. Serwatka.  He doesn't

       12    remember if it was one or two.  But I would agree if he got two

       13    containers, there should be credit for two.

       14            THE COURT:  Okay.

       15            MR. BURK:  If I might add, these are not two regular

       16    containers.  These are the largest ones ever made.  They are

       17    53-foot high cubes.  They are actually 450 square feet on the

       18    inside.  They are 9-foot, 6 inches tall.  They are

       19    8-foot-6-inches wide.

       20            THE COURT:  I'm familiar with that.

       21            MR. BURK:  Thank you, Your Honor.

       22            THE COURT:  And I recall the testimony there being a

       23    range on the price of the containers from the used container

       24    lot -- one of the used container lots that there was testimony

       25    about.  So that's why I was satisfied with the 2900 as being a

15:21 1    midpoint, like an average.

2              So that said, I will look into the trial transcript on

3    whether there was one or two containers.  And we will take care

4    of that tomorrow.

5              MR. BURK:  Thank you, Your Honor.

6              MR. SOLIS:  Would an easier plan be to simply make

7    contact with Mr. Allen?

8              THE COURT:  I'm sorry, Mr. Solis?  Say that again,

9    please.

10             MR. SOLIS:  Would an easier effort be to make contact

11   with Mr. Allen and simply ask him?

12             MR. KEAGLE:  Judge, it goes back to I can't force them

13   to participate.

14             THE COURT:  No.  Exactly.  Exactly.

15             MR. SOLIS:  But he has already participated.  He

16   submitted a victim impact statement.

17             THE COURT:  Well, here is the thing:  I am going to

18   look at the trial testimony.  And if I -- and if I cannot

19   ascertain it from the trial testimony, you know, the doubt goes

20   to the defendant here.

21             MR. SOLIS:  Thank you, sir.

22             THE COURT:  So I will just add it.

23             MR. SOLIS:  Yes, sir.

24             THE COURT:  So, Ms. Ramm, you looked at the records,

25   the bank records, and the bank records show that the total

15:22  1    amount of funds from Mr. Stuart, who, like I said before, the

        2    defendant and other related entities, was $55,820?

        3              THE WITNESS:  Yes.

        4              THE COURT:  Can you tell me what was the time frame of

        5    those?

        6              THE WITNESS:  The first one was February 13, 2018, and

        7    the last one was March 5, 2018.

        8              THE COURT:  Very well, thank you.  I find by a

        9    preponderance of the evidence that the amount of restitution

       10    owed to Joseph Stuart is $55,820.  Mr. Burk, any questions of

       11    Ms. Ramm with respect to Cindy Richter, victim number 11?

       12              MR. BURK:  Yes, Your Honor.  One moment, please.

       13                         CROSS-EXAMINATION

       14    BY MR. BURK:

       15    Q.  Ms. Ramm, have you seen the contract between Atomic and

       16    Cindy Richter about this particular project?

       17    A.  I don't recall seeing one, sir.

       18              MR. KEAGLE:  Judge -- I'm sorry -- we have got 27 more

       19    of these to go.  And looking back, talking to Mr. Serwatka

       20    about this trial, there was reciprocal discovery, and there was

       21    a jury trial.  No contracts were ever turned over to the

       22    government at all, which I would presume, in a case like this,

       23    the defense attorneys, if they had them, would have brought

       24    them to the government and said:  Look at this.  And there was

       25    reciprocal discovery and not a single contract was ever turned

15:24 1   over.  So I'm going to keep objecting to this line of

2   questioning on these contracts.  I'm just trying to kind of nip

3   it in the bud so I don't have to do it 28 more times.

4          THE COURT:  If you review -- if you review the PSR,

5   there were documents signed through the DocuSign app.

6          Please correct me, Ms. Martinez.  Was that the correct

7   application?

8          PO MORALES:  Good afternoon, Your Honor.  Francis

9   Morales with U.S. Probation.

10          THE COURT:  I'm sorry.  Ms. Morales, could you correct

11   me on the app that was used?  Was it DocuSign?

12          PO MORALES:  Some of the discovery that was received

13   did have those DocuSigns.  They were limited.  Not all of the

14   victims had them signed, but it was just like a template

15   signature.

16          THE COURT:  Right.

17          PO MORALES:  It was not a written-out signature.

18          THE COURT:  Right.  Okay.  So the question to you,

19   ma'am:  Do you know if Ms. Richter signed a contract?

20          THE WITNESS:  I don't know, sir.

21          THE COURT:  Okay.  Back to you, Mr. Burk.

22   BY MR. BURK:

23   Q.  Are you aware of the size of her property, ma'am?

24   A.  I'm not.

25   Q.  Okay.  Are you aware of any of the work that had been done

CROSS - NICOLE RAMM                                    138

15:26  1  by Atomic to bring this bill up to $12,000?

2  A.  I'm unaware.  I don't -- what bill?

3  Q.  Okay.  When Atomic did the work, we billed her the $12,000.

4  So what I'm saying is, are you aware of the work that we did to

5  bill her the $12,000?

6  A.  She made a payment of $15,000 and was refunded $3,000.

7  There is $12,000 for restitution.

8  Q.  And my math is a little off.  I do have the $3,000 refund

9  here.  Thank you for that.  Are you aware of any of the work

10  that we did there?

11  A.  I'm unaware of any work, sir.

12  Q.  Is there any bank statement material that you have at your

13  access that shows work done at this time near her property in

14  Colorado?

15  A.  Work done at her property?  No.

16  Q.  You don't, okay.

17         MR. BURK:  Then I pass the client, Your Honor -- I'm

18  sorry -- the witness.

19         MR. SOLIS:  No questions, sir.

20         THE COURT:  Ms. Richter, like Mr. Stuart, received

21  nothing.  And I'm finding Ms. Richter's restitution amount by a

22  preponderance of the evidence to be $12,000.

23         Mr. Burk, any questions of Mr. Mark Washington?

24         MR. BURK:  Yes, Your Honor.  Thank you.

25

15:28  1                    CROSS-EXAMINATION

2    BY MR. BURK:

3    Q.  And help correct me here, Ms. Ramm, is the amount 7500 or

4    $6,800 on USA versus Burk?

5    A.  For Mark Washington, it reflects $6,800.

6    Q.  Okay.  And the reason I was concerned about this was the

7    302 showed me something else.  That's why I asked.  Is there a

8    particular reason that you are aware of, Ms. Ramm, why I was

9    not given the U.S. Bank account records?

10   A.  They were provided, sir.

11   Q.  The U.S. Bank account records were not provided to me.

12   A.  They were provided to your counsel.

13           THE COURT:  And they were marked -- and they were

14   marked as evidence in this case.  And you were at the hearing

15   where they were marked as evidence.

16           Next question, please.

17   Q.  Are you aware that there were multiple payments for this

18   particular project, Ms. Ramm?

19   A.  I am aware of the two payments made by Morgan [sic]

20   Washington to Ethan Day.

21   Q.  Are you aware of what this money was to stand for, what was

22   basically purchased with this money?

23   A.  What it was intended for or what it was actually used for?

24   Q.  Both.

25   A.  My spreadsheets show that.  And the 302 or the email that

15:30 1    was provided states what it was to be used for.  My

2    spreadsheets, which were presented at trial, showed what the

3    money was actually spent on.

4    Q.  Are you aware of how much time Mr. Day spent with Mark

5    Washington driving around attempting to buy property for him?

6    A.  I'm unaware.

7    Q.  Have you seen the final project as it was designed by Dawn

8    Clayton for his particular property?

9    A.  I have not seen drafts.

10              MR. BURK:  I pass the witness, Your Honor.

11              MR. SOLIS:  Thank you, sir.

12                        CROSS-EXAMINATION

13    BY MR. SOLIS:

14    Q.  Ms. Ramm, so if you look at Defense Exhibit 1,

15    Mr. Washington would be entry number 12, there starting on the

16    left going right.  The PSR has Mr. Washington at $7,500 loss,

17    whereas table 3 you note, as your testimony here today, 6800;

18    is that right?

19    A.  Yes.

20    Q.  Okay.  But I believe this is an issue Mr. Keagle and

21    yourself addressed to the Court where you saw and corroborated

22    and verified two $1,500 deposits, but could not corroborate or

23    verify a previous $3,800 deposit because there was just no

24    access to that.  Is that -- am I stating this correctly?

25    A.  So similar to, I think, the exchange that we had earlier

15:32  1   for individuals that made deposits in a way other than a wire

       2   transfer or something that could be directly attributable to

       3   them, there are transfers that just show numbers that it could

       4   have been theirs.  It may not have been theirs.  I could not

       5   verify.

       6   Q.  So the short answer is you cannot verify 3800; you can

       7   verify 3,000?

       8   A.  I verified $3,000.

       9   Q.  Correct.  And it's in the attached exhibits from the

      10   government to myself, right?

      11   A.  Yes.

      12   Q.  But whatever the case -- and that's the issue there -- the

      13   loss wasn't 7500; it was 6800, if we go with allowing a 3800

      14   phantom payment, so to speak?

      15        MR. KEAGLE:  I am going to object to argumentative,

      16   Judge.

      17        THE COURT:  You need to rephrase -- you need to

      18   rephrase that question.

      19        MR. SOLIS:  Thank you.  I will.

      20   BY MR. SOLIS:

      21   Q.  Entry number 12 on the left-hand side of the PSR, $7,500

      22   could not be corroborated anywhere, even if we allow the

      23   $3,800, correct?

      24   A.  Except the 302.  The 302 is the only thing that specifies

      25   $7,500.

CROSS - NICOLE RAMM                    142

15:33  1   Q.  Yeah, but no bank deposits, no financial records indicate

       2   that?

       3   A.  Nothing directly attributable.

       4   Q.  And, in fact, the email Mr. Keagle addressed to the Court

       5   and yourself -- or maybe just to the Court -- that he attached

       6   just recently an email as recently as about a week ago,

       7   Mr. Washington tells Mr. Keagle:  I only have records for two

       8   $1,500 payments at 3,000.  I can tell you about a third payment

       9   for 3800, but I can't get that.  So we can't verify that.

      10   That's only 6800, not 7500, right?

      11   A.  Correct.

      12              MR. SOLIS:  Thank you.

      13              THE COURT:  So what is the documentation that you

      14   have, Ms. Ramm, supporting the original 7500?  Was that just

      15   simply a typo?

      16              THE WITNESS:  I'm sorry?

      17              THE COURT:  What documentation do you have that

      18   originally suggested $7,500?

      19              THE WITNESS:  The 302.

      20              THE COURT:  Okay.

      21              THE WITNESS:  That was his estimate, and then his more

      22   recent explanation to the prosecutor was $6,800 in an email.

      23              THE COURT:  Okay.  So he originally estimated 7500?

      24              THE WITNESS:  Yes.

      25              THE COURT:  And then reduced it to 68, but could only

15:34  1   find the two payments that you identified from the bank

2   records; is that correct?

3          THE WITNESS:  Yes.

4          THE COURT:  Fair enough.

5          MR. LOPEZ:  Your Honor, a real quick housekeeping

6   question -- I do not recall when we started.  Did Mr. Burk -- I

7   believe he moved to admit his packet that he provided to the

8   Court, as well as to the parties as Burk's Exhibit 1.  Did he

9   move to admit that?  I can't recall.  And if he has not, then

10   at this time we would like to move to admit it as his exhibit

11   so he can refer to it during this hearing.

12          THE COURT:  You are talking about the excerpts of

13   testimony that I ruled on?

14          MR. LOPEZ:  Apologies, Your Honor?

15          THE COURT:  Are you referring to the excerpts of

16   testimony that I ruled on on the order that I issued yesterday?

17          MR. LOPEZ:  No, sir.  This is the binder or the

18   cardboard dividers that I just -- that he provided to the

19   parties, as well as to the Court, before we started.  I

20   apologize I didn't bring that to the Court's attention for

21   Mr. Burk.  But it's previous documentation that he would like

22   the Court to consider.

23          THE COURT:  I haven't seen it.  It hasn't been

24   offered.  So --

25          MR. LOPEZ:  Okay, fair enough, Your Honor.  At this

CROSS - NICOLE RAMM                    144

15:36 1    time, Mr. Burk would request the Court if he could move to

2    admit that for purposes of this hearing as his Exhibit 1.

3              THE COURT:  Have you reviewed this?

4              MR. KEAGLE:  Judge, I guess I have quite a few

5    questions.  Judge, so this is cardboard.  The front says:

6    "Government copy" front cover.  But the back of it has what I

7    can only say is gibberish.  It has got some math.  It talks

8    about registered office, registered agent, Ms. Gonzalez, civil

9    liability.

10             So, quite frankly, Judge, I have no idea what is going

11   on.  That's just this front cover.  I guess I'm going to have

12   to make a relevance objection at this point.  Mr. Solis'

13   exhibit that he had previously given me, I think that is

14   relevant.  I have no idea what the relevancy is to FBI 302,

15   some photos.  We have got -- again, we have got some more

16   cardboard.  This one, Judge, I don't even know what to tell you

17   this is.  And so I guess maybe if you want to clarify:  What's

18   on the cardboard is supposed to be part of the exhibit?

19             THE COURT:  And from what I hear you say, the

20   cardboard on mine has different things.  So we have two issues

21   here, Mr. Lopez.

22             MR. LOPEZ:  Yes, Your Honor.

23             THE COURT:  We go through that old, you know, evidence

24   class mark:  Identify and offer.

25             MR. LOPEZ:  Yes, sir.

15:37 1            THE COURT:  That is usually done through a sponsoring

2      witness for the exhibit.

3            MR. LOPEZ:  Yes, sir.

4            THE COURT:  So I have -- I take it Mr. Burk saying,

5      Here, take this into consideration.  But I don't know what for.

6      It has been marked as his exhibits.  But this hasn't been

7      identified, and I don't know what it is offered for.

8            MR. LOPEZ:  Yes, sir.

9            THE COURT:  Because there hasn't been a witness

10     through which it has been offered.  Imagine if a hearing could

11     be conducted by throwing pieces of evidence at the judge and

12     say, Hey, you go figure it out.  You know, it would be a

13     circus.

14           MR. LOPEZ:  Yes, it would, Your Honor.

15           THE COURT:  And worse yet, in this case, the copy the

16     prosecutor has is different than mine.  You know what he is

17     reading on his covers is different than what I have in mine.

18     For example, mine has "judge's copy" front cover.  And then

19     behind that front cover, it says, "Barraza property."  And then

20     there's another cardboard that says:  Stuart Vance, the Vance

21     Law Firm, Lejuneinjurylaw.com, and then there's a comment about

22     FBI.  And, I mean, it's different than what he has in his,

23     so --

24           MR. BURK:  May I offer an explanation, Your Honor?

25           THE COURT:  Excuse me, sir.  So, no, this is not

15:39 1    properly before me for the reasons I have stated.  So what has

2    been identified as "judge's copy," I will not admit into

3    evidence.  It is going to be made part of the record, so that

4    the court of appeals can rule on this.  But, no, I will not

5    consider what is in this court's exhibit -- I mean, this

6    proposed court's exhibit -- proposed Burk exhibit for the

7    reasons I have already stated.

8              So, Adriana --

9              MR. KEAGLE:  Judge, I know Mr. Burk is doing his best,

10   but there is information on this one particularly that not only

11   is there some PII, but it's probably some things that the Court

12   would not want to see.  I understand he is doing his best to

13   work with what he has.  But maybe the Court could give him a

14   little bit of guidance on not filing things that can be

15   disparaging to the attorneys or the Court.

16             THE COURT:  Mr. Burk.

17             MR. BURK:  Your Honor, the cardboard was only to

18   protect the paperwork as I was coming here, in my possession.

19   That is all, Your Honor, as far as the cardboard.  It's pieces

20   I put together to keep things separate so that things were

21   separate, and also so that your exhibit did not get destroyed

22   on the bus.  That was all that the cardboard was for.  I

23   apologize if it offended.  It was not intended to.  It was only

24   intended to protect the items inside.

25             THE COURT:  So the derogatory comments about -- what

15:41  1    is it -- myself and the FBI and who else?

2              MR. KEAGLE:  Judge, it just has a couple of comments.

3    It talks about the prosecutor.  It talks about removing the

4    judge.

5              MR. BURK:  What?

6              MR. KEAGLE:  And then it has got some PIIs.  This

7    appears to be an attorney in Wichita Falls.  I don't know who

8    this gentleman is -- someone local -- Jose Troche.  So, yeah, I

9    just don't think it's proper.

10             THE COURT:  My ruling stands.

11             MR. SOLIS:  Before you rule on Mr. Washington, can I

12   be heard, Your Honor?

13             THE COURT:  I'm going to wrap it up, and I will give

14   you a chance to object to it.  Okay?

15             MR. SOLIS:  Thank you, sir.

16             THE COURT:  So as we stand, we have -- to summarize

17   your testimony, Ms. Ramm, he can verify $3,000?

18             THE WITNESS:  Yes.

19             THE COURT:  And the 3800 -- I mean, the other 3800, he

20   doesn't have any documentation?

21             THE WITNESS:  Correct.

22             THE COURT:  Fair enough.  So, yeah, let me hear from

23   you, sir.

24             MR. SOLIS:  It's just that, Your Honor.  It is just

25   that the correct sum should be $3,000.  That's the only

15:42 1    verifiable sum.  For certain, the $7500 loss attributed by the

2    PSR is incorrect by whatever approach.  The $6,800, they cannot

3    account for 3800.  So I believe 3,000 is correct, Your Honor,

4    thank you.

5          THE COURT:  Okay.  I recall from the evidence at trial

6    that the 68- -- and this is a question for you, Ms. Ramm --

7    that the $6,800 was a recurring amount that was originally paid

8    by various victims.

9          THE WITNESS:  Consistently what I saw, the first

10   payment for drafting was 3800, and that's how Mr. Washington

11   describes it in his 302.

12         THE COURT:  Okay.  And then, for example, there is

13   another person here, Mr. Cheng, that he also paid $6,800?

14         THE WITNESS:  What number is he, sir?

15         THE COURT:  Mr. Cheng is number 30.

16         THE WITNESS:  30.  Yes, received incomplete plans, no

17   container.

18         THE COURT:  Right.  In essence, the same thing that

19   Mr. Washington received?

20         THE WITNESS:  Yes.

21         THE COURT:  Okay.  I'm reducing the -- I mean, I'm

22   finding by a preponderance of the evidence that the amount owed

23   Mr. Washington is $3,000.

24         Any questions of Mr. Leach, Steven Leach -- I mean,

25   Steve Leach, Mr. Burk?

15:44  1        MR. BURK:  Well, this is difficult for me to proceed

       2   with, Your Honor, without being allowed to utilize my evidence

       3   that I brought because that has to do with this particular

       4   person.  But I understand.

       5        THE COURT:  You can use any documents you want to use.

       6   It's a different story to ask me to consider them when there is

       7   no witness telling me what they are offered for.  That doesn't

       8   preclude you from using documents and refer to them when you

       9   are questioning the witness.  So, no, I am not hindering your

      10   questioning of this witness in any way whatsoever by

      11   disallowing that piece of evidence for my consideration.  It

      12   doesn't keep you from utilizing it.

      13        MR. KEAGLE:  Judge, while they are conferring -- on

      14   break, I was speaking with the court reporter.  I don't know

      15   that you ever admitted the exhibits that I tendered.  I know

      16   there was some back-and-forth discussion.  So just for purposes

      17   of making sure the record is clear, the government did move to

      18   admit Exhibits 1 through 14 and 16 through 40.  And there was

      19   objections.  I believe you overruled them.  So I would like to

      20   move to admit those now.

      21        THE COURT:  No.  I actually admitted them because I

      22   got into the colloquy with Mr. Solis about the --

      23        MR. SOLIS:  No one remembers my name anymore.

      24        THE COURT:  -- weight to be given versus

      25   admissibility.

15:48 1          MR. KEAGLE:  Okay.  I'm just making sure, Judge.

2          THE COURT:  No, it's okay.

3          MR. SOLIS:  Nobody remembers my name.

4     Mr. What-was-your-name Solis, yeah.

5          THE COURT:  So to pacify Mr. Solis, Mr. Solis'

6     objection is overruled.  Okay.  The Government's 1 through 14

7     and 16 through 40 are admitted.

8          MR. KEAGLE:  Thank you, Judge.

9          MR. SOLIS:  My exhibit was admitted at your urging,

10    Your Honor, so --

11         THE COURT:  Yes, sir, yes.

12         MR. BURK:  I was very well schooled, Your Honor, and I

13    see my mistake here in the way that I have tried to do this

14    with bringing this particular evidence in because I didn't have

15    the proper witness for it.  So please forgive me, and let me

16    move forward asking some questions about number 13, Mr. Leach.

17         THE COURT:  Mr. Burk, I'm doing my job.  This isn't

18    about forgiving you.  That's -- that's at a different level.  I

19    made a ruling.  And what I ruled is on the record.  So do you

20    have any questions of Ms. Ramm with respect to Defendant Leach?

21    I mean -- I'm sorry -- with respect to victim number 11, Ms. --

22    victim number 13, Mr. Leach?

23                         CROSS-EXAMINATION

24    BY MR. BURK:

25    Q.  Ms. Ramm, are you aware that Steve Leach came and visited

15:50 1    us at 1575 East San Antonio Avenue?

2    A.  It does state that in the 302.

3    Q.  Are you aware of what he contracted us to build while he

4    was there?

5    A.  The 302 states a hunting cabin.

6    Q.  That is correct, okay.  Are you aware of the amount of

7    money that he sent to us to build that project for him?

8    A.  Yes.

9    Q.  Are you aware of the completion level of that project when

10   it was finished?

11   A.  I'm unaware.

12   Q.  Are you aware of what the discrepancy was between Atomic

13   and Mr. Leach of why he chose not to move forward with the

14   purchase of that product?

15   A.  I am unaware.

16   Q.  Are you aware that Atomic was looking at a liability

17   situation because of the weight of what he was asking us to do?

18        MR. KEAGLE:  Objection, argumentative.

19        THE COURT:  Sustained.

20   BY MR. BURK:

21   Q.  Are you aware that I brought a photograph of that project

22   with me today?

23   A.  I'm unaware.

24   Q.  Okay.  I have that if the Court would allow you to look at

25   it, only if you want to.

15:51 1          THE COURT:  And what is the purpose of Ms. Ramm

2    looking at that photograph?  What are you offering that

3    photograph through this witness for?

4          MR. BURK:  Because I believe that Ms. Ramm has been in

5    the warehouse, and she would be able to state whether or not

6    she recognizes this item.  Also, she would be able to state

7    whether or not she recognizes our warehouse.

8          THE COURT:  At issue here is what Mr. Leach gave you,

9    Mr. Day, and/or the associated entities and what he received in

10   return for that.

11         MR. BURK:  Yes, Your Honor.

12         THE COURT:  That Ms. Ramm may have seen that at the

13   time of the execution of the search warrant in which she

14   attended.  It's not relevant to that because there isn't

15   somebody under oath testifying to:  That photo is for

16   Mr. Leach's.  So your request is denied.

17         MR. BURK:  Okay, Your Honor.

18   BY MR. BURK:

19   Q.  Ms. Ramm, were you aware that our attorney in California

20   who had been in front of this court, Bill Cumming, Esquire, had

21   made arrangements --

22         THE COURT:  Mr. Burk, Mr. Burk, I need to stop you

23   right now.  Your attorney from California wasn't in front of

24   this court.  Your attorney from California was called to

25   testify in the case.  They are two different stories, two

15:53 1    different things.  He appeared as a witness.  He wasn't in

2    front of this court.  So you may rephrase that question.

3            MR. BURK:  Yes, Your Honor.

4    BY MR. BURK:

5    Q.  Our attorney -- are you aware of our attorney handling a

6    stock transfer to Mr. Steven Leach?

7    A.  I'm unaware.

8    Q.  Are you aware that the product that Mr. Leach did not want

9    to buy was then purchased by another entity that is on this

10   list?

11           MR. KEAGLE:  Objection, argumentative.

12           THE COURT:  Sustained.

13   BY MR. BURK:

14   Q.  Were you aware, Ms. Ramm, that Private Properties, LLC,

15   purchased Steve Leach's former product?

16           MR. KEAGLE:  Objection, argumentative.

17           THE COURT:  Sustained.

18   BY MR. BURK:

19   Q.  Are you aware, Ms. Ramm, that Steve Leach was made whole by

20   Atomic with a class A security stock in the corporation in lieu

21   of his $20,000?

22   A.  I'm unaware of any valuable stock given.

23           MR. BURK:  I pass the witness, Your Honor.

24           THE COURT:  Mr. Solis.

25           MR. SOLIS:  Very good, Your Honor.

15:55  1              CROSS-EXAMINATION

2    BY MR. SOLIS:

3    Q.  Ms. Ramm, so government exhibits for Mr. Leach, the wire

4    transfers and the bank accounts, can you look at that briefly?

5    So we will start from the -- do you find it, ma'am?

6    A.  Yes.

7    Q.  So we will start on the second page or where it notes the

8    4-1 -- April -- April 4, April 5, 6.  And then the 8th on my

9    copy is highlighted in orange and yellow, a $20,000 in-store

10   deposit.  And on the back is -- attached is -- looks like not

11   even a cashier's check, but an actual check -- old-school check

12   from Steve Leach to Quantum Stealth Technologies in the amount

13   of 20,000.  Are you with me so far?

14   A.  Yes.

15   Q.  Then on the first page, there is a February 26,

16   yellow-and-orange highlighted wire transfer for $6,800.  I

17   don't see any reference or link to a Mr. Steve Leach in this.

18   You can educate me on how you attributed that to Mr. Steve

19   Leach.

20   A.  In the same way.

21   Q.  What way is that?

22   A.  Through Special Agent Nebrich.

23   Q.  Okay.  And so nothing to memorialize or corroborate that?

24   A.  I don't know if she did, sir.

25   Q.  Okay.  Then if you would also help me -- and I don't know

CROSS - NICOLE RAMM                                    155

15:56  1   if it is included in what you have there -- I'm looking at FBI

       2   302, serial 49.  Do you have that there, ma'am?

       3   A.  I have a 302.  This copy doesn't have a number on it, but

       4   it is the interview of Steve Leach.

       5   Q.  Is there a date at the top right that says 9-12-2017?

       6   A.  Yes.

       7   Q.  And at the bottom, does it show by Claudia Matos?

       8   A.  Yes, that's the agent.

       9   Q.  Okay.  And at the copy you are looking at, 302, does it not

      10   read at the very bottom of the first page in the paragraph,

      11   last sentence, you read -- I will read to you.  You tell me if

      12   it's incorrect:  "Leach wire transferred 20,000 to Burk and

      13   Atomic Container Homes, and was to wire transfer the final

      14   8,000 upon completion."

      15          And so it appears from the FBI 302 the amount was to

      16   be $28,000.  And he only made an initial deposit of $20,000 at

      17   least from FBI 302.  And that's what you confirmed definitively

      18   on the bank statements, correct?

      19   A.  That's what he initially approximated he thought, yes, in

      20   the interview.

      21   Q.  Other than what was told you, you have nothing to

      22   corroborate the 6800 -- not 8,000 like he indicated he was to

      23   pay later -- but 6800 in that wire transfer, there's no way to

      24   link that to Mr. Leach, other than what was told you?  Is that

      25   correct?

15:58 1    A.  Well, in the same manner, it may be in the wire transfer

2    details.

3    Q.  I beg your pardon?

4    A.  In the same manner, it may be in the wire transfer details,

5    but not on this statement itself.

6    Q.  Yes, ma'am.  It may be.  But for purposes of today's

7    hearing, you can't say that; you can't confirm that; you can't

8    verify that?  Is that right?

9    A.  On the statement, no.

10   Q.  On the bank statement, correct, you can't do that?

11   A.  On the statement, correct.

12   Q.  You say "statement"; you mean the bank statement?

13   A.  The bank statement, yes.

14   Q.  All right.  Thank you, ma'am.

15        THE COURT:  Ms. Ramm, help me with that, please.  Walk

16   me through the -- walk me through the Steve Leach deposits,

17   please.

18        THE WITNESS:  I'm sorry?

19        THE COURT:  What deposits did Mr. Leach make?

20        THE WITNESS:  Mr. Leach made one payment, one wire

21   transfer from his business, Professional Shopping Services,

22   Incorporated --

23        THE COURT:  Okay.

24        THE WITNESS:  -- for $6,800.  And --

25        THE COURT:  For how much?  I'm sorry.  6800.

15:59  1             THE WITNESS:  $6,800.

      2             THE COURT:  Okay.

      3             THE WITNESS:  And then made a second deposit of

      4      $20,000 from a personal check.

      5             THE COURT:  Right, okay.  So the original one that he

      6      made was for $6,800 -- I mean, not the original one, the first

      7      one, right?

      8             THE WITNESS:  The first one, yes.

      9             THE COURT:  And then he made a $20,000 deposit?

     10             THE WITNESS:  Yes.

     11             THE COURT:  Okay.  And that was it?

     12             THE WITNESS:  Yes.

     13             THE COURT:  Okay.  Then the additional amounts, how

     14      did you link additional amounts to Mr. Leach?

     15             THE WITNESS:  That is the total, 26,800.

     16             THE COURT:  Oh, okay.  So what he is documenting is

     17      what he is requesting in restitution, exactly the precise

     18      amount that he's documenting 26,8-?

     19             THE WITNESS:  Well, 28,000 was his initial estimate.

     20             THE COURT:  28,000, but it's --

     21             THE WITNESS:  And I found 26,800 attributable.

     22             THE COURT:  Okay.

     23             MR. SOLIS:  Your Honor, if I may?

     24             THE COURT:  Yes, yes, sir.

     25             MR. SOLIS:  So the 302 statements attributed to

16:00 1   Mr. Leach are that:  I paid $20,000, and later, as per the 302,

2   I was to wire transfer $8,000.  Per Mr. Leach and the 302,

3   $28,000 total.  28,000 total.

4         The bank statements show definitively a check from

5   Mr. Leach deposited into the account for $20,000.  Then there's

6   a transaction for $6800, not 8,000, but $6,800 that Mr. Leach

7   never addresses in his 302 in the bank account.  But in nowhere

8   there does it link it to Mr. Leach, other than what is

9   essentially a hearsay statement that Ms. Nebrich, I think, Ms.

10   Ramm says told her, but there is nothing to corroborate other

11   than that, Your Honor.

12         THE COURT:  And she is conceding to that.

13         MR. SOLIS:  Yes, sir.

14         THE COURT:  She is conceding to that, and that's

15   why -- you know, what got me confused here was that I'm looking

16   at the amount of loss here as 26,800 --

17         MR. SOLIS:  Yes, sir.

18         THE COURT:  -- which is what is documented by the bank

19   records.  But you kept talking about 8,000, but that's an

20   academic exercise.  Because what he can verify is the 2680 -- I

21   mean, is the 26800, right?

22         MR. SOLIS:  Yes, sir.

23         THE COURT:  So I'm finding by a preponderance of the

24   evidence that the amount owed Mr. Leach for restitution is

25   $26,800.  So that's for victim number 13.

16:02  1        Mr. Burk, victim number 14, Matthew DePofi.

2                        CROSS-EXAMINATION

3    BY MR. BURK:

4    Q.   Okay.  Ms. Ramm, according to what I have in front of me,

5    there's quite a few different numbers that come in for Matthew

6    DePofi.  It looks like the 302 dated 9-19 of 2017 states:

7    Well, it talks about different numbers.  But, anyway, I see

8    42,000.  I see 35,250.  Can you help me with which number we

9    are working with today that is on the chart today?  Which one

10   are we actually using today?  Which number?

11   A.   So Mr. DePofi paid $35,250 in total.

12   Q.   Thank you.  Do you have a list of the work that was done,

13   the people that have been out there, things of that nature that

14   would offset any of this money?

15   A.   There were no Atomic records for me to work off of, sir,

16   no.

17   Q.   And when you say there were no Atomic records, does that

18   mean the prosecution didn't give them to you or that possibly

19   the people that you work with in the FBI didn't give them to

20   you?  Where would you be getting these records from that would

21   be an offset if there were an offset?

22   A.   From the warehouse on San Antonio that two search warrants

23   were executed at or at trial.

24   Q.   So you were only looking for paper records, not electronic

25   records at 1575 --

16:04 1    A.  We looked for both -- yes, sir, we looked for both.  We

2    took both.

3    Q.  Were you aware that the executives of this business take

4    their laptop home every day so that they basically wouldn't be

5    left behind?  Are you aware of that?

6              MR. KEAGLE:  Judge -- I'm sorry -- I'm going to object

7    again to argumentative and renew my prior objection about

8    reciprocal discovery.

9              THE COURT:  Sustained.  Sustained.  There is no trial

10   testimony of that, no witnesses offered for that purpose, and

11   you can't testify now and try to inject evidence that the

12   opportunity to present evidence is at trial.  It's not at the

13   restitution hearing.  At the restitution hearing is the

14   documentation -- and I think we have gone through this

15   already -- the documentation that she used in arriving at those

16   figures.

17             And, Ms. Ramm, the $35,250, those are actual bank

18   records?

19             THE WITNESS:  Yes, one is a wire -- one, two -- two

20   wire transfers.

21             THE COURT:  Okay.  Back to you, Mr. Burk.

22             MR. BURK:  Thank you, Your Honor.

23   BY MR. BURK:

24   Q.  Have you seen a contract for this project, Ms. Ramm?

25   A.  No.

16:05 1    Q.  Are you aware of what the final amount was for this

2    particular project?

3    A.  No.

4    Q.  Was the 35,250 done in one payment or multiple; do you

5    know?

6    A.  Two.

7    Q.  In two payments.  Are you aware that Cody Carbone had

8    contacted Matthew DePofi?

9              MR. KEAGLE:  Objection, argumentative.

10             THE COURT:  Sustained.

11   BY MR. BURK:

12   Q.  Are you aware why Matthew DePofi might have stopped his

13   project?

14   A.  I'm unaware if that's true.

15   Q.  Are you aware of an engineer that we had go out and do work

16   on his property?

17   A.  I'm unaware, sir.

18   Q.  Is there any other records that we don't see here that you

19   have been made aware of so far on this project?

20   A.  No.

21             MR. BURK:  Pass the witness, Your Honor.

22             MR. SOLIS:  No questions, Your Honor.

23             THE COURT:  Mr. DePofi, as many of the victims in this

24   case received drawings that were of no use or had no value,

25   likewise, he received floor plan drawings that were of no use

16:07 1    and no value, and he did not receive a container.

2              So I'm finding by a preponderance of the evidence that

3    the restitution amount for Mr. DePofi is $35,250.  This is a

4    good point for a break.  We will recess for ten minutes.

5              Counsel, approach the bench.

6              And this is off the record, quick housekeeping here,

7    Nalene.

8              Ma'am, you can get off.

9              (Discussion at the bench off the record)

10             (Recess)

11             THE COURT:  Mr. Burk, do you have any questions

12   regarding victim number 16?

13             MR. BURK:  Yes, Your Honor.

14                          CROSS-EXAMINATION

15   BY MR. BURK:

16   Q.  Ms. Ramm, have you seen or are you aware of any

17   documentation that shows monies earned by Atomic to offset the

18   restitution amounts assessed against me, Day, or Atomic?

19   A.  No.

20             MR. BURK:  Pass the witness, Your Honor.

21             MR. SOLIS:  Very brief, Your Honor.

22             THE COURT:  Yes, sir.

23                          CROSS-EXAMINATION

24   BY MR. SOLIS:

25   Q.  Ms. Day -- I'm sorry.  I'm so sorry, Ms. Ramm.  You have

16:34 1    Defense Exhibit 1 there before you, right?

2    A.  Yes.

3    Q.  And 16 corresponds to Jeff Guillot or Guillot, right?

4    A.  Yes.

5    Q.  The PSR noted a loss of $102,350.  The most recent

6    iteration of the government's spreadsheet shows a loss of

7    $2,000.  I think the information in the exhibits was that he

8    did receive the containers and all he spent to get them to his

9    liking was $2,000; is that correct?

10    A.  Yes.

11    Q.  So he did receive his containers, Mr. Guillot or Guillot.

12    So the difference with entry number 16, on the left-hand side

13    for Jeff Guillot, should be adjusted to reflect that he got

14    that except for $2,000?

15    A.  And yes, and that's how it's here.

16    Q.  Okay.  You would agree with that assessment?

17    A.  Well, it shows the 102, which is what I traced.  I believe

18    the 99,450 is the deduction of 2900 for a container.

19    Q.  Okay.  And then since we are on the subject, ma'am -- and

20    if we skipped it because it was omitted or deleted -- but right

21    above it, entry number 15 is Frank Mancuso?

22         MR. KEAGLE:  Judge, I'm going to object.  There is no

23    relevance to this restitution hearing.

24         MR. SOLIS:  It has some relevance with regard to the

25    motion pending before the Court, Your Honor, the motion to

16:36 1    reconsider.  And since we are on the subject, it's not

2    addressed here today because they have omitted him as owing any

3    restitution for purposes of payment, but he is included in the

4    PSR restitution.

5              THE COURT:  Yes, you can question.

6              MR. SOLIS:  Thank you.

7    BY MR. SOLIS:

8    Q.  So it turns out he was delivered a container, correct,

9    ma'am?

10   A.  I don't know, sir.  There's nothing here.

11   Q.  All right.  I'm sorry.  You don't have a 302 of any sort,

12   ma'am?

13   A.  I don't, no.

14             MR. SOLIS:  May I approach the witness, Your Honor?

15             THE COURT:  Yes.

16             MR. SOLIS:  Let the record reflect I'm tendering the

17   document to counsel for the government.

18             MR. KEAGLE:  No objection, Judge.

19             MR. SOLIS:  May I approach, Your Honor?

20             THE COURT:  Yes, sir.

21   BY MR. SOLIS:

22   Q.  I'm handing you what's -- well, for purposes of the record,

23   I don't have an exhibit sticker yet, but it does have FBI

24   serial 75 and it is a 302.  Is that correct, ma'am?

25   A.  Yes.

16:37 1   Q.  All right.  Have you look at that and see if it addresses a

2   302 concerning a container billed for Mr. Frank Mancuso.  Do

3   you see his name on that document at all, ma'am?

4   A.  I do, yes, Frank Mancuso.

5   Q.  I'm sorry.  Did you say "yes," and I didn't hear you?

6   A.  No, I thought you asked me to review it.  I was reading.

7   Q.  Well, does it address an issue or, rather, the sale or the

8   build of a container for Mr. Frank Mancuso?

9   A.  Yes.

10   Q.  And on the second page, does it show where the container

11   was delivered to Mr. Mancuso?

12   A.  Yes.

13          THE COURT:  Excuse me.  I am on victim --

14          MR. SOLIS:  16, Your Honor.

15          THE COURT:  -- 16, right.

16          THE WITNESS:  This is 15.

17          MR. SOLIS:  Yeah, I am addressing victim 15 because he

18   is omitted completely, and they are not seeking restitution,

19   "they" being the government.

20          THE COURT:  Okay.  I'm sorry.

21          MR. SOLIS:  It could be you don't have it at all,

22   Your Honor.

23          THE COURT:  There is no Exhibit 15.

24          MR. KEAGLE:  That's correct.  There is nothing for 15.

25          THE COURT:  Right.  So the next victim is Mr. Guillot.

16:38 1          MR. KEAGLE:  Yes, Judge, I believe Mr. Solis is

2     wanting to discuss with the witness Mr. Mancuso, who in the PSR

3     is listed as number 15.

4          THE COURT:  Okay.  No --

5          MR. SOLIS:  One way to address it, Your Honor, is

6     Defense Exhibit 1.  That does include on the left-hand side the

7     PSR spreadsheet.  And he is number 15 all the way across that

8     exhibit, which is a spreadsheet.

9          THE COURT:  Okay, go ahead.

10    BY MR. SOLIS:

11    Q.  Defense Exhibit 1, number 15, FM is Frank Mancuso.  And so

12    the question I'm posing to Ms. Ramm is:  It turns out he was

13    delivered a container, Ms. Ramm?

14    A.  That's what the 302 states, that he received it.

15    Q.  Okay.  And he was not included in any restitution

16    spreadsheet that you are aware of as of today, August 9, 2023,

17    correct?

18    A.  Correct.

19    Q.  So he was removed from any previous restitution

20    spreadsheets, as Defense Exhibit 1 illustrates it.  If you look

21    at spreadsheet number 2 and spreadsheet number 3 both from the

22    government, they include Mr. Mancuso except, finally, the

23    Government Exhibit 3 has zero in the amount of restitution?

24    A.  August 1, he was removed.

25    Q.  He was removed?

16:40 1    A.  Yes.

2    Q.  All right.  So would that indicate he received his

3    container and is owed no money?

4    A.  For restitution purposes --

5    Q.  Correct.

6    A.  -- that is my understanding, yes.

7    Q.  And he received his container from what the 302 reads?

8    A.  What the 302 says, yes.

9              MR. SOLIS:  Thank you.  May I retrieve the exhibit,

10   Your Honor?  May I approach the witness, Your Honor?

11             THE COURT:  Yes.

12             MR. SOLIS:  Your Honor, I didn't label this an

13   exhibit.  I don't intend to admit it, unless the Court needs to

14   see it, I can.

15             THE COURT:  Let's have it admitted.

16             MR. SOLIS:  Okay.  May I?

17             THE COURT:  Because it's not -- I mean, it clarifies a

18   restitution.

19             MR. SOLIS:  Yes, sir.

20             THE COURT:  But I'm not making any finding on it,

21   so --

22             MR. SOLIS:  I will label this Defense Exhibit 11 and

23   move for its admission, Your Honor.  Thank you.  Thank you,

24   sir.

25             MR. KEAGLE:  No objection, Judge.

16:41 1         THE COURT:  Okay.  Defense Exhibit 11 is admitted.

2               MR. KEAGLE:  Judge, just being that it is an FBI 302,

3      I am not sure if it is redacted or not.  Since it is a 302, I

4      would ask it be sealed.

5               MR. SOLIS:  No objection.

6               THE COURT:  Actually, we are sealing all the exhibits

7      in this hearing.

8               MR. KEAGLE:  Thank you, Judge.

9               MR. SOLIS:  Thank you, Your Honor.  Pass the witness.

10              THE COURT:  So you are not contesting Mr. Guillot's

11     then?

12              MR. SOLIS:  Your Honor, I did ask questions of

13     Ms. Ramm with Mr. Guillot, and the government's spreadsheet and

14     the questions posed to her show that restitution is owed in the

15     amount of $2,000.  And it turns out that he was delivered his

16     containers.  We would later contest at the proper hearing at

17     the proper forum when the Court invites me to address the PSR,

18     as I noted in my Defense Exhibit 1 of $102,350, is incorrect

19     because he did receive his containers.  All he did was modify

20     them where he was out of pocket $2,000.

21              So in my Defense Exhibit 1, the difference there, what

22     the PSR alleges is the loss and what the government spreadsheet

23     indicates is the loss, is a difference of $100,350 in favor of

24     the defendant.  So we would argue the PSR amount loss would be

25     actually $2,000, as the government contends it is in their own

16:42 1   exhibit today.  Thank you, Your Honor.

2          THE COURT:  So, Ms. Ramm, as you understand it from

3   the 302, Mr. Guillot received some containers, but he had no

4   records of the amount he paid for them or the amount it cost

5   him to fix them -- it cost his entity to fix them.  So he

6   estimated in the email to Mr. Keagle that it was around $2,000?

7          THE WITNESS:  Correct.

8          THE COURT:  Okay.

9          MR. LOPEZ:  Judge, I do apologize.  I have been given

10  an instruction.  I have to come back --

11         THE COURT:  Yes, sir.

12         MR. LOPEZ:  -- to the death -- to the trial across the

13  street.  I apologize to all the parties.

14         THE COURT:  Give me five more minutes.  Okay?

15         MR. LOPEZ:  I understand, Your Honor.

16         THE COURT:  So I find by a preponderance of the

17  evidence that the amount owed in restitution to Mr. Guillot is

18  $2,000.

19         And to be clear, Mr. Keagle, the government withdrew

20  the request for restitution by Mr. Mancuso.

21         MR. KEAGLE:  That's correct, Judge.

22         THE COURT:  Okay.  Because there is neither a loss nor

23  a restitution that can be established by a preponderance of the

24  evidence.

25         MR. KEAGLE:  Correct, Judge.

16:44 1          THE COURT:  Fair enough.  So this is a good point to

2    break.  I will see you all at 9:00 tomorrow morning, okay?

3    Thank you.  Thank you, ma'am.  Thank you very much.  See you

4    tomorrow.

5          MR. SERWATKA:  Your Honor, can we leave the stuff

6    here?

7          THE COURT:  Yes, sir, yeah, Ms. Subia, Ms. Morales, if

8    you could come forward, please.

9          MR. LOPEZ:  Your Honor, I have done my best to go

10   through all of the exhibits.  And if I have seen anything that

11   had to do with addresses, phone numbers, or any identifiers on

12   the victim impact, I have redacted them myself.  I will tell

13   the Court that all of that has been done.

14         THE COURT:  Thank you.  I appreciate that.  Thank you.

15   You are free to go.

16                         *  *  *  *  *  *

17

18

19

20

21

22

23

24

25

GOVERNMENT'S EVIDENCE
WITNESS:
NICOLE RAMM
    Direct Examination by Mr. Keagle ...............7
    Cross-Examination by Mr. Burk .................56
    Cross-Examination by Mr. Solis ................59
    Cross-Examination by Mr. Burk .................72
    Cross-Examination by Mr. Solis ................74
    Cross-Examination by Mr. Burk .................79
    Cross-Examination by Mr. Burk .................85
    Redirect Examination by Mr. Keagle ............88
    Cross-Examination by Mr. Burk .................91
    Cross-Examination by Mr. Solis ................92
    Cross-Examination by Mr. Burk .................94
    Cross-Examination by Mr. Solis ................96
    Recross-Examination Mr. Burk ..................98
    Cross-Examination by Mr. Burk ................104
    Cross-Examination by Mr. Burk ................107
    Cross-Examination by Mr. Solis ...............110
    Cross-Examination by Mr. Burk ................112
    Cross-Examination by Mr. Solis ...............117
    Cross-Examination by Mr. Burk ................131
    Cross-Examination by Mr. Burk ................136
    Cross-Examination by Mr. Burk ................139
    Cross-Examination by Mr. Solis ...............140
    Cross-Examination by Mr. Burk ................150
    Cross-Examination by Mr. Solis ...............154
    Cross-Examination by Mr. Burk ................159
    Cross-Examination by Mr. Burk ................162
    Cross-Examination by Mr. Solis ...............162

COURT'S RULING ON JONES ..................................69
COURT'S RULING ON JONES ..................................71
COURT'S RULING ON MILLER .................................78
COURT'S RULING ON MILLER .................................84
COURT'S RULING ON CARBONE ................................90
COURT'S RULING ON SIMPSON AND WADE .......................93
COURT'S RULING ON RAO ....................................95
COURT'S RULING ON LU ....................................100
COURT'S RULING ON OLSON .................................107
COURT'S RULING ON REAGENT WORLD .........................112
COURT'S RULING ON ALLEN AND GEIS ........................129
COURT'S RULING ON STUART ................................136
COURT'S RULING ON RICHTER ...............................138
COURT'S RULING ON WASHINGTON ............................148
COURT'S RULING ON LEACH .................................158
COURT'S RULING ON DEPOFI ................................162
COURT'S RULING ON GUILLOT ...............................169

| EXHIBITS: | Offered | Admitted |
|---|---|---|
| Government | | |
| 01-14 Restitution | 52 | 54 |
| 16-39 Restitution | 52 | 54 |
| 40      Summary of Restitution | 53 | 54 |

| EXHIBITS: | Offered | Admitted |
|---|---|---|
| Defense | | |
| Burk 1 Documents | 143 | |
| Day 1  Spreadsheet | 71 | 72 |
| Day 11 Frank Mancuso | 167 | 168 |

C E R T I F I C A T E

    I certify that the foregoing is a correct transcript from

the record of proceedings in the above-entitled matter.  I

further certify that the transcript fees and format comply with

those prescribed by the Court and the Judicial Conference of

the United States.


Signature: /s/Nalene Benavides          Date:  September 29, 2023
           Nalene Benavides, RMR, CRR